Catherine Kilduff (CA Bar No. 256331)
Kristen Monsell (CA Bar No. 304793)
Miyoko Sakashita (CA Bar No. 239639)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, St. #800
Oakland, CA 94612
Phone: (510) 844-7100
Facsimile: (510) 844-7150
ckilduff@biologicaldiversity.org
kmonsell@biologicaldiversity.org
miyoko@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

# UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF CALIFORNIA

CENTER FOR BIOLOGICAL DIVERSITY, a non-profit organization,

     Plaintiff,

v.

GINA RAIMONDO, Secretary of Commerce, and NATIONAL MARINE FISHERIES SERVICE,

     Defendants.

Case No. 22-

**COMPLAINT FOR DECLARATORY AND OTHER RELIEF**

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

**INTRODUCTION**

1.      Plaintiff Center for Biological Diversity brings this action under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. §§ 1361-1423h, against the Secretary of Commerce Gina Raimondo and the National Marine Fisheries Service (collectively, "the Fisheries Service") for failing to ensure that commercial fisheries do not jeopardize the continued existence of, or cause more than a negligible impact to, threatened and endangered humpback whales. Specifically, Plaintiff challenges Defendants' unlawful authorizations under the ESA and MMPA to take humpback whales in the Washington/Oregon/California sablefish pot fishery ("Pot Fishery"). *Id.* §§ 1536(a)(2), 1371(a)(5)(E).

2.       Entanglement in commercial fishing gear is one of the primary threats to the recovery of imperiled humpback whales. The most recent annual estimates of mortality and serious injury of humpback whales off California, Oregon, and Washington are 48.6 from human activities, of which at least 25.2 are from fisheries. This represents a *400 percent increase* in humpback whale mortality and serious injury from human activities since 2018 estimates.

3.      The Pot Fishery entangles humpback whales. When humpback whales get tangled in sablefish pot gear, they can drown or die of starvation or infection. The lines can wrap around a whale, sometimes anchoring the whale in place and drowning or severely injuring it. Other times the whale swims away with the gear dragging behind it, causing painful constrictions of the rope and sapping the whale's energy.

4.      Sablefish pots sit on the bottom of the ocean and are connected to each other in approximately two-mile-long strings of 15 to 50 pots. Each of the string's ends is connected to a vertical line to a surface buoy. The gear sometimes soaks for long periods.

5.      Despite the nearly 50 humpback whales annually killed or seriously injured by human activities off the U.S. West Coast, the Fisheries Service has not issued regulations to reduce humpback whale mortality and serious injury from either of the primary threats – commercial fishing or vessel strikes – since the listing of the Central America distinct population segment ("DPS") and the threatened Mexico DPS under the ESA in 2016.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

6.      The Fisheries Service's authorization, permitting, oversight, and management of the Pot Fishery has caused, and will likely continue to cause, the death and injury of threatened and endangered humpback whales.

7.      In October 2020 Defendants issued an inadequate biological opinion that failed to comply with the ESA and the Administrative Procedure Act. Specifically, the 2020 Biological Opinion failed to include the best available science. 16 U.S.C. § 1536(a)(2), (b)(4)(C)(iii).

8.      The Fisheries Service's continued authorization and management of the Pot Fishery in reliance on the fundamentally flawed 2020 Biological Opinion violates the agency's substantive duty under Section 7 of the ESA to ensure that the actions it authorizes are not likely to jeopardize the continued existence of humpback whales. 16 U.S.C. § 1536(a)(2).

9.      On December 8, 2021, the Fisheries Service unlawfully issued a MMPA permit for the taking of threatened and endangered humpback whales in the Pot Fishery ("2021 Permit"). 86 Fed. Reg. 69,627 (Dec. 8, 2021). The 2021 Permit is based on a faulty negligible impact determination that failed to consider fishing gear mortality other than that which is attributable to the Pot Fishery, and arbitrarily failed to base its determination on the most recent scientific information regarding humpback whale populations. Further, the Fisheries Service issued the 2021 Permit without developing or having completed a take reduction plan, which is a pre-requisite for issuance of such permits. 16 U.S.C. §1371(a)(5)(E).

10.     Accordingly, Plaintiff seeks a declaration that Defendants' 2020 Biological Opinion violates the ESA and that Defendants' 2021 Permit violates the MMPA. Plaintiff also seeks mitigation measures to protect humpback whales from further unlawful death, injury, and other harm due to Defendants' illegal actions and omissions.

**JURISDICTION, VENUE, and INTRADISTRICT ASSIGNMENT**

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1346 (action against the United States); 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty); 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments and grant relief in cases of actual controversy); 16 U.S.C. § 1540(g) (ESA citizen suit provision); and 5 U.S.C. § 702 (Administrative Procedure Act).

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

12.     Plaintiff provided Defendants with notice of Plaintiff's intent to sue over the ESA violations alleged in this Complaint more than 60 days ago. Defendants have not remedied these violations of law.

13.     Venue is proper in the Northern District of California pursuant to 16 U.S.C. § 1540(g)(3)(A) because the ESA violations are occurring in this district and pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred here.

14.     Pursuant to Civil Local Rule 3-2(c) and 3-2(d), the appropriate intradistrict assignment of this case is either to the San Francisco Division or the Oakland Division.

## PARTIES

### Plaintiff

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a national nonprofit conservation organization that works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is dedicated to the preservation, protection, and restoration of biodiversity and ecosystems throughout the world. The Center has more than 89,600 members.

16.     The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species are properly protected from destructive practices in our oceans. In pursuit of this mission, the Center has been actively involved in securing ESA protections for imperiled marine mammals and protecting whales and other wildlife from deadly and harmful entanglement in commercial fishing gear.

17.     Center members live in and regularly visit ocean waters, bays, beaches, and other coastal areas to observe, photograph, study and otherwise enjoy humpback whales and their habitat. Center members have an interest in whales, marine mammals, and other wildlife and their Pacific Ocean habitat; including waters off California, Oregon, and Washington. For example, Center members frequently sail, kayak, and go on humpback whale-watching tours in Gulf of the Farallones, Half Moon Bay, Monterey Bay, and the Santa Barbara Channel to look for and photograph humpback whales and other wildlife. Center members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefit from the presence of humpback whales,

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

and their habitat. One Center member took her young daughter whale watching in Monterey Bay in September 2021 and saw many humpbacks. She enjoyed her trip but felt sad to see multiple humpbacks with entanglement scars. She and other Center members intend to continue to use and enjoy the habitat of humpback whales frequently and on an ongoing basis in the future.

18.     Entanglements of humpback whales in the Pot Fishery kills and harms animals that Center members enjoy viewing. The Fisheries Service's failure to comply with the ESA makes it less likely that Center members will be able to observe, study, and enjoy these animals. Additionally, Center members reasonably fear that they will see a humpback whale entangled in fishing gear when recreating and visiting California's beaches and ocean waters.

19.     An integral aspect of the Center's members' use and enjoyment of humpback whales is the expectation and knowledge that the species are in their native habitat. For this reason, the Center's members' use and enjoyment of humpback whales is entirely dependent on the continued existence of healthy, sustainable populations in the habitat off the Pacific Coast. The Fisheries Service's failure to comply with applicable environmental laws deprives humpback whales of statutory protections that are vitally important to the species' survival and eventual recovery. The Fisheries Service's failure to prepare an adequate biological opinion under the ESA diminishes the aesthetic, recreational, spiritual, scientific, and other interests of the Center and its members because humpback whales are more vulnerable to harm and less likely recover absent the protections that result from those actions. The Center and its members are therefore injured because the Center's use and enjoyment of the humpback whales, and those areas inhabited by them, are threatened by the Fisheries Service's ongoing authorization of the Pot Fishery without compliance with environmental law.

20.     The Center's members' above-described cultural, spiritual, aesthetic, recreational, scientific, educational, and other interests have been, are being and, unless the relief prayed herein is granted, will continue to be adversely affected and irreparably injured by the Fisheries Service's continued refusal to comply with obligations under the ESA, the MMPA, and other laws. The relief sought in this case will redress these injuries.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

21.     In addition, the Center's members regularly comment on agency actions that affect wildlife off California and the West Coast, including humpback whales, and regularly comment on and participate in the Fisheries Service's decisions affecting threatened and endangered species. Rules regarding fishing, the management of national marine sanctuaries, and offshore energy development all have the potential to impact humpback whales. The Fisheries Service's failure to comply with the ESA and MMPA, specifically by failing to use the best available science, ensure against jeopardy, and adequately assess the impact of the Pot Fishery, deprives them of these rights to understand and comment on agency activities' impacts on humpback whales, and causes them informational injuries that would be redressed by a favorable decision.

### Defendants

22.     Defendant GINA RAIMONDO, U.S. Secretary of Commerce, is the highest-ranking official within the Department of Commerce and, in that capacity, has responsibility for its administration and implementation of the ESA and for compliance with all other federal laws applicable to the Department of Commerce. She is sued in her official capacity.

23.     Defendant NATIONAL MARINE FISHERIES SERVICE is an agency within the Department of Commerce. The National Marine Fisheries Service is the agency which implements the ESA and the MMPA.

### LEGAL BACKGROUND

### Endangered Species Act

24.     With the ESA, Congress intended endangered species to be afforded the highest of priorities. The ESA's purpose is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

25.     Under the ESA, conservation means "to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id*. § 1532(3).

26.     Section 7(a)(2), 16 U.S.C. § 1536(a)(2), is a critical component of the statutory and regulatory scheme to conserve endangered and threatened species. It requires that every federal

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

agency must determine whether its actions "may affect" any endangered or threatened species. If so, the action agency must formally consult with the Fisheries Service as part of its duty to "insure that [its] action is . . . not likely to jeopardize the continued existence" of that species. *Id.* § 1536(a)(1), (2); 50 C.F.R. § 402.14 (2019). The term "jeopardize" is defined as an action that "reasonably would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (2019).

27.    At the completion of formal consultation, the Fisheries Service will issue a biological opinion that determines if the agency action is likely to jeopardize the species. 16 U.S.C. §1536(b)(3)-(4); 50 C.F.R. § 402.14(h). In formulating the biological opinion, the Fisheries Service must use only "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

28.    The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of the "current status of the listed species," the "effects of the action," and the "cumulative effects." 50 C.F.R. § 402.14(g)(2), (g)(3).

29.    "Effects of the action" include both direct and indirect effects of an action "that will be added to the environmental baseline." *Id.* § 402.02. The "environmental baseline" includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." *Id.* "Cumulative effects" include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id.*

30.    Thus, in issuing a biological opinion, the Fisheries Service must consider not just the isolated share of responsibility for impacts to the species traceable to the activity that is the subject of the biological opinion, but also the effects of that action when added to all other activities and influences that affect the status of that species.

31.    After the Fisheries Service has added the direct and indirect effects of the action to

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

the environmental baseline and cumulative effects, it must make its determination of "whether the action is likely to jeopardize the continued existence of a listed species." 16 U.S.C. § 1536(b)(3), (b)(4); 50 C.F.R. § 402.14(h). A likelihood of jeopardy is found when "an action [] reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Recovery is defined as "improvement in the status of listed species to the point at which listing is no longer appropriate." *Id.*

32.  A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but will result in take incidental to the agency action must include an incidental take statement. 16 U.S.C. § 1536(b)(4).

33.  The incidental take statement must specify the amount or extent of incidental taking on such listed species, "reasonable and prudent measures" that the Fisheries Service considers necessary or appropriate to minimize such impact and set forth "terms and conditions" that must be complied with by the action agency to implement the reasonable and prudent measures. *Id.*; 50 C.F.R. § 402.14(i). Additionally, when the listed species to be incidentally taken are marine mammals, the take must first be authorized by the Fisheries Service pursuant to the MMPA, and the incidental take statement must include any additional measures necessary to comply with the MMPA take authorization. *Id.*

34.  The ESA generally prohibits any person, including both private persons and federal agencies, from "taking" any endangered species, such as, in this case, humpback whales. 16 U.S.C. § 1538(a)(1). The term "take" is defined by the ESA to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." *Id.* § 1532(19). The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under section 9 of the ESA. *Id.* § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(5).

35.  If the Fisheries Service determines in its biological opinion that the action is likely to jeopardize the continued existence of a listed species, the biological opinion must include "reasonable and prudent alternatives" to the action that will avoid jeopardy. 16 U.S.C.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

7

§ 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3).

36.     Regardless of the conclusion reached in the biological opinion, the agency undertaking the federal action has an independent duty to ensure that its actions are not likely to jeopardize the continued existence of listed species. 16 U.S.C. § 1536(a)(2). An agency's reliance on a legally flawed biological opinion to authorize an action does not satisfy its substantive duty to ensure against jeopardy.

37.     The ESA specifies that Section 7 consultation must typically be completed within ninety days after initiation. 16 U.S.C. § 1536(b)(1); 50 C.F.R. § 402.14(e). The substantive duty to ensure against jeopardy of listed species remains in effect regardless of the status of the consultation.

38.     The ESA defines the term "species" to include "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16).

39.     The Central America distinct population segment of humpback whales is listed as endangered under the ESA, 50 C.F.R. § 224.101 (2016), and the Mexico distinct population segment of humpback whales is listed as threatened, *id*. § 223.102 (2016). The prohibition on the take of endangered species under the ESA applies to the threatened Mexico humpback whales. *Id*. § 223.213 (2016).

**Marine Mammal Protection Act**

40.     Congress enacted the MMPA in 1972 in response to widespread concern that large numbers of marine mammals were being killed through interactions with commercial fisheries. Congress found that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). The policy behind the MMPA is that "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id*. § 1361(2).

41.     The primary mechanism by which the MMPA protects marine mammals is through the implementation of a moratorium on the take of marine mammals. *Id*. § 1371(a). "Take" is

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

defined broadly by the MMPA to mean "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture or kill any marine mammal." *Id.* § 1362(13).

42.     In addition, the MMPA requires the Fisheries Service to prepare a "stock assessment" for each marine mammal population in U.S. waters, documenting the population's abundance and trend, describing the fisheries that interact with the stock, and estimating the level of "mortality and serious injury" caused by those fisheries each year. 16 U.S.C. § 1386(a). The Fisheries Service defines "serious injury" as "any injury that will likely result in mortality." 50 C.F.R. § 229.2 (1995). The MMPA requires the Fisheries Service to review stock assessments at least annually for stocks which are specified as strategic stocks, like the humpback whale, and revise the stock assessment if the status of the stock has changed or can be more accurately determined. 16 U.S.C. § 1386(c).

43.     Based on the stock assessment, the agency must estimate the "potential biological removal" ("PBR") level for each stock, *id.* § 1386(a), defined as the maximum number animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population. *Id.* § 1362(20).

44.     The MMPA also requires that the Fisheries Service annually publish a list of commercial fisheries, classifying each fishery as a Category I, II, or III fishery. *Id.* § 1387(c)(1). Category I fisheries are those that cause "frequent incidental taking of marine mammals"; Category II fisheries are those that cause "occasional incidental mortality and serious injury of marine mammals"; and Category III fisheries are those that have "a remote likelihood of or no known incidental mortality or serious injury of marine mammals." *Id*

45.     The MMPA established a Marine Mammal Commission. *Id.* § 1401. The duties of the Commission include recommending to the Fisheries Service the steps that "it deems necessary or desirable for the protection and conservation of marine mammals." *Id.* § 1402(a). The MMPA requires the Fisheries Service either to adopt the recommendation or respond "with a detailed explanation of the reasons why those recommendations were not followed or adopted." *Id.* § 1402(d).

46.     The MMPA established regional scientific review groups. *Id*. § 1386(d). The

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

MMPA states that the scientific review groups shall advise the Fisheries Service on, *inter alia*, "population estimates and the population status and trends" of marine mammal stocks, "research needed to identify modifications in fishing gear and practices likely to reduce the incidental mortality and serious injury of marine mammals in commercial fishing operations," and other any other issue that the Fisheries Service of the groups consider appropriate. *Id*.

47.     The MMPA defines the term "population stock" or "stock" as "a group of marine mammals of the same species or smaller taxa in a common spatial arrangement, that interbreed when mature." *Id*. § 1362(11). Based on the management objectives of the MMPA, the Fisheries Service has determined that stocks should represent demographically independent populations.

48.     The Fisheries Service has defined the California/Oregon/Washington stock ("CA/OR/WA stock") to include humpback whales that feed off the U.S. West Coast. Off California and Oregon, the feeding group includes whales from the endangered Central America, which almost exclusively use this area to feed, and threatened Mexico DPSs. Off Washington and southern British Columbia, the feeding group includes primarily threatened Mexico DPS whales, with smaller numbers of endangered Central America DPS humpbacks and of unlisted Hawaii DPS humpbacks.

49.     The Fisheries Service considers the CA/OR/WA stock a "strategic stock" under the MMPA because it is listed on the Endangered Species Act. *See id*. § 1362(19).

### *Permitting Commercial Fisheries' Incidental Take*

50.     The MMPA contains limited exceptions to its broad prohibition on take. Section 101(a)(5)(E) of the MMPA allows the Fisheries Service to permit take incidental to commercial fishing from marine mammal species or stocks listed as threatened or endangered under the ESA *only if* the Fisheries Service determines that:

> (I) the incidental mortality and serious injury resulting from fishery
>
> operations will have a negligible impact on such species or stock;
>
> (II) a recovery plan has been developed or is being developed for such
>
> species or stock pursuant to the ESA, and

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

(III) a monitoring program is established and a take reduction plan has been

or is being developed for such species or stock pursuant to 16 U.S.C. § 1387.

16 U.S.C. § 1371(a)(5)(E).

51.     According to the committee report for the legislation creating this permit, "the 'negligible impact' standard in the MMPA is more stringent than the 'no jeopardy' standard in the ESA, and consequently provides more protection for endangered or threatened marine mammals under the MMPA than under the ESA." H.R. Rep. No. 103-439 (1994).

52.     For fisheries for which the Fisheries Service makes a "negligible impact determination" under clause (I) above, "if, during the course of the commercial fishing season, the [Fisheries Service] determines that the level of incidental mortality or serious injury . . . has resulted or is likely to result in an impact that is more than negligible on the endangered or threatened species or stock, the [Fisheries Service] shall use the emergency authority granted under section 1387" to prescribe regulations that reduce incidental mortality and serious injury in that fishery. 16 U.S.C. §1371(a)(5)(E)(iii).

### *Monitoring Program Required by the MMPA*

53.     With respect to the monitoring program required under clause (III) of Section 101(a)(5)(E), the MMPA states that the Fisheries Service "shall establish a program to monitor incidental mortality and serious injury of marine mammals during commercial fishing operations." *Id.* § 1387(d)(1). The program's purposes "shall be to—(A) obtain statistically reliable estimates of incidental mortality and serious injury; (B) determine the reliability of reports of incidental mortality and serious injury [submitted by fishermen]; and (C) identify changes in fishing methods or technology that may increase or decrease incidental mortality and serious injury." *Id.*

54.     The Fisheries Service may place observers on board vessels as necessary, *id.* at § 1387(d)(2), and "may establish an alternative observer program to provide statistically reliable information on the species and number of marine mammals incidentally taken. . . . [that] may include direct observation of fishing activities from vessels, airplanes, or points on shore." *Id.* at § 1387(d)(5).

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

11

*Take Reduction Plan*

55.     With respect to the take reduction plan required under clause (III) of section 101(a)(5)(E) to issue authorization of incidental take of ESA-listed marine mammals, the Fisheries Service must develop a take reduction plan for each strategic stock that interacts with a commercial fishery that the Fisheries Service has identified as causing frequent or occasional mortality and serious injury of marine mammals, i.e. Category I and II fisheries, respectively. *Id.* § 1387(f)(1).

56.     The Fisheries Service must establish a take reduction team "[a]t the earliest possible time (not later than 30 days) after the Secretary issues a final stock assessment … for a strategic stock." *Id.*  § 1387(f)(6)(A). For any stock in which incidental mortality and serious injury from commercial fisheries exceeds the potential biological removal level, "the plan shall include measures the Secretary expects will reduce, within 6 months of the plan's implementation, such mortality and serious injury to a level below the potential biological removal level." *Id.* § 1387(f)(5)(A).

57.     Congress provided strict deadlines for the team to develop a draft plan that the Fisheries Service must amend, approve, and implement as necessary to comply with the MMPA. *Id.* § 1387(f)(7), (8).

**Administrative Procedure Act**

58.     The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-706, provides for judicial review of final agency action. Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed. . . ." *Id.* § 706(1). The APA also requires that a reviewing court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

**FACTUAL AND PROCEDURAL BACKGROUND**

59.     The humpback whale (*Megaptera novaeangliae*) is an ESA-listed species that has been, and is being, taken by the Fisheries Service's authorization and management of the Pot Fishery.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

1

2

**Imperiled Humpback Whales**

3

60.     Humpback whales were listed as endangered in 1970 under the Endangered

4

Species Conservation Act—the precursor to the ESA—and as endangered under the ESA upon its

5

enactment in 1973. 35 Fed. Reg. 18,319 (Dec. 2, 1970). Entanglement in fishing gear is the most

6

frequently identified source of human-caused injury or mortality to the species.

7

61.     The Fisheries Service reclassified the globally listed humpback whale species into

8

14 different distinct population segments ("DPS") in 2016. 81 Fed. Reg. 62,259 (Sept. 8, 2016).

9

Two of those populations are found in waters off California and Oregon: the Central America

10

DPS and the Mexico DPS. *Id.* The Fisheries Service listed the Central America DPS as

11

endangered and the Mexico DPS as threatened. *Id.* at 62,269; 50 C.F.R. § 17.11 (2016).

12

62.     Humpback whales in the Central America DPS generally migrate from their winter

13

breeding grounds off Central America to feed almost exclusively off California and Oregon in

14

spring and summer. The Fisheries Service determined the Central America DPS is endangered

15

based, in part, on the continuing, ongoing threat of entanglement in fishing gear. Vessel strikes

16

and entanglement in fishing gear are considered likely to moderately reduce the population size or

17

growth rate of the Central America DPS. In 2021, a scientist working for the Fisheries Service

18

updated the abundance estimate of the Central America DPS and concluded it contained about

19

750 individuals.

20

63.     The Central America DPS breeding grounds – along the Pacific coast of Costa

21

Rica, Panama, Guatemala, El Salvador, Honduras, and Nicaragua – occupy a unique ecological

22

setting. The Fisheries Service determined this DPS is a discrete population based on sightings

23

data and significant genetic differentiation between it and other North Pacific populations. The

24

genetic composition of this DPS is unique also in that it shares some DNA with Southern

25

Hemisphere humpback whale DPSs, suggesting it may serve as a conduit for gene flow between

26

the North Pacific and the Southern Hemisphere.

27

64.     The Central America DPS is in danger of extinction. Loss of the Central America

28

DPS would result in a significant gap in the range of humpback whales as a species. The potential

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

13

for its imminent extinction warrants caution in assessing impacts of take.

65.     The Mexico DPS consists of whales that breed along the Pacific coast of mainland Mexico in winter, migrate through the Baja California Peninsula coast and feed across a broad geographic range from California to the Aleutian Islands in the summer and spring, with concentrations in California and Oregon.

66.     The Fisheries Service determined the Mexico DPS is threatened because the estimate of 3,264 Mexico DPS humpback whales is more reliable than the higher estimates that were not DPS-specific. Id. at 62,305. In 2021 a scientist working for the Fisheries Service updated the abundance estimate of the Mexico DPS and concluded it contained about 2,900 individuals.

67.     Five biologically important feeding areas for humpback whales exist off California. These areas include waters from San Francisco Bay to Monterey Bay, Morro Bay, and parts of the Santa Barbara Channel. Humpback whales are generally present in these areas during the spring, summer, and fall, but can be found off California in every month of the year.

**The Pot Fishery**

68.     The Fisheries Service implements the Pacific Coast Groundfish Fishery Management Plan, 50 C.F.R. § 660.10 (2010), which uses measures like quotas, area restrictions, and gear specifications to manage over 100 different species that primarily live on or near the ocean bottom. Sablefish are one of six species of "groundfish" covered in the Plan.

69.     The Washington/Oregon/California Pot Fishery uses pots (or "traps"), heavy-duty fishing line, and buoys. The gear is configured so that multiple heavy pots are fished, linked along the seafloor, with ends marked at the surface by one or more buoys attached to a line that runs through the water column. The heavy pots can weigh hundreds of pounds.

70.     Approximately 155 vessels fish in the Pot Fishery off Washington, Oregon, and California. From 2015 to 2019, those vessels fished an annual average of approximately 75,000 pots.

71.     Landings indicate that concentrated fishing areas exist off Astoria, OR; Newport, OR; Fort Bragg, CA; and San Francisco, CA. While fishing occurs year-round, landings of

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

14

1    groundfish in the Pot Fishery are highest from May through December.

2        72.    Some vessels in the Pot Fishery fished in the Dungeness crab fishery in 2015 and

3    2016, especially vessels in Fort Bragg, California. The Dungeness crab fishery closure in 2016

4    due to naturally-occurring toxins caused additional vessels from the Dungeness crab fishery to

5    switch to the Pot Fishery for that season.

6        73.    In 2009 the Fisheries Service designated the Pot Fishery as a Category II fishery

7    for humpback whales, meaning it causes "occasional" mortality and serious injury of humpback

8    whales, based on a reported humpback whale with numerous sablefish pots trailing in 2006 off

9    Monterey, California. 73 Fed. Reg. 33,760, 33,772 (2009); *see also* 86 Fed. Reg. 3029, 3041,

10   3043 (Jan. 14, 2021).

11       74.    Central California is a known "hot spot" for humpback whale activity, especially

12   from April through November. Fishing in this area at this time increases the risk of the Pot

13   Fishery's whale entanglements.

14       75.    The rate of entanglements of large whales in fishing gear reported off the West

15   Coast has increased dramatically since 2014. Since 2000, the Fisheries Service has confirmed 289

16   large whale entanglements in fishing gear. Pot gear has become the most commonly identified

17   gear type associated with entanglement reports, representing 32 percent, or 92 instances, of

18   confirmed reports. The Fisheries Service estimated that the Pot Fishery has entangled more than

19   one humpback whale every year since 2003 and entangled an estimated 3.26 humpbacks in 2016.

20       76.    In 2016 the Fisheries Service received the highest number of large whale

21   entanglement reports in its history (53 entangled humpbacks, 91 percent of which were confirmed

22   reports). These results represent a minimum estimate of entanglement events.

23       77.    Scientists estimated based on a scar study that at a minimum, 45 percent of

24   humpback whales in California and Oregon and 33 percent in Washington and British Columbia

25   have been entangled in fishing gear.

26       78.    Entanglement reports most frequently came from Monterey, California. Whale

27   entanglement reports are opportunistic and are likely biased towards areas of higher human

28   populations and areas where whale species are closer to shore. Most pot fisheries are not observed

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

or have observers on a very low percent of the vessels, as in the Pot Fishery.

**The Pot Fishery's Humpback Whale 2020 Biological Opinion**

79.     The 2020 Biological Opinion purports to analyze the effects of the Pot Fishery on endangered Central America DPS and threatened Mexico DPS of humpback whales. The 2020 Biological Opinion defines the agency action as the Fisheries Service's continuing implementation of the Pacific Coast Groundfish Fishery Management Plan.

*Humpback Whale Population Estimates*

80.     The 2020 Biological Opinion states that the population trend for the Central America DPS is unknown yet assumed that the positive growth rates of U.S. West Coast humpback whales as a whole reflects growth of the DPS. The Central America DPS population growth could differ given its relatively small population size and other unique demographic factors. Nevertheless, the Fisheries Service assumed the DPS has increased by six percent annually in the past 15 years, yielding a current abundance estimate of 1,876 individual whales.

81.     The Fisheries Service concluded that the most recent estimated abundance of the Central America DPS (about 750 whales) by a Fisheries Service scientist is not a reliable estimate, in part because the data are more than eight years old. The data used for this estimate comes from the ocean basin-wide study referred to as the ''Structure of Populations, Levels of Abundance, and Status of Humpbacks'' or the "SPLASH study," which was a significant effort undertaken in coordination with ten countries that involved the collection of both photo-identification and genetic data during three breeding seasons (2004, 2005, and 2006) and over two feeding seasons (2004, 2005) in known breeding and feeding areas.

82.     The SPLASH study underpinned the Fisheries Service's abundance estimate of the Central America DPS when it was listed as endangered in 2016, despite the data being more than eight years old. 81 Fed. Reg. at 62,287.

83.     The Fisheries Service relied on the SPLASH study again in 2021 to estimate movement probabilities of each particular DPS and designate critical habitat for humpback whales. 86 Fed. Reg. 21,082, 21,097 (Apr. 21, 2021). The notice for the final critical habitat rule

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

stated that the Fisheries Service continues "to find that this information—i.e., the estimated number or proportion of whales from the listed DPS within a feeding region—to be . . . part of the best available data regarding habitat use by the listed DPSs." *Id.*

84. The 2020 Biological Opinion, however, concluded that there have been changes in the abundance and/or distribution of humpback whales DPSs and generated new estimates of current abundance and distribution of the listed DPSs. It assumes that the "probability rates in summer feeding areas off of CA/OR estimated by [using the SPLASH study data] are outdated."

85. The 2020 Biological Opinion tries to explain the Fisheries Service's change in position since its decision to list the DPSs on the ESA by saying that humpback whales have increased between six and seven percent annually over the last 30+ years, yet the Fisheries Service knew this at the time it listed the Central America DPS as endangered and the Mexico DPS as threatened.

86. An increase in humpback whales off the U.S. West Coast could be due to several factors other than an increase in the populations of the Central American and Mexico DPSs, including an influx of animals into the region from neighboring areas such as southeast Alaska. The 2020 Biological Opinion did not consider these factors that potentially contradict the assumption of population increases.

### *Scientific Papers Assessing the Pot Fishery's Humpback Whale Entanglement Risk*

87. The Fisheries Service has published scientific papers assessing the Pot Fishery's entanglement risk for humpback whales that it did not consider in the 2020 Biological Opinion.

88. Saez et al. (2013) performed an entanglement risk assessment for eleven fisheries, including the Pot Fishery. The Pot Fishery tied for the third-highest entanglement risk for humpback whales.

89. Feist et al. (2015) overlaid the predicted densities of humpback whales with data for commercial fishing effort in the West Coast groundfish fishery, including the Pot Fishery. The authors, all Fisheries Service scientists, characterized the study as an important first step "in generating formal risk assessments for quantification of the impacts of various fishing fleets on populations of cetacean species that occur in the California Current."

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

17

90.     The Feist et al. (2015) paper identified management changes – specifically the Fisheries Service's incentives to move from trawl gear to pot gear beginning in 2011 – that increased concentration of the Fishery in regions of high humpback whale density like Morro Bay. The changes "may increase the time and area that is currently fished . . . potentially having negative effects on whales" (Feist et al. 2015).

91.     The 2020 Biological Opinion fails to consider changes in management measures that occurred in the Fishery and potential impacts to humpback whales. Feist et al. (2015) said that "it is clear that it is a time of flux for the west coast groundfish fishery, and these changes have implications for the risks to cetaceans posed by these fleets." Yet the Biological Opinion did not consider or evaluate these changes.

92.     The 2020 Biological Opinion unlawfully failed to consider the Fishery Service's own scientific data about the humpback whale entanglement risk for the Pot Fishery. The information in the papers describe the areas and seasons in which the Pot Fishery operates that result in the highest entanglement risk, thus is important both to assess impact and evaluate mitigation measures.

*Increases in Vessel Strike Threats to Humpback Whales*

93.     Since the listing of the Central America DPS and the threatened Mexico DPS in 2016, estimates of human-caused humpback whale mortality and serious injury off the U.S. West Coast has increased from about 5.5 humpback whales annually to nearly 50 humpback whales annually.

94.     The 2020 Biological Opinion does not consider the best available science regarding the mortality and serious injuries from vessel strikes in its environmental baseline. It estimates vessel strikes kill 2.2 humpbacks per year. The best available scientific information estimates that vessel strikes kill 35 humpback whales from January to November off California alone.

95.     The Fisheries Service anticipated that the threat of human-caused mortality and serious injuries from vessel strikes will continue to occur into the future.

96.     The Fisheries Service has not issued regulations to reduce humpback whale

COMPLAINT FOR DECLARATORY AND OTHER RELIEF                                    18

mortality and serious injury off the U.S. West Coast from either of the primary threats –
commercial fishing or vessel strikes – since the listing of the Central America DPS and the
threatened Mexico DPS in 2016.

97.     The 2020 Biological Opinion fails to include reasonable and prudent measures that
will minimize humpback take. Instead, it requires that the Fisheries Service "monitor the [Pot
Fishery] to ensure compliance with the regulatory and conservation measures included in the
proposed action and the identified amount or extent of incidental take, including collection and
evaluation of data on the capture, injury, and mortality of humpback whales."

98.     The terms and conditions include a Fisheries Service feasibility study for gear
marking; review of the terms of reference for a humpback-related work group; observer coverage
to provide humpback whale bycatch estimates; and a review of the utility and benefit of electronic
monitoring.

### The 2021 Permit Authorizing Take Under the MMPA

99.     Five years after the expiration of the Pot Fishery's most recent MMPA permit, the
Fisheries Service proposed and finalized the 2021 Permit for the Fishery. 86 Fed. Reg. 69,627.

#### *The Negligible Impact Determination Relied on an Outdated Stock Definition*

100.    In making its negligible impact determination, the Fisheries Service analyzed the
impact to the CA/OR/WA stock of humpback whales. The Fisheries Service's own scientists have
said that the stock definition is outdated because of the identification of the Central America and
Mexico DPSs.

101.    The Fisheries Service's guidance on revising stock assessment reports states that
the stock, or "population stock," is the fundamental unit of legally-mandated conservation. The
guidance also proposes that when "information becomes available that appears to justify a
different stock structure or stock boundaries, it may be desirable to include the new structure or
boundaries as 'prospective stocks'" in the stock assessment report, and include calculations of the
prospective PBR for each new stock. Despite this guidance, the Fisheries Service has neither
revised the definition of the CA/OR/WA stock of humpback whales nor identified a prospective

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

stock and its PBR.

102.    Grouping multiple DPSs into the CA/OR/WA stock of humpback whales increases the stock's abundance and PBR, which is the biological threshold that triggers management action under the MMPA.

103.    On or before December 8, 2021, the Fisheries Service finalized a technical memorandum evaluating humpback whales wintering in Central America and Southern Mexico as a demographically independent population under the MMPA.

104.    In other cases where mortality or serious injury cannot be ascribed to a particular marine mammal stock, the entire take within the area of the stock's overlap is applied to each marine mammal stock separately. If the Fisheries Service applied that method in its negligible impact determination, the estimates of takes of Central America DPS humpbacks and perhaps the Mexico DPS would exceed PBR and not meet the negligible impact criteria.

*The Negligible Impact Determination Considered Only Mortality and Serious Injury Attributed to the Pot Fishery*

105.    The Fisheries Service concluded the Pot Fishery would have a negligible impact on the ESA-listed humpback whales. 86 Fed. Reg. 69,627. The agency reached this determination even though since 2009, the Fisheries Service's estimate of mortality and serious injury of humpback whales from all commercial fisheries has increased almost ten-fold.

106.    Below is a table of the estimates of (a) PBR (the biological-based threshold), (b) serious injuries and mortality of the CA/OR/WA stock of humpback whales from commercial fisheries, and (c) from all human activities.

| Notice of Final Stock Assessment Report | PBR, U.S. waters | Mortality + Serious Injury, U.S. Commercial Fisheries | All U.S. Human-Caused Mortality + Serious Injury |
|---|---|---|---|
| 71 Fed. Reg. 26,340 (May 4, 2006) | 2.3 | > 1.2 | > 1.6 |
| 74 Fed. Reg. 19,530 (Apr. 29, 2009) | 2.5 | ≥ 2.6 | ≥ 2.6 |
| 76 Fed. Reg. 34,054 (June 10, 2011) | 11.3 | ≥ 3.2 | ≥ 3.6 |

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

20

| 80 Fed. Reg. 50,599 (Aug. 20, 2015) | 11 | ≥ 4.4 | ≥ 5.5 |
| 83 Fed. Reg. 32,093 (July 11, 2018) | 11 | ≥ 7.6 | 9.2 |
| 85 Fed. Reg. 46,589 (Aug. 3, 2020) | 16.7 | ≥ 17.3 | 42.1 |
| 86 Fed. Reg. 58,887 (Oct. 25, 2021) | 28.7 | ≥ 25.2 | 48.6 |

107.    The Fisheries Service's draft 2021 stock assessment report said that if methods were available to correct for undetected serious injury and mortality, total fishery mortality and serious injury would likely exceed PBR.

108.    Thus, mortality from commercial fisheries alone is likely exceeding the level of serious injury and mortality that the CA/OR/WA stock of humpback whales may withstand without impairing its ability to reach or maintain its optimum sustainable population. *See* 16 U.S.C. § 1362(20).

109.    In making its negligible impact determination, the Fisheries Service relied on the approach for determining negligible impact in Procedural Directive 02–204–02, "Criteria for Determining Negligible Impact under MMPA section 101(a)(5)(E)," which became effective on June 17, 2020.

110.    The Fisheries Service considered only the mortality and serious injury attributed to the Pot Fishery in making the negligible impact determination. The Fishery Service failed to tally or otherwise consider mortality and serious injury (a) from unspecified pot fisheries; (b) unidentified other fisheries; and (c) state-managed pot fisheries.

111.    In contrast, in 2013 the Fisheries Service tallied the mortality and serious injuries from state-managed fisheries in its negligible impact determination. 78 Fed. Reg. 54,553, 54,558 (Sept. 4, 2013).

112.    More than half of all commercial fisheries' humpback mortalities and serious injuries are from unidentified fisheries (13.55 annually). This is over five times the Fisheries Service's negligible impact threshold for a single fishery (13.55 / 2.48 = 5.46). The Fisheries Service failed to tally or otherwise consider this large source of commercial fishing mortality in its negligible impact determination.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF                                    21

113.     Because of the piecemeal approach to the negligible impact analysis, the Fisheries Service unlawfully authorized incidental take in the Pot Fishery without implementing any mitigation measures to reduce or avoid the risk that the Pot Fishery will entangle, injure, and kill humpback whales.

*The Fisheries Service's Determination Regarding a Take Reduction Plan*

114.     The Fisheries Service has neither implemented nor is developing a take reduction plan for the Pot Fishery under section 118 of the MMPA.

115.     The Fisheries Service first authorized the mortality and serious injury of ESA-listed humpback whales in the Pot Fishery in 2013, 78 Fed. Reg. 54,553. At that time the Marine Mammal Commission recommended that the Fisheries Service take affirmative steps to develop a take reduction plan for the Pot Fishery before issuing the permit. *Id.* at 54,557. But the Fisheries Service deferred the development of the take reduction plan and proceeded to issue the MMPA permit. *Id.*

116.     While issuing the 2013 permit, the Fisheries Service noted that the Pot Fishery's biological opinion dated December 7, 2012, required the creation of a work group with a duty to propose conservation and management measures to minimize bycatch of protected species, including humpback whales. *Id.* The work group is not a substitute for a take reduction team.

117.     The work group met four times between 2015 and 2021. At the work group's 2019 meeting, it stated that it understood that "no specific actions are being taken or are imminent in terms of conservation and management measures to minimize humpback whale entanglements." At its meeting in 2021, the work group did not provide any recommendations regarding management measures for humpback whales. The Fisheries Service has not implemented any management measures to minimize the take of humpback whales in the Pot Fishery.

118.     In 2017, the Fisheries Service proposed issuing a permit to authorize the incidental take of the CA/OR/WA stock of humpback whales in the Pot Fishery. 82 Fed. Reg. 2,954 (Jan. 10, 2017). In that notice the Fisheries Service stated that it intended to continue to defer the development of a take reduction plan for the Pot Fishery. *Id.* at 2,959.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

22

119.    Likewise, in 2021 the Fisheries Service deferred the development of a take reduction plan under MMPA section 118. 86 Fed. Reg. at 69,629.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**

**Violation of the Endangered Species Act and Administrative Procedure Act**

**(Unlawful Biological Opinion)**

120.    Paragraphs 1 through 119 are hereby realleged as though set out in full.

121.    The 2020 Biological Opinion is a final agency action within the meaning of the APA.

122.    The 2020 Biological Opinion is arbitrary, capricious, and contrary to law in that it is not based on the best scientific and commercial data available. The Fisheries Service entirely ignored relevant factors and failed to analyze and develop projections based on information and methodology that was available, in violation of the ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. § 706(2)(A).

123.    The 2020 Biological Opinion is arbitrary, capricious, and contrary to law in that it fails to determine whether the action, in combination with the environmental baseline and cumulative effects, will jeopardize the species, in violation of the ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; *id.* § 402.02; 5 U.S.C. § 706(2)(A).

124.    The 2020 Biological Opinion is arbitrary, capricious, and contrary to law in that its incidental take statement fails to include "reasonable and prudent measures" that minimize the impact of incidental take on endangered and threatened humpback whales and set forth "terms and conditions" to implement those reasonable and prudent measures, in violation of the ESA and APA. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i); 5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF**

**Violations of Marine Mammal Protection Act and Administrative Procedure Act**

**(Unlawful Issuance of the 2021 Permit)**

125.    Paragraphs 1 through 119 are hereby realleged as though set out in full.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

126.    The 2021 Permit to authorize the Pot Fishery's incidental take of humpback whales is a final agency action within the meaning of the APA.

127.    The negligible impact determination is arbitrary, capricious, and contrary to law in that it is not based on the best scientific and commercial data available. The Fisheries Service ignored relevant factors and failed to analyze and develop projections based on information and methodology that was available, in violation of the MMPA and the APA. 16 U.S.C. § 1371(a)(5)(E); 50 C.F.R. § 229.20 (1999); 5 U.S.C. § 706(2)(A).

128.    The negligible impact determination is arbitrary, capricious, and contrary to law in that it fails to determine whether the Pot Fishery will have more than a negligible impact on the demographically independent populations and DPSs of affected humpback whales, in violation of the MMPA and the APA. 16 U.S.C. § 1371(a)(5)(E); 50 C.F.R. § 229.20; 5 U.S.C. § 706(2)(A).

129.    The negligible impact determination is arbitrary, capricious, and contrary to law in that it considers only the incidental mortality and serious injury attributed to the Pot Fishery and not also the mortality and serious injury from unspecified pot fisheries; unidentified other fisheries; and state-managed pot fisheries, in violation of the MMPA and the APA. 16 U.S.C. § 1371(a)(5)(E)(i)(I); 50 C.F.R. § 229.20(a)(1); 5 U.S.C. § 706(2)(A).

130.    The determination that the Fisheries Service has developed or is developing a take reduction plan is arbitrary, capricious, contrary to law, and invalid in that the take reduction plan is neither complete nor underway. 16 U.S.C. § 1371(a)(5)(E)(i)(III); 50 C.F.R. § 229.20(a)(3)(iii); 5 U.S.C. § 706(2)(A).

131.    Each of these violations thereby renders the 2021 Permit to authorize the Pot Fishery's incidental take of endangered and threatened humpback whales unlawful.

### THIRD CLAIM FOR RELIEF

**Violation of the Endangered Species Act and Administrative Procedure Act**

**(Unlawful Reliance on 2020 Biological Opinion)**

132.    Paragraphs 1 through 119 are hereby realleged as though set out in full.

133.    The Fisheries Service has a duty as the action agency authorizing and managing the Pot Fishery to ensure that its actions are not likely to jeopardize the continued existence of any

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

ESA-listed species, including humpback whales. 16 U.S.C. §1536(a)(2).

134.    The Fisheries Service cannot rely on the unlawful 2020 Biological Opinion to meet its duty to ensure that its authorization of the Pot Fishery will not jeopardize the Central America DPS or Mexico DPS of humpback whales.

135.    The Fisheries Service's continued authorization and management of the Pot Fishery based on the 2020 Biological Opinion is in violation of section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and reliance on the 2020 Biological Opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with law, contrary to the APA, 5 U.S.C. § 706(2).

**REQUEST FOR RELIEF**

For the reasons stated above, Plaintiff respectfully requests that the Court:

1.    Declare that the Fisheries Service has violated and is violating the ESA, its implementing regulations, and the APA by issuing an inadequate biological opinion;

2.    Declare that the Fisheries Service has violated and is violating the MMPA, its implementing regulations, and the APA by issuing an inadequate negligible impact determination and an invalid permit to authorize incidental take of humpback whales in the Pot Fishery;

3.    Declare that the Fisheries Service is in violation of its ESA section 7(a)(2), 16 U.S.C. § 1536(a)(2), duty to ensure that the agency's continued authorization and management of the Pot Fishery is not likely to jeopardize the continued existence of the Central America DPS and Mexico DPS of humpback whales;

4.    Vacate and set aside the 2020 Biological Opinion;

5.    Vacate and set aside the 2021 Permit to authorize the incidental take of humpback whales under the MMPA;

6.    Issue any appropriate injunctive relief;

7.    Award Plaintiff the costs of this litigation, including reasonable attorneys' fees; and

8.    Provide such other relief as the Court deems just and proper.

COMPLAINT FOR DECLARATORY AND OTHER RELIEF

DATE: January 9, 2022                          Respectfully Submitted,

                                               /s/ Catherine Kilduff

                                               Catherine W. Kilduff (CA Bar No. 256331)

                                               Kristen Monsell (CA Bar No. 304793)
                                               Miyoko Sakashita (CA Bar No. 239639)
                                               CENTER FOR BIOLOGICAL DIVERSITY
                                               1212 Broadway, St. #800
                                               Oakland, CA 94612
                                               Phone: (510) 844-7100
                                               Facsimile: (510) 844-7150

                                               *Attorneys for Plaintiff*

COMPLAINT FOR DECLARATORY AND OTHER RELIEF                                26