Catherine Kilduff (CA Bar No. 256331)
Kristen Monsell (CA Bar No. 304793)
Miyoko Sakashita (CA Bar No. 239639)
Center for Biological Diversity
1212 Broadway, Suite #800
Oakland, CA 94612
Phone: (510) 844-7100
Fax: (510) 844-7150
ckilduff@biologicaldiversity.org
kmonsell@biologicaldiversity.org
miyoko@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | Case No. 3:22-cv-00117-JD |
| *Plaintiff,* | **PLAINTIFF'S NOTICE OF MOTION, MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| v. | |
| GINA RAIMONDO, in her official capacity as Secretary of Commerce; and NATIONAL MARINE FISHERIES SERVICE, | Date:  December 1, 2022 (or another date at the Court's convenience)<br>Time: 10 a.m.<br>Place: Courtroom 11, 19th Floor<br>Judge: Honorable James Donato |
| *Defendants.* | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iii

TABLE OF ACRONYMS AND ABBREVIATIONS ....................................... ix

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................... 1

FACTUAL BACKGROUND .................................................................................. 2

    I.     Humpback Whales ............................................................................... 2

    II.    Commercial Sablefish Pot Fishing Off the U.S. West Coast ................ 3

STANDARD OF REVIEW .................................................................................... 4

ARGUMENT .......................................................................................................... 5

    I.     Plaintiff Has Associational Article III Standing ................................ 5

    II.    NMFS's Issuance of the Permit Violates the MMPA ............................ 5

           A.    Legal Background: The MMPA Requires NMFS to Limit
                 Commercial Fisheries' Impacts on Marine Mammals. .................... 6

           B.    The Negligible Impact Determination Unlawfully Fails
                 to Consider Humpback Whale Entanglements in All
                 Commercial Fisheries. ....................................................................... 8

           C.    NMFS Unlawfully Authorized the Fishery Because No
                 Take Reduction Plan Exists, Nor Is NMFS Developing One. ................ 11

    III.   NMFS Violated the ESA by Failing to Properly Evaluate and
           Minimize the Pot Fishery's Impact on Humpback Whales. ..................... 14

           A.    Legal Background: The ESA Requires NMFS to Analyze
                 and Mitigate Impacts to Humpback Whales. ................................... 14

           B.    NMFS Failed to Properly Analyze the Impacts of the Pot
                 Fishery on Humpback Whales. ......................................................... 16

           C.    NMFS's Biological Opinion Is Unlawful for Failing to
                 Minimize Take. ................................................................................. 18

    IV.   NMFS Failed to Use the Best Available Science. ................................ 20

Plaintiff's Notice, Mot. Summ. J., & Mem. in Supp.
3:22-cv-00117-JD

Page i

A.    The Negligible Impact Determination Is Not Based
on the Best Available Science...................................................... 20

B.    NMFS Failed to Consider the Best Available Science. ........................... 22

V.    NMFS Arbitrarily Relied on the Unlawful Biological Opinion. ......................... 24

VI.    The Court Should Vacate the Biological Opinion and Take Permit.................... 24

CONCLUSION........................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Alaska v. Lubchenco,*
    723 F.3d 1043 (9th Cir. 2013)............................................................... 14

*All. for the Wild Rockies v. U.S. Forest Serv.,*
    907 F.3d 1105 (9th Cir. 2018)............................................................. 4, 25

*Alyeska Pipeline Serv. Co. v. Kluti Kaah Native Vill. of Copper Ctr.,*
    101 F.3d 610 (9th Cir. 1996)................................................................... 5

*Bare v. Barr,*
    975 F.3d 959 (9th Cir. 2020)................................................................... 9

*Bennett v. Spear,*
    520 U.S. 154 (1997).............................................................................. 4

*Brower v. Evans,*
    257 F.3d 1058 (9th Cir. 2001)............................................................... 10

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council,*
    467 U.S. 837 (1984).............................................................................. 5

*City of Arlington v. FCC,*
    569 U.S. 290 (2013)............................................................................ 12

*Coal. to Protect Puget Sound v. Army Corps of Eng'rs,*
    466 F. Supp. 3d 1217 (W.D. Wash. 2020).............................................. 25

*Conner v. Burford,*
    848 F.2d 1441 (9th Cir. 1988)............................................................... 15

*Ctr. for Biological Diversity v. Bernhardt,*
    982 F.3d 723 (9th Cir. 2020)................................................................ 24

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.,*
    422 F. Supp. 2d 1115 (N.D. Cal. 2006) ............................................ 19, 24

*Ctr. for Biological Diversity v. Haaland,*
    998 F.3d 1061 (9th Cir. 2021)............................................................... 11

*Ctr. for Biological Diversity v. Kempthorne,*
    588 F.3d 701 (9th Cir. 2009)................................................................... 5

*Ctr. for Biological Diversity v. Raimondo,*
    No. 1:18-cv-00112-JEB, 2022 WL 2643535 (D.D.C. July 8, 2022) ...................... 11

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) ........................................................................... 4

*Defs. of Wildlife v. Browner*,
   191 F.3d 1159 (9th Cir. 1999) ........................................................................... 5

*Earth Island Inst. v. Brown*,
   865 F. Supp. 1364 (N.D. Cal. 1994) ............................................................... 10

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*,
   528 U.S. 167 (2000) ........................................................................................... 5

*Guidiville Band of Pomo Indians v. NGV Gaming, LTD*,
   531 F.3d 767 (9th Cir. 2008) ........................................................................... 12

*Humane Soc'y of the U.S. v. Locke*,
   626 F.3d 1040 (9th Cir. 2010) ..................................................................... 4, 22

*Hunt v. Wash. State Apple Advert. Comm'n*,
   432 U.S. 333 (1977) ........................................................................................... 5

*In re Gerwer*,
   898 F.2d 730 (9th Cir. 1990) ........................................................................... 13

*Intertribal Sinkyone Wilderness Council v. Nat'l Marine Fisheries Serv.*,
   970 F. Supp. 2d 988 (N.D. Cal. 2013) ............................................................ 23

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*,
   109 F. Supp. 3d 1238 (N.D. Cal. 2015) .......................................................... 25

*Knight v. Comm'r of Internal Revenue*,
   552 U.S. 181 (2008) ..................................................................................... 13, 14

*Kokechik Fishermen's Ass'n v. Sec'y of Com.*,
   839 F.2d 795 (D.C. Cir. 1988) .......................................................................... 6

*Life Techs. Corp. v. Promega Corp.*,
   580 U.S. 140 (2017) ........................................................................................... 9

*Microsoft Corp. v. Comm'r of Internal Revenue*,
   311 F.3d 1178 (9th Cir. 2002) ......................................................................... 12

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ............................................................................................. 4

*Nat. Res. Def. Council v. Evans*,
   364 F. Supp. 2d 1083 (N.D. Cal. 2003) .......................................................... 21

*Nat. Res. Def. Council v. Kempthorne*,
   506 F. Supp. 2d 322 (E.D. Cal. 2007) ............................................................ 23

Plaintiff's Notice, Mot. Summ. J., & Mem. in Supp.
3:22-cv-00117-JD

Page iv

*Nat. Res. Def. Council v. Pritzker,*
  828 F.3d 1125 (9th Cir. 2016) .................................................................. 22

*Nat'l Family Farm Coal. v. U.S. EPA,*
  960 F.3d 1120 (9th Cir. 2020) .................................................................. 25

*Nat'l Wildlife Fed'n v. NMFS,*
  524 F.3d 917 (9th Cir. 2008) ........................................................... *passim*

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) ...................................................................... 4

*Pac. Coast Fed'n of Fishermen's Ass'n v. NMFS,*
  265 F.3d 1028 (9th Cir. 2001) ............................................................ 10, 17

*Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Recl.,*
  426 F.3d 1082 (9th Cir. 2005) .................................................................. 16

*Pac. Ranger, LLC v. Pritzker,*
  211 F. Supp. 3d 196 (D.D.C. 2016) ......................................................... 13

*Pollinator Stewardship Council v. U.S. EPA,*
  806 F.3d 520 (9th Cir. 2015) .................................................................... 25

*Sierra Club v. Marsh,*
  816 F.2d 1376 (9th Cir. 1987) .................................................................. 14

*Tenn. Valley Auth. v. Hill,*
  437 U.S. 153 (1978) .................................................................................. 14

**Statutes**

5 U.S.C. § 706 ............................................................................................... 4

5 U.S.C. § 706(2) ..................................................................................... 1, 24

16 U.S.C § 1361(a)(5) .................................................................................. 19

16 U.S.C. § 1361(1) ....................................................................................... 6

16 U.S.C. § 1361(6) ....................................................................................... 6

16 U.S.C. § 1362(11) ................................................................................... 21

16 U.S.C. § 1362(13) ..................................................................................... 6

16 U.S.C. § 1362(19)(C) ................................................................................ 7

16 U.S.C. § 1362(20) ..................................................................................... 7

16 U.S.C. § 1371(a) .............................................................................................. 6, 10

16 U.S.C. § 1371(a)(2) .............................................................................................. 10

16 U.S.C. § 1371(a)(5)(E) .................................................................................. 1, 6, 21

16 U.S.C. § 1371(a)(5)(E)(i) ........................................................................................ 6

16 U.S.C. § 1371(a)(5)(E)(i)(I) .............................................................................. 9, 21

16 U.S.C. § 1371(a)(5)(E)(i)(II) ................................................................................ 13

16 U.S.C. § 1371(a)(5)(E)(i)(III) .............................................................................. 12

16 U.S.C. § 1371(a)(5)(E)(ii) ...................................................................................... 9

16 U.S.C. § 1372(a) .............................................................................................. 6, 10

16 U.S.C. § 1386(a)(4) ................................................................................................ 18

16 U.S.C. § 1386(c) .................................................................................................... 18

16 U.S.C. § 1387(3)(A) ................................................................................................ 8

16 U.S.C. § 1387(a)(2) ............................................................................................ 6, 8

16 U.S.C. § 1387(b)(4) ................................................................................................ 9

16 U.S.C. § 1387(c)(1)(A)(i)–(ii) ................................................................................ 7

16 U.S.C. § 1387(c)(2) ................................................................................................ 8

16 U.S.C. § 1387(c)(3)(A)(iii)–(iv) ............................................................................ 8

16 U.S.C. § 1387(d)(1) .............................................................................................. 18

16 U.S.C. § 1387(f) .................................................................................................... 12

16 U.S.C. § 1387(f)(1) ........................................................................................ 6, 7, 9

16 U.S.C. § 1387(f)(2) ............................................................................................ 7, 12

16 U.S.C. § 1387(f)(5)–(8) .......................................................................................... 7

16 U.S.C. § 1387(f)(6)(A) .......................................................................................... 13

16 U.S.C. § 1387(f)(7)(A)–(C) .................................................................................. 13

16 U.S.C. § 1387(f)(9)(A)–(B) .................................................................................... 7

16 U.S.C. § 1531(b) .................................................................................................... 14

16 U.S.C. § 1532(19) .................................................................................................... 14

16 U.S.C. § 1532(3) ...................................................................................................... 14

16 U.S.C. § 1533(b)(1)(A) ........................................................................................... 20

16 U.S.C. § 1536(a)(2) ................................................................................. 1, 14, 15, 24

16 U.S.C. § 1536(b)(3)–(4) ........................................................................................... 15

16 U.S.C. § 1536(b)(4) .................................................................................................. 15

16 U.S.C. § 1536(b)(4)(C) ............................................................................................. 16

16 U.S.C. § 1536(b)(4)(iii) ............................................................................................ 19

16 U.S.C. § 1538(a)(1) .................................................................................................. 14

16 U.S.C. § 1371(a)(5)(E) ............................................................................................. 21

**Legislative Material**

H.R. Rep. No. 103-439 (1994), 1994 WL 93670 ...................................................... 7, 10

Pub. L. No. 92-522, § 101(a)(2) (1972) ...................................................................... 10

**Regulations**

50 C.F.R. § 17.11 ............................................................................................................ 2

50 C.F.R. § 216.103 .................................................................................................... 6, 21

50 C.F.R. § 229.2 ................................................................................................ 3, 6, 7, 21

50 C.F.R. § 402.02 ......................................................................................................... 15

50 C.F.R. § 402.14(a) .................................................................................................... 14

50 C.F.R. § 402.14(g)(4) ................................................................................................ 15

50 C.F.R. § 402.14(g)(7) ................................................................................................ 16

50 C.F.R. § 402.14(g)(8) ................................................................................................ 15

50 C.F.R. § 402.14(h)(1) ................................................................................................ 15

50 C.F.R. § 402.14(i)(1) ................................................................................................. 16

50 C.F.R. § 402.14(i)(1)(ii) ............................................................................................ 19

Plaintiff's Notice, Mot. Summ. J., & Mem. in Supp.
3:22-cv-00117-JD

Page vii

50 C.F.R. § 660.219(a)(1) ................................................................ 3

50 C.F.R. §§ 660.10–660.79 ............................................................ 3

**Federal Register Notices**

35 Fed. Reg. 18,319 (Dec. 2, 1970) ................................................ 2

60 Fed. Reg. 45,086 (Aug. 30, 1995) ............................................ 13

61 Fed. Reg. 64,500 (Dec. 5, 1996) .............................................. 10

71 Fed. Reg. 42,809 (July 28, 2006) .............................................. 7

73 Fed. Reg. 33,760 (June 13, 2008) .............................................. 3

78 Fed. Reg. 54,553 (Sept. 4, 2013) .............................. 10, 11, 19

80 Fed. Reg. 22,304 (Apr. 21, 2015) .............................................. 2

81 Fed. Reg. 62,260 (Sept. 8, 2016) ....................................... *passim*

84 Fed. Reg. 54,354 (Oct. 9, 2019) .............................. 18, 23, 24

86 Fed. Reg. 21,082 (Apr. 21, 2021) .............................. 3, 21, 23

86 Fed. Reg. 69,627 (Dec. 8, 2021) ....................................... *passim*

**Other Authorities**

*Develop*, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/develop (last updated July 18, 2022) ............ 12

1

## TABLE OF ACRONYMS AND ABBREVIATIONS

2

3        APA                        Administrative Procedure Act

4        CA/OR/WA stock         California/Oregon/ Washington stock of humpback whales

5        ESA                        Endangered Species Act

6        ITS                        incidental take statement

7        MMPA                 Marine Mammal Protection Act

8        NIT                        negligible impact threshold

9        NMFS                 National Marine Fisheries Service

10       RPM                    reasonable and prudent measure

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

On December 1, 2022, at 10:00 a.m., or as soon as possible thereafter, Plaintiff Center for Biological Diversity will move for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff moves for summary judgment because there is no genuine dispute as to any material fact and Plaintiff is entitled to judgment as a matter of law.

Plaintiff seeks an order declaring that Defendants Gina Raimondo, in her official capacity as the Secretary of Commerce, and the National Marine Fisheries Service (collectively, "NMFS") violated the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371(a)(5)(E), Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), and Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), in authorizing the Washington/Oregon/California sablefish pot fishery ("pot fishery") to entangle, injure, and kill (i.e., "take") endangered humpback whales. Plaintiff also seeks an order vacating the take permit issued under the MMPA ("Permit") and associated biological opinion issued under the ESA ("Biological Opinion"). This Motion is based on the Notice of Motion; the supporting Memorandum of Points and Authorities and declarations attached hereto; all pleadings and documents on file in this action; and such oral and documentary evidence as may be presented at or before any hearing on the Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Entanglement in commercial fishing gear is one of the most significant threats to imperiled humpback whales. Entanglement rates have significantly increased since 2014. BiOp_4492. In fact, the most recent annual estimates of humpback whale mortality off the U.S. West Coast represents a *four-fold* increase in fisheries-related mortalities since 2017. MMPA_0019 (25.2 mortalities); 82 Fed. Reg. 2954, 2957 (Jan. 10, 2017) (5.6 mortalities). Yet NMFS authorized the pot fishery to entangle, injure, and kill two populations of humpback whales without requiring *any* measures to minimize entanglement risk. That authorization is the subject of this case.

Specifically, Plaintiff challenges NMFS's authorization of the pot fishery without ensuring the fishery will have no more than a negligible impact on the endangered Central

America and threatened Mexico humpback whale populations as required by the MMPA, and will not jeopardize the whales' continued existence as required by the ESA. The agency's actions and inactions in issuing the MMPA Permit and Biological Opinion threaten the survival and recovery of these humpback whales and undermine congressional intent that NMFS prioritize the protection of these imperiled species. NMFS failed to require measures to avoid risk to humpback whales and instead allows intense fishing when humpback whales are present off the West Coast in the greatest numbers.

Summary judgment is appropriate here where the record shows that NMFS disregarded the law. NMFS issued the MMPA Permit without analyzing the impact of humpback whale mortality in all commercial fisheries and without a take reduction plan in place or in development, in violation of the MMPA's plain language. NMFS's Biological Opinion failed to accurately assess and mitigate the harm of the pot fishery on humpback whales as the ESA requires. Finally, NMFS arbitrarily inflated the abundance of ESA-listed humpback whale populations when making its negligible impact determination and no jeopardy conclusion.

## FACTUAL BACKGROUND

### I.   Humpback Whales

Humpback whales are known for their acrobatic displays, long pectoral flippers, and songs. 80 Fed. Reg. 22,304, 22,308 (Apr. 21, 2015). Their fins and tails are so distinctive that scientists can identify individual whales. *Id*. Humpback whales were listed as endangered upon the enactment of the ESA. 35 Fed. Reg. 18,319 (Dec. 2, 1970). In 2016, NMFS reclassified humpback whales into 14 distinct population segments ("populations"). 81 Fed. Reg. 62,260 (Sept. 8, 2016); 50 C.F.R. § 17.11. Two of these populations feed in and migrate through waters off California and Oregon—the endangered Central America population and the threatened Mexico population. 81 Fed. Reg. at 62,305–06. These two populations, and one more, the delisted Hawaii population, feed off Washington. *Id*. at 62,304–06. NMFS named the populations after the location of their winter breeding grounds. *See id*. at 62,283.

NMFS listed the Central America population as endangered in part due to its high risk of extinction because there are so few whales remaining. *Id*. at 62,287, 62,307. The agency

determined that entanglement in fishing gear and ship strikes are the two primary threats to the survival and recovery of the population. *Id*. at 62,307. NMFS listed the Mexico population as threatened largely because of ongoing fishing gear entanglements. *Id*. at 62,286, 62,305.

Humpback whales typically feed off the West Coast during the spring, summer, and fall, but they are present year-round. BiOp_0133; *see also* BiOp_7671, Table 2 (humpback whale entanglements every month of 2016). NMFS identified California and Oregon as the "primary foraging destination" for the Mexico population, 86 Fed. Reg. 21,082, 21,124 (Apr. 21, 2021), and as the almost-exclusive feeding grounds of the Central America population. 81 Fed. Reg. at 62,306.

## II.    Commercial Sablefish Pot Fishing Off the U.S. West Coast

According to NMFS, the commercial sablefish pot fishery operates primarily during the season when whales occur off California and Oregon in the highest numbers. *See, e.g.*, BiOp_0136 (fishing data is "dominated by effort occurring during the whale season when entanglement risks are highest"). Approximately 150 vessels fish approximately 75,000 pots each year. MMPA_0410; BiOp_5494 (Table 7).

The pot fishery sets strings of traps, or "pots," along the seafloor. BiOp_8843; MMPA_0018. Surface buoys mark each end of the string via a vertical rope rising through the water column. 50 C.F.R. § 660.219(a)(1). These ropes can then catch on a whale and wrap around its body, which can cause severe injury, infections, starvation, and drowning. BiOp_0125; BiOp_0140. In 92 percent of the cases where human intervention does not occur, humpback whale entanglements result in death or serious injury.[1] BiOp_0141.

To manage the pot fishery, NMFS implements the Pacific Coast Groundfish Fishery Management Plan, 50 C.F.R. §§ 660.10–660.79; issues permits that allow fishing to occur; and designates the pot fishery as a "Category II" fishery, meaning it causes "occasional" mortality of humpback whales. 86 Fed. Reg. 69,627 (Dec. 8, 2021); 73 Fed. Reg. 33,760, 33,772 (June 13, 2008); 50 C.F.R. § 229.2. In October 2020 NMFS issued a biological opinion purporting to

---

[1] "Serious injury" means "any injury that will likely result in mortality." 50 C.F.R. § 229.2. For simplicity, in this brief "deaths" or "mortalities" includes serious injuries.

analyze whether its continued authorization of the fishery is likely to jeopardize the continued existence of humpback whales. BiOp_0085–167 ("Biological Opinion"). The Biological Opinion finds the fishery will cause multiple humpback whale mortalities each year. BiOp_0147. Nevertheless, NMFS concluded that the fishery will not jeopardize either the endangered Central America population or the threatened Mexico population. BiOp_0146. In December 2021, NMFS issued an MMPA permit allowing the fishery to kill threatened and endangered humpback whales via entanglements in the gear used in the fishery. 86 Fed. Reg. at 69,627 ("Permit").

## STANDARD OF REVIEW

Section 706 of the APA governs judicial review of NMFS's Permit and Biological Opinion. 5 U.S.C. § 706; *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1047 (9th Cir. 2010) (review of an MMPA permit arises under the APA); *Bennett v. Spear*, 520 U.S. 154, 175–79 (1997) (review of a biological opinion arises under the APA). "Under the APA, courts shall 'hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1112 (9th Cir. 2018) (citation omitted).

The APA requires courts "to engage in a substantial inquiry," consisting of "a thorough, probing, in-depth review." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citation omitted). Even where an agency with "special expertise" acts "within its area of expertise," a court "need not defer to the agency when the agency's decision is without substantial basis in fact." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1067 (9th Cir. 2018) (citations omitted). An agency's decision is arbitrary and capricious if it "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Importantly, a court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

Interpretation of a statute is a question of law. *Alyeska Pipeline Serv. Co. v. Kluti Kaah Native Vill. of Copper Ctr.*, 101 F.3d 610, 612 (9th Cir. 1996). When reviewing an agency's interpretation, the first step is to consider "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 842 (1984).

Courts "employ 'traditional tools of statutory construction' to determine" congressional intent. *Defs. of Wildlife v. Browner*, 191 F.3d 1159, 1162 (9th Cir. 1999) (citation omitted). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43. If Congress has not spoken to the issue, or if Congress's intent is unclear, courts then consider the agency's interpretation and give it effect only if it is permissible. *Id.* at 843.

## ARGUMENT

### I.   Plaintiff Has Associational Article III Standing

Plaintiff has standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000) (discussing "injury-in-fact"); *see also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–45 (1977) (describing associational standing test); *Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 707–08 (9th Cir. 2009) (finding standing to challenge MMPA take authorization). Plaintiff's mission is to protect wildlife, including humpback whales. Cummings Decl. ¶¶ 3, 5. Plaintiff's members value, observe, study, and otherwise enjoy seeing humpback whales. Bevington Decl. ¶¶ 7, 11–15, 17; Hartl Decl. ¶¶ 6, 9. Plaintiff's members are injured by NMFS's issuance of the MMPA Permit and Biological Opinion that allow the pot fishery to injure and kill humpback whales without adequately analyzing or mitigating such impacts. Bevington Decl. ¶¶ 13, 19, 21, 23–24; Hartl Decl. ¶ 10. A favorable decision would redress these injuries.

### II.   NMFS's Issuance of the Permit Violates the MMPA.

NMFS's issuance of the Permit violates the MMPA's plain language in multiple ways. First, NMFS's negligible impact determination fails to consider the high level of humpback whale mortality from other commercial fisheries. Second, NMFS issued the Permit despite the fact there is no take reduction plan in place to reduce entanglements, nor is one being developed.

1

2

### A.      Legal Background: The MMPA Requires NMFS to Limit Commercial Fisheries' Impacts on Marine Mammals.

3

Congress enacted the MMPA to address the concern that "certain species and population

4

stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of

5

man's activities," and to help "protect[] and encourage[]" marine mammals "to develop to the

6

greatest extent feasible." 16 U.S.C. § 1361(1), (6). "The interest in maintaining healthy

7

populations of marine mammals comes first" under the statute. *Kokechik Fishermen's Ass'n v.*

8

*Sec'y of Com.*, 839 F.2d 795, 800, 802 (D.C. Cir. 1988).

9

To accomplish its goals, the MMPA establishes a moratorium on the "taking" of marine

10

mammals. 16 U.S.C. §§ 1371(a), 1372(a). It prohibits actions that harass, capture, or kill marine

11

mammals, *id.* § 1362(13), and specifically requires NMFS "to assist in the recovery or prevent

12

the depletion" of marine mammals that "interact[] with a commercial fishery." *Id.* § 1387(f)(1).

13

The MMPA contains limited exceptions to the broad take prohibition. Sections

14

101(a)(5)(E) and 118 establish separate but related requirements for authorizing commercial

15

fishing operations to take a species like the humpback whale that is protected under both the

16

ESA and MMPA. 16 U.S.C. §§ 1371(a)(5)(E), 1387(a)(2).

17

Under section 101(a)(5)(E), NMFS can authorize the incidental take of ESA-listed

18

marine mammals by commercial fishing operations for a three-year period provided it

19

determines, after public notice and comment, that:

20

21

(I)      the incidental mortality and serious injury from commercial fisheries will have a negligible impact on [the] species or stock;

(II)     a recovery plan has been or is being developed for such species or stock pursuant to the [ESA]; and

22

23

(III)    where required under section 118…, a monitoring plan is established…, vessels engaged in such fisheries are registered in accordance with such section, and a take reduction plan has been developed or is being developed.

24

*Id.* § 1371(a)(5)(E)(i).

25

A "[n]egligible impact is an impact resulting from the specified activity that cannot be

26

reasonably expected to, and is not reasonably likely to, adversely affect the species or stock

27

through effects on annual rates of recruitment or survival." 50 C.F.R. § 216.103; *see id.* § 229.2

28

(MMPA regulations for fisheries stating "[n]egligible impact has the same meaning as in

§ 216.103"). In creating the MMPA "negligible impact standard," Congress specified that it "is more stringent than the 'no jeopardy' standard in the ESA, and consequently provides more protection for endangered or threatened marine mammals under the MMPA than under the ESA." H.R. Rep. No. 103-439, at 30 (1994), 1994 WL 93670.

Section 118, in turn, requires NMFS to publish a list of fisheries that cause "frequent" or "occasional" mortality and serious injury to marine mammals, identified as Category I and II fisheries, respectively. 16 U.S.C. § 1387(c)(1)(A)(i)–(ii); 50 C.F.R. § 229.2. NMFS categorized the sablefish pot fishery as a Category II fishery due to interactions with humpback whales. 86 Fed. Reg. at 69,627.

Section 118 also requires NMFS to develop a "take reduction plan" for each "strategic stock" of marine mammals that interacts with a Category I or II fishery. 16 U.S.C. § 1387(f)(1). The humpback whale is a strategic stock under the MMPA. *See id.* § 1362(19)(C); 86 Fed. Reg. at 69,629. The "immediate goal" of a take reduction plan for a strategic stock is to reduce commercial fishery-related mortality and serious injury to below a species' "potential biological removal level"[2] within six months. 16 U.S.C. § 1387(f)(2). The "long-term goal" of such plan is to reduce mortality and serious injury to levels approaching zero "within 5 years of its implementation[.]" *Id.* The statue prescribes specific procedures and various timelines with which NMFS must comply in developing and implementing such plans. *See, e.g.*, *id.* § 1387(f)(5)–(8). It further specifies that such plans can include regulations that "restrict commercial fisheries by time or area" or "require the use of alternative commercial fishing gear or techniques." *Id.* § 1387(f)(9)(A)–(B). In this way, the plans play a vital role in helping to accomplish the MMPA's overall goal of protecting marine mammals. *See, e.g.*, 71 Fed. Reg. 42,809 (July 28, 2006) (after implementing a take reduction plan for the drift gillnet fishery, "overall cetacean mortality in this fishery has been reduced considerably.").

---

[2] Potential biological removal level (or "PBR") is "the maximum number animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20).

1    Under Section 118, each fishing vessel owner engaged in a Category I or II fishery must

2    obtain NMFS's permission to be exempt from the MMPA's take prohibition. 16 U.S.C.

3    § 1387(c)(2), (3)(A). Additionally, each owner must comply with reporting requirements and

4    "any applicable take reduction plan" NMFS establishes. *Id*. § 1387(c)(3)(A)(iii)–(iv). When an

5    ESA-listed marine mammal is involved, both sections 101(a)(5)(E) and 118 apply. *Id*.

6    § 1387(a)(2).

7    **B.    The Negligible Impact Determination Unlawfully Fails to Consider
          Humpback Whale Entanglements in All Commercial Fisheries.**

8

9    NMFS's negligible impact determination is unlawful for considering only the level of

10   humpback whale mortality from the pot fishery and not also considering the extent of mortality

11   from other commercial fisheries. This violates the MMPA's plain language. NMFS's arbitrary

12   piecemeal approach to its negligible impact analysis means NMFS authorized the pot fishery to

13   incidentally kill humpback whales, even though commercial fisheries mortality for humpback

14   whales is already occurring at a level well above what Congress prescribed.

15   Entanglement in commercial fishing gear is one of the primary threats to the recovery of

16   imperiled humpback whales. BiOp_4341. Yet NMFS found entanglements in the pot fishery

17   would be "negligible." To make this determination, NMFS employed a "Tier 2" analysis, which

18   "compares each individual fishery's [level of mortality] for a particular stock to" the negligible

19   impact threshold, or NITs. 86 Fed. Reg. at 69,628–29. "If NITs is not exceeded, then the

20   commercial fishery is determined to have a negligible impact on that particular stock." *Id*. at

21   69,628. NMFS thus limited the negligible impact analysis to the pot fishery, rather than

22   considering the mortality level from all U.S. commercial fisheries. Here, the NITs for

23   humpbacks is 2.48 whale deaths per year and the estimated annual level of humpback whale

24   mortality in the pot fishery is 1.9, so NMFS determined that the fishery has a negligible impact

25   on the whales. *Id*. at 69,629; MMPA_0020. This is improper.

26

27

28

1    To illustrate the problem, NMFS has determined that U.S. commercial fisheries cause at

2  least 25 humpback whale mortalities each year.[3] MMPA_0701. This is *more than ten times*

3  NMFS's negligible impact threshold for a single fishery (25/2.48 = 10.08). Yet NMFS failed to

4  tally or otherwise consider whether humpback populations can sustain this level of commercial

5  fishery deaths. This approach is inconsistent with section 101(a)(5)(E)(i)(I)'s plain language as

6  well as its conservation purposes. 16 U.S.C. § 1371(a)(5)(E)(i)(I).

7    First, the MMPA requires NMFS to determine that "the incidental mortality and serious

8  injury *from commercial fisheries* will have a negligible impact." *Id.* (emphasis added). While the

9  use of the plural can include the singular, a statute's "text, context, and structure" can

10  demonstrate "that when Congress said [a word in the] plural, it meant plural, and when it said [a

11  word in the] singular, it meant singular." *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 151

12  (2017). This is one of those situations.

13    Congress's use of the singular elsewhere in the statute, including elsewhere in section

14  101(a)(5), shows that its use of the plural in 101(a)(5)(E)(i)(I) was intentional. *See, e.g.*, 16

15  U.S.C. §§ 1371(a)(5)(E)(ii) (referring to "*a* commercial fishery") (emphasis added), 1387(b)(4)

16  (same), 1387(f)(1) (same); *Life Techs. Corp.*, 580 U.S. at 150 (noting distinction between

17  Congress's use of "'components,' plural," and "'any component,' singular," in the same statutory

18  provision); *see also Bare v. Barr*, 975 F.3d 959, 968 (9th Cir. 2020) (courts "must presume that

19  Congress intended a different meaning when it uses different words in connection with the same

20  subject." (citation omitted)). NMFS does not have the discretion to treat the phrase "commercial

21  fisheries" as though it was written in the singular by myopically looking only at the impacts from

22  the pot fishery.

23    Second, considering the deaths from all commercial fisheries before allowing any

24  individual fishery to kill an endangered marine mammal is the only reading consistent with the

25  purposes of the MMPA. An "unquestionable primary purpose of the MMPA is to … replenish

---

26
27  [3] As NMFS has acknowledged, "entanglement totals do not represent all cases due to incomplete
detection of incidents[.]" MMPA_0699. NMFS has stated said that "if methods were available to
28  correct for undetected serious injury and mortality, total [humpback whale] fishery mortality and
serious injury would likely exceed PBR." MMPA_0703.

any depleted species." *Earth Island Inst. v. Brown*, 865 F. Supp. 1364, 1370 (N.D. Cal. 1994). From its enactment in 1972, the MMPA embodied this purpose by prohibiting the unauthorized take of all marine mammals, 16 U.S.C. §§ 1371(a), 1372(a), and establishing "the immediate goal that the incidental kill or incidental serious injury of marine mammals permitted in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate." *Id.* § 1371(a)(2); *see also* Pub. L. No. 92-522, § 101(a)(2) (1972). If NMFS only had to consider the impacts of an individual fishery in authorizing the death of marine mammals incidental to operation of that fishery, this statutory purpose would never be realized. Thus, this "construction should be avoided because it would lead to absurd results." *Brower v. Evans*, 257 F.3d 1058, 1067 (9th Cir. 2001) (citation omitted).

The MMPA's legislative history confirms this reading. In enacting section 101(a)(5)(E), Congress stated that it intended the "negligible impact" standard to be a stricter standard that the "jeopardy" standard of the ESA. H.R. Rep. No. 103-439, at 30. Just as NMFS must "aggregate[]" the impacts "of individual projects … to ensure that their cumulative effects are perceived and measured" when conducting a jeopardy analysis, *Pac. Coast Fed'n of Fishermen's Ass'n v. NMFS*, 265 F.3d 1028, 1036–37 (9th Cir. 2001), NMFS must consider the totality of impacts from commercial fisheries in conducting a negligible impact determination. Otherwise, not only would the negligible impact standard fail to be stricter than the no jeopardy standard of the ESA, it could also allow "a listed [marine mammal] species [to] be gradually destroyed, so long as each step on the path to destruction is sufficiently modest." *Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008).

Consistent with the MMPA's plain language—and contrary to its approach here—NMFS has previously "considered the impacts of all commercial fishery operations in making its negligible impact determinations" because "section 101(a)(5)(E)(i) of the MMPA refers to commercial fisheries in the plural." 61 Fed. Reg. 64,500, 64,502 (Dec. 5, 1996). This includes the only other time NMFS authorized take under the MMPA for the pot fishery. 78 Fed. Reg. 54,553, 54,558 (Sept. 4, 2013). In conducting that analysis "NMFS considered *all* fishery-related serious injury and mortality to … humpback … whales in making its negligible impact

determination." *Id.* (emphasis added); *see also id.* (noting the agency included "mortalities attributed to the state-managed fisheries … in the tallies of take in the negligible impact determination analysis."). The agency's departure from that approach is arbitrary, particularly where NMFS failed to acknowledge its change in position or explain the reasons for its reversal. *See Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021) ("When an agency changes its position, it must (1) display[ ] awareness that it is changes its position, (2) show 'the new policy is permissible under the statute, (3) believe[ ] the new policy is better, and (4) provide good reasons for the new policy." (citation and internal quotation marks omitted)).[4]

Yet under its new approach, NMFS ignored the documented level of mortality from all other fisheries, including other pot fisheries; entanglements where the specific fishery responsible is unknown; and state managed fisheries. *See* BiOp_8794 (sources of confirmed humpback whale entanglements). NMFS's piecemeal analysis is unlawful. *Cf. Ctr. for Biological Diversity v. Raimondo*, No. 1:18-cv-00112-JEB, 2022 WL 2643535, *11 (D.D.C. July 8, 2022) ("If the action under review could not be authorized under the MMPA, then the agency was obligated to revise its action to ensure any anticipated take would be lawfully authorized and appropriately minimized to meet the antecedent requirement." (citation and internal quotation marks omitted)).

## C.   NMFS Unlawfully Authorized the Fishery Because No Take Reduction Plan Exists, Nor Is NMFS Developing One.

NMFS's issuance of the Permit is also unlawful as there is no applicable take reduction plan in place, nor is one in development. NMFS's approach allows the agency to authorize the pot fishery to kill endangered and threatened humpback whales without *any* mitigation measures being in place or any intent to develop such measures in the near future. NMFS's interpretation contravenes the MMPA's purpose and structure and has absurd results Congress did not intend.

The language of the MMPA is clear regarding threatened and endangered whales: prior to authorizing any incidental take, NMFS must determine "a take reduction plan has been

---

[4] While NMFS recently developed new guidance for how to analyze negligible impacts, that guidance does not acknowledge (let alone explain) NMFS's change in position regarding its interpretation of "commercial fisheries" in section 101(a)(5)(E). *See* MMPA_1219–39.

1    developed or is being developed" if one is required under section 118. 16 U.S.C.

2    § 1371(a)(5)(E)(i)(III). Section 118 requires NMFS to develop a take reduction plan for each

3    "strategic stock" that interacts with a Category I or II fishery. *Id.* § 1387(f)(2). The humpback

4    whales are a "strategic stock," MMPA_00702, and the pot fishery is a Category II fishery. 86

5    Fed. Reg. at 69,627. Thus, section 118 requires NMFS to develop a take reduction plan to reduce

6    the risk of humpback whale mortality in this fishery.

7          There is no take reduction plan in place for the pot fishery. Nor is one in development.

8    NMFS nevertheless determined this criterion was satisfied because, "[b]ased on [the agency's]

9    priorities, implementation of a [take reduction plan] for the … fishery is currently deferred." 86

10   Fed. Reg. at 69,629; *see also* MMPA_0022 (NMFS's worksheet for the Permit finding this

11   criterion satisfied because a plan is "included on the priority list for development"). This

12   determination is arbitrary. NMFS's issuance of the Permit without a take reduction plan in place

13   or being developed violates the plain language of the MMPA.

14         The phrase "is being developed" is not defined in the statute and should be interpreted

15   based on its "ordinary meaning[]." *Microsoft Corp. v. Comm'r of Internal Revenue*, 311 F.3d

16   1178, 1183 (9th Cir. 2002). The ordinary meaning of the phrase "develop" is "to create or

17   produce" or "to make active." *Develop*, Merriam-Webster, https://www.merriam-

18   webster.com/dictionary/develop (last updated July 18, 2022). The use of the present tense

19   indicates Congress only intended NMFS to allow commercial fisheries to kill marine mammals

20   in situations where NMFS is actively working to create or produce measures to reduce the risk of

21   such occurrences in accordance with the procedures outlined in section 118. *See Guidiville Band*

22   *of Pomo Indians v. NGV Gaming, LTD*, 531 F.3d 767, 775 (9th Cir. 2008) (noting the importance

23   of Congress's use of the present tense in interpreting statutory language and that had Congress

24   intended a different interpretation, "it would have been the simplest of matters to word the statute

25   differently.").

26         The specificity with which Congress detailed how NMFS must go about developing such

27   measures only further demonstrates this point. *See* 16 U.S.C. § 1387(f); *see also City of*

28   *Arlington v. FCC*, 569 U.S. 290, 296 (2013) ("Congress knows to speak in plain terms when it

1   wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."). A

2   plan could be considered "being developed" if NMFS had taken any of the enumerated steps it

3   must follow in developing a take reduction plan, such as establishing a take reduction team or

4   issuing a draft plan. 16 U.S.C. § 1387(f)(6)(A); *see also* 60 Fed. Reg. 45,086, 45,095–96 (Aug.

5   30, 1995). And once NMFS takes these steps, strict statutory deadlines for issuing a final plan

6   apply. *See, e.g.*, 16 U.S.C. § 1387(f)(7)(A)–(C). A plan for which development has been

7   indefinitely deferred cannot qualify as one that "is being developed."

8       This is the only interpretation consistent with the Supreme Court's instruction that

9   exceptions to statutory prohibitions, like the MMPA's prohibition on taking marine mammals, be

10  read "narrowly." *Knight v. Comm'r of Internal Revenue*, 552 U.S. 181, 190–91 (2008) (citation

11  omitted); *see also Pac. Ranger, LLC v. Pritzker*, 211 F. Supp. 3d 196, 217–18 (D.D.C. 2016)

12  ("the incidental-take exception to the [MMPA's] broad take prohibition must be read narrowly,

13  to give effect to Congress's intent that '[t]he interest in maintaining healthy populations of

14  marine mammals comes first[.]'" (citation omitted) (first and third alteration added)). And it is

15  the only reading consistent with the notion that "[t]he express enumeration [of specific

16  exceptions] indicates that other exceptions should not be implied." *In re Gerwer*, 898 F.2d 730,

17  732 (9th Cir. 1990). Section 101(a)(5)(E)(i)(III) identifies the specific, limited situations in

18  which NMFS can issue take permits for commercial fisheries under the MMPA, including (1)

19  where "a take reduction plan has been developed" or (2) where one "is being developed."

20  Deferring development of a plan or placing the fishery on a list for future development—

21  particularly where that list indicates development of a take reduction plan for humpback whales

22  is a "low" priority, ER_0668—is not among them.

23      Indeed, the same "is being developed" language is also in 101(a)(5)(E)(i)(II), which

24  restricts NMFS's ability to issue take authorizations for threatened and endangered species to

25  those for which "a recovery plan has been … or is being developed." 16 U.S.C.

26  § 1371(a)(5)(E)(i)(II). If NMFS's interpretation were correct, all it would have to do to meet this

27  criterion was say it has deferred development of a recovery plan. Such an interpretation, like

28  NMFS's interpretation here, would allow for exceptions that "swallow the general rule"

prohibiting take of endangered marine mammals. *Knight*, 552 U.S. at 191. NMFS's issuance of the Permit thus cannot stand.

### III.    NMFS Violated the ESA by Failing to Properly Evaluate and Minimize the Pot Fishery's Impact on Humpback Whales.

NMFS's issuance of the Biological Opinion violated the ESA. NMFS failed to consider the *additional* impact from the pot fishery on top of the already high level of mortality from other threats and failed to include a proper incidental take statement to minimize entanglements.

#### A.    Legal Background: The ESA Requires NMFS to Analyze and Mitigate Impacts to Humpback Whales.

Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the ESA embodies Congress's "plain intent" to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978). Congress enacted the ESA "to provide a program for the conservation of … endangered species and threatened species." 16 U.S.C. § 1531(b). Through the ESA, "Congress clearly intended that [agencies] give 'the highest of priorities' … to preserving endangered species[.]" *Sierra Club v. Marsh*, 816 F.2d 1376, 1386 (9th Cir. 1987) (citations omitted). The goal of the statute is not to maintain a species on life support indefinitely, but to recover the species to the point where it no longer requires ESA protections. *See* 16 U.S.C. § 1532(3); *Alaska v. Lubchenco*, 723 F.3d 1043, 1054 (9th Cir. 2013).

To accomplish these goals, section 9 prohibits any person from "taking" an endangered species, 16 U.S.C. § 1538(a)(1), defined broadly to include acts that kill, harm, harass, and capture protected animals. *Id*. § 1532(19). A federal agency may authorize actions causing take of threatened or endangered species, "only if the projected take 'is not likely to jeopardize the continued existence of' any listed species." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 878 F.3d 725, 735 (9th Cir. 2017) (quoting 16 U.S.C. § 1536(a)(2)).

The ESA prescribes a consultation process by which a federal agency can meet its substantive no-jeopardy obligation. When an action agency proposes to take any action that "may affect" a listed species, it must consult with the expert wildlife agency delegated responsibility for that species. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Where, as here,

NMFS is both the action agency (for authorizing and managing the pot fishery) and expert wildlife agency, it must undertake intra-agency consultation. Formal consultation ends with NMFS's issuance of a biological opinion, which provides its evaluation of whether the agency action may jeopardize any listed species' continued existence. The ESA requires the consultation process and resulting biological opinion to be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). In doing so, NMFS "cannot ignore available biological information" and must "give the benefit of the doubt to the species." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988) (quoting legislative history). In its jeopardy analysis, NMFS must determine whether the direct and indirect effects of an action—in the context of the existing status of the species, added to the environmental baseline, and taken together with cumulative effects—"is likely to jeopardize the continued existence of a listed species." 50 C.F.R. § 402.14(g)(4), (h)(1); *see* 16 U.S.C. § 1536(b)(3)–(4). The environmental baseline includes "the past and present impacts of all federal, state, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. "Cumulative effects" are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

NMFS cannot simply compare the effects of the agency action on the listed species to other threats; it must consider the status of the species, the impacts of the proposed action added to the environmental baseline and the cumulative effects, and whether these effects in the aggregate are likely to jeopardize a species' survival and recovery. *Nat'l Wildlife Fed'n*, 524 F.3d at 929–30. The requirement to conduct such a comprehensive evaluation is key to ensuring a species does not suffer a "slow slide into oblivion"—"one of the very ills the ESA seeks to prevent." *Id.* at 930.

If the agency action "is reasonably certain" to result in incidental take, the biological opinion must include an incidental take statement ("ITS"). 16 U.S.C. § 1536(b)(4); 50 C.F.R.

§ 402.14(g)(7), (i)(1). The ITS must specify the amount or extent of permitted incidental take, reasonable and prudent measures necessary to minimize the impacts of take, and terms and conditions to implement those measures. 16 U.S.C. § 1536(b)(4)(C); 50 C.F.R. § 402.14(i)(1). When the listed species is a whale, the incidental take must first be authorized pursuant to section 101(a)(5) of the MMPA and the ITS must include any measures necessary to comply with the separate MMPA incidental take authorization. 16 U.S.C. § 1536(b)(4)(C).

**B.   NMFS Failed to Properly Analyze the Impacts of the Pot Fishery on Humpback Whales.**

NMFS's Biological Opinion fails to consider threats to humpback whales in the environmental baseline and when aggregated with other threats. First, the best available science demonstrates that vessel strikes kill at least 22 humpback whales each year. BiOp_1949. NMFS only analyzed the impacts of 2.2 mortalities from vessel strikes each year, BiOp_0122—only the number that were reported and confirmed. BiOp_1949. The failure to account for nearly 20 humpback whale deaths each year violates the ESA. *See Nat'l Wildlife Fed'n*, 524 F.3d at 929 (biological opinion was unlawful because agency "failed to incorporate degraded baseline conditions into its jeopardy analysis").

Second, NMFS never looked at whether the aggregate threats—including 22 vessel strikes each year—plus the pot fishery deaths would cause jeopardy. The correct "analysis is not the proportional share of responsibility the federal agency bears for the decline in the species, but what jeopardy might result from the agency's proposed action in the present and future human and natural contexts." *Pac. Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Recl.*, 426 F.3d 1082, 1093 (9th Cir. 2005) (citations omitted).

The Ninth Circuit has repeatedly rejected jeopardy analyses that fail to consider the impacts of the action under review when *added to* baseline conditions that have already contributed to a species' decline. For example, in *Turtle Island Restoration Network v. U.S. Department of Commerce*, the Ninth Circuit held that NMFS unlawfully minimized the risk of bycatch by basing its determination "on the proportionally low risk that the [longline] fishery poses to the loggerheads relative to other threats." 878 F.3d at 738. This logic defies the ESA,

because "where baseline conditions already jeopardize a species, an agency may not take action

that deepens the jeopardy by causing additional harm." *Id.* at 737 (quoting *Nat'l Wildlife Fed'n*,

524 F.3d at 930); *see also Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 265 F.3d at 1036–

37 (holding that if "individual projects are diluted to insignificance and not aggregated," then

NMFS's "assessment … is tantamount to assuming that no project will ever lead to jeopardy of a

listed species.").

      NMFS took a similarly arbitrary approach in the Biological Opinion at issue here. In the

section titled "Integration and Synthesis," NMFS found that while "baseline impacts from human

activities may be underestimated to some degree," the pot fishery causes "a small fraction

(~10%) of the [mortalities] of Mexico [population of] humpback whales" that are estimated to

occur; and this proportion "will account for an even smaller fraction of the true total amount of

human caused mortality of the Mexico … population that will occur in the future." BiOp_0144;

*see also* BiOp_0145 (using same approach for the Central America population). NMFS analyzed

the impact of the pot fishery using a proportional method—comparing the fishery mortalities to

other threats—and then concluded the pot fishery is not likely to prohibit the continued

population growth toward recovery. BiOp_0144, BiOp_0145–46.

      In making its no jeopardy determination, NMFS nowhere analyzed the effects of the pot

fishery when *combined* with baseline conditions, cumulative impacts, and the status of the

populations. For example, NMFS reached its no-jeopardy determination on the basis that the

Mexico population would experience an average of 15.68 mortalities each year, BiOp_0144, and

the Central America population would experience an average of 10 mortalities each year.

BiOp_0145. But these numbers do not include the estimated "annual ship strike deaths [of] 22

humpback whales." BiOp_1949. Had NMFS included the estimated 22 deaths from ship strikes

in its analysis, the Mexico population would experience an annual average of 27.76 mortalities

and the Central America population would experience an annual average of 17.71 mortalities.

This is *a 77 percent increase* in annual mortality for both populations than the level NMFS

Plaintiff's Notice, Mot. Summ. J., & Mem. in Supp.
3:22-cv-00117-JD

Page 17

considered.[5] Nowhere in the Biological Opinion does NMFS explain why 20 additional humpback whale deaths *annually* is insignificant to its jeopardy analysis. *Cf.* 81 Fed. Reg. at 62,307 ("Vessel collisions and entanglement in fishing gear pose the greatest threat" to the Central America population); *see also* 84 Fed. Reg. 54,354, 54,356 (Oct. 9, 2019) (similar). Instead, it used an unlawful analysis that dilutes the impact of the pot fishery by failing to consider harms to the whales in the aggregate.

Simply put, NMFS impermissibly based its "no jeopardy" conclusions on the view that, because the pot fishery will take a fraction of the total amount of human caused mortality, the additional entanglement deaths will not leave the whales that much worse off, comparatively speaking. The ESA and Ninth Circuit forbid this approach. *See Nat'l Wildlife Fed'n*, 524 F.3d at 930 (rejecting NMFS's approach to conduct a full jeopardy analysis only if the effects of the action "are 'appreciably' worse than baseline conditions").

### C.    NMFS's Biological Opinion Is Unlawful for Failing to Minimize Take.

NMFS's Biological Opinion is also unlawful because the incidental take statement ("ITS") fails to include measures to minimize the impact of humpback whale entanglements from the pot fishery. This means NMFS authorized the fishery to kill humpback whales without *any* measures to minimize or mitigate the risk of such take. While the ITS includes a reasonable and prudent measure ("RPM") and terms and conditions, the RPM requires nothing more than monitoring the fishery, which NMFS must already do under the MMPA. *See* BiOp_0148–49 (requiring NMFS to monitor "data on the capture, injury, and mortality of humpback whales"); 16 U.S.C. § 1387(d)(1) (requiring NMFS "to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations"); *id.* § 1386(a)(4), (c)

---

[5] Including 22 ship strike deaths, total human-caused annual mortalities is 42.15 humpback whales. To estimate Mexico DPS mortalities, NMFS multiplied total mortalities by 0.61 and added 2.05 pot fishery mortalities, which would equal 27.76 whales if ship strike deaths were included. *See* BiOp_0123 (Table 6). To estimate Central America DPS mortalities, NMFS multiplied total mortalities by 0.39 and added 1.28 pot fishery mortalities, which equals 17.71 whales when ship strike deaths are included. *See* BiOp_0124 (Table 7), 0145 (Table 13), 0146 (Table 14).

(NMFS must issue marine mammal stock assessments that include analysis of the impacts of commercial fisheries on marine mammals).

As such, neither the RPM nor the terms and conditions will actually minimize or mitigate the impact of take of humpback whales in the pot fishery and therefore do not serve their purposes. *See* 50 C.F.R. § 402.14(i)(1)(ii) (RPMs must "*minimize* [the] impact" of incidental take) (emphasis added). Courts have found ITSs unlawful in similar circumstances. *See, e.g.*, *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 422 F. Supp. 2d 1115, 1141 (N.D. Cal. 2006) (failure "to include terms and conditions [in an ITS] to minimize the potential for incidental take … violates the plain language of the ESA."); *see also* 16 U.S.C. § 1536(b)(4)(iii) (an ITS for marine mammals must specify measures necessary to comply with section 101(a)(5) of the MMPA (16 U.S.C § 1361(a)(5)).

The failure to include such measures—or explain why additional measures are unnecessary—is particularly arbitrary here because NMFS previously stated that it implements measures to reduce entanglements via ESA section 7 consultations on Fishery Management Plans and MMPA take reduction plans, yet there is no take reduction plan in place for the pot fishery. 78 Fed. Reg. 54,553, 54,553, 54,558 (Sept. 4, 2013).

Indeed, NMFS included several RPMs beyond monitoring in its last biological opinion (issued in 2012), including the formation of a workgroup to recommend management measures NMFS could adopt to reduce entanglement risk. BiOp_4194, 4197–98. Yet it failed to do so here. Instead, in its new Biological Opinion, NMFS eliminated all the prior RPMs for humpback whales, despite the fact that "no specific actions are being taken or are imminent in terms of conservation and management measures to minimize humpback whale entanglements." BiOp_8037.

NMFS's failure to include additional RPMs in this Biological Opinion is arbitrary, especially considering the rate of human-caused humpback mortality has only increased in recent years, *see, e.g.*, BiOp_8060 (2020 report from NMFS noting "an overall increase in the number of reported entanglements in recent years"), and NMFS considers ongoing entanglement in

commercial fishing gear as a reason these ESA-protected animals have not recovered. *See* 81 Fed. Reg. at 62,305 (Mexico population), *id.* at 62,307 (Central America population).

## IV.    NMFS Failed to Use the Best Available Science.

Neither NMFS's negligible impact determination nor its Biological Opinion are based on the best available science—the incontrovertible body of science showing that West Coast humpback whales are comprised of distinct populations—that NMFS identified in its own listing decisions. *See* 81 Fed. Reg. at 62,260; 16 U.S.C. § 1533(b)(1)(A) (NMFS must make listing determinations based solely on the best scientific data available). Instead, NMFS arbitrarily inflated the abundance of the Central America and Mexico populations in an apparent effort to make the "negligible impact" and "no jeopardy" determinations and maintain the status quo for the pot fishery.

In 2016, NMFS divided the globally listed endangered humpback whale species into 14 distinct populations, three of which feed off the West Coast. 81 Fed. Reg. at 62,260. The Central America population is endangered because of the "low abundance estimate … [and] the fact that the moderate threats of vessel collisions and fishing gear entanglement continue to act upon a population that is so small." *Id.* at 62,307. The Mexico population is threatened in part because fishing gear entanglements likely "moderately reduce the population size or the growth rate." *Id.* at 62,305. The Hawaii population has recovered and is no longer ESA-listed. *Id*. at 62,304.

Yet in its negligible impact determination, NMFS lumped the ESA-listed California and Mexico population together with an unlisted population (Hawaii), thereby inflating the population numbers and deflating the fishery's impact. 86 Fed. Reg. at 69,628. In its Biological Opinion, NMFS relied on a 2020 scientific paper that similarly lumped together these populations to assume that the ESA-listed populations had increased drastically. BiOp_0107–08, 0111–0112. NMFS's issuance of the Permit and Biological Opinion is therefore unlawful.

### A.    The Negligible Impact Determination Is Not Based on the Best Available Science.

NMFS's negligible impact determination is arbitrary because its analysis pools together three distinct populations of humpback whales off the West Coast. NMFS lumped whales from

the California, Mexico, and Hawaii populations in the California/Oregon/ Washington stock[6] ("CA/OR/WA stock"), thereby overestimating abundance and underestimating the pot fishery's impacts to ESA-listed humpback whales.

First, pooling three populations of whales into a single stock confounds the population dynamics that underpin the negligible impact determination and thus guts the MMPA's added protections for threatened and endangered species incidentally killed in commercial fisheries. *See* 16 U.S.C. § 1371(a)(5)(E). NMFS's MMPA regulations define negligible impact as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival." 50 C.F.R. §§ 216.103, 229.2. By lumping together three distinct populations into its analysis—including one that is no longer ESA-listed because it has recovered—NMFS has no way of knowing to what extent the sablefish fishery will "adversely affect … annual rates of recruitment or survival" of Central America or Mexico humpbacks—the specific populations 101(a)(5)(E) is intended to protect. *See* 16 U.S.C. § 1371(a)(5)(E). For example, NMFS may have reached a different conclusion had it conducted its analysis using the smaller, species-level analysis of 783 whales—the estimated abundance of Central America humpbacks, 86 Fed. Reg. at 21,123,—rather than using the estimated abundance of 4,776 whales for the CA/OR/WA stock. MMPA_0019. Indeed, the MMPA's definition of stock contemplates that NMFS must make management decisions using the smallest population unit. *See* 16 U.S.C. § 1362(11). Using the smallest unit is consistent with the MMPA's overall purpose to protect and recover marine mammal populations and "[t]he intent of Congress … that the taking of even a single marine mammal is to be avoided." *Nat. Res. Def. Council v. Evans*, 364 F. Supp. 2d 1083, 1104 (N.D. Cal. 2003).

Further, it was arbitrary for NMFS to fail to consider its own science about these populations. Because the MMPA requires NMFS to determine whether incidental mortality will have a negligible impact on the population, 16 U.S.C. § 1371(a)(5)(E)(i)(I), identifying the

---

[6] The MMPA defines a stock as "a group of marine mammals of the same species or smaller taxa in a common spatial arrangement, that interbreed when mature." 16 U.S.C. § 1362(11).

correct population for evaluation is critical.[7] Yet NMFS failed to consider several of its own scientific papers on humpback whale demographics and genetics that show the populations NMFS lumped together are distinct. *See* ER_0043 (determining populations are "significantly genetically differentiated"), ER_0206 (identifying whales wintering in Central America and summering off the West Coast as part of a "demographically independent population"), ER_0220 (identifying whales wintering in mainland Mexico and summering off the West Coast as a "demographically independent population"). Ignoring these references while making a negligible impact determination is arbitrary and capricious. *See Nat. Res. Def. Council v. Pritzker*, 828 F.3d 1125, 1139 (9th Cir. 2016) ("[a]n agency conclusion that is in direct conflict with the conclusion of its own experts … is arbitrary and capricious." (citation omitted)); *Humane Soc'y*, 626 F.3d 1048–49 (MMPA permit unlawful because NMFS's conclusions rested on "findings … in apparent conflict" with its findings in other documents). NMFS's issuance of the Permit is therefore unlawful.

### B.    NMFS Failed to Consider the Best Available Science.

NMFS also underestimated the pot fishery's harm to humpback whales in its Biological Opinion by erroneously assuming that information about the CA/OR/WA stock applies to the Central America and Mexico populations. The agency's listing decision that divided worldwide humpbacks into 14 populations means that the relevant populations for conservation are the Mexico and Central America humpback whales. Thus, it is arbitrary to assume that a population trend observed for the CA/OR/WA stock, which includes the recovered Hawaii population, also applies to the ESA-listed populations.

NMFS assumed an unsupportable increase in ESA-listed populations to reach its no jeopardy decision. The Biological Opinion adopts information and rationale that it explicitly rejected in its ESA listing decision and recent critical habitat decision, such as assuming that both the Mexico and Central America humpback whales have increased by 6 percent annually in the last 15 years. *Compare* BiOp_0111–12, *with* 81 Fed. Reg. at 62,306 (NMFS "do[es] not have

---

[7] Where mortalities cannot be ascribed to a particular stock because of overlapping populations, the total mortalities within the overlap are applied to each stock separately. *See* MMPA_1743.

1    specific evidence that [the Mexico population] is actually increasing"), *and* 84 Fed. Reg. at

2    54,356 (Central America population estimated to include 783 whales), *and* 86 Fed. Reg. at

3    21,123 (same), *and* 81 Fed. Reg. at 62,278 (guidance regarding outdated population estimates

4    does not apply to ESA listing decisions, which are based on the best available science).

5          As a result, the Biological Opinion *more than doubles* the estimated size of the ESA-

6    listed populations and consequently underestimates the impact of the pot fishery. And it relied on

7    this arbitrarily inflated population number to reach its no jeopardy determination. *See*

8    BiOp_0142 (comparing the pot fishery's mortalities to the inflated estimates to conclude the

9    fishery kills "less than 0.1 percent of the abundance of either population."). Courts have rejected

10   agency decisions in similar situations and this Court should do the same. *See Intertribal Sinkyone*

11   *Wilderness Council v. Nat'l Marine Fisheries Serv.*, 970 F. Supp. 2d 988, 998–1002 (N.D. Cal.

12   2013) (invalidating NMFS's reliance on outdated exposure thresholds the agency had abandoned

13   elsewhere). Indeed, the species-specific population abundance estimates that NMFS failed to

14   analyze here are precisely the type of data that courts have found are needed to conduct a lawful

15   jeopardy analysis. *See, e.g., Nat. Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 362–67

16   (E.D. Cal. 2007) (holding biological opinion issued in 2005 arbitrary and capricious for failing to

17   consider 2004 annual population survey of endangered species at issue).[8]

18         NMFS's approach is particularly egregious here because NMFS protected the Central

19   America and Mexico humpback populations under the ESA in part because of the magnitude of

20   the entanglement threat. In other words, NMFS already determined that fishery deaths impact

21   these humpback populations. *See, e.g.*, 81 Fed. Reg. at 62,286 ("we now conclude, in light of the

22   ongoing threat of fishing gear entanglements which are believed likely to have a moderate

23   impact on this [population], that the Mexico [population] is threatened").

24

25   [8] While NMFS's Biological Opinion cites a scientific paper that post-dates its listing decision
     (Calambokidis and Barlow (2020)), that paper does not mention the Central America or Mexico
26   populations. BiOp_1152–65. Moreover, that paper notes that it may have overestimated
     abundance of the CA/OR/WA stock because of a potential influx of whales from other
27   populations. BiOp_1157. This paper therefore cannot be a rational basis for NMFS's reliance on
     information it has previously rejected.
28

Plaintiff's Notice, Mot. Summ. J., & Mem. in Supp.
3:22-cv-00117-JD                                                                        Page 23

At the very least, NMFS should have compared the pot fishery mortalities (two Central America humpback whales and three Mexico humpback whales in one year, BiOp_0142) against the population estimates *without* an increase (i.e., base its analysis on a population of 783 Central America humpbacks and 2,806 Mexico humpbacks, 84 Fed. Reg. at 54,356). This approach is consistent with the directive that a biological opinion must use the best available scientific data. "To the extent that there is any uncertainty as to what constitutes the best available scientific information, Congress intended 'to give the benefit of the doubt to the species.'" *Bureau of Land Mgmt.*, 422 F. Supp. at 1127 (citation omitted). This is particularly important given the highly imperiled status of the Central America humpback. *See e.g.*, ER_0003 (NMFS stating it is "particularly concerned with conservation of the endangered Central America DPS due to its low abundance and the persistence of threats to these animals from human activities on and along the west coast."). NMFS's failure to do so renders its Biological Opinion unlawful.

## V.    NMFS Arbitrarily Relied on the Unlawful Biological Opinion.

Section 7 of the ESA imposes a substantive duty on NMFS to ensure that its actions to authorize and manage the pot fishery, including issuing the MMPA Permit, are not likely to jeopardize the continued existence of any listed species. 16 U.S.C. § 1536(a)(2); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 751 (9th Cir. 2020). As the Ninth Circuit has made clear, NMFS "cannot meet its Section 7 duties by relying on a legally flawed biological opinion or failing to discuss information that might undercut the opinion's conclusions." *Bernhardt*, 982 F.3d at 751.

As a result of NMFS preparing an unlawful Biological Opinion for authorizing and managing the sablefish pot fishery, NMFS's reliance on that Biological Opinion violates its substantive duty to ensure against jeopardy to humpback whales. *See, e.g.*, 86 Fed. Reg. at 69,630 (stating that NMFS relied on the Biological Opinion in issuing the MMPA Permit).

## VI.    The Court Should Vacate the Biological Opinion and Take Permit.

The APA mandates "[t]he reviewing court shall … hold unlawful and set aside agency action" that violates the law. 5 U.S.C. § 706(2); *see also All. for the Wild Rockies v. U.S. Forest*

*Serv.*, 907 F.3d 1105, 1121 (9th Cir. 2018) (normal remedy under the APA for unlawful agency action is vacatur). The Court should therefore vacate the MMPA Permit and Biological Opinion.

Although courts have recognized a narrow exception to this default remedy, under which a court can remand without vacatur where vacatur would cause environmental harm, *see, e.g.*, *Pollinator Stewardship Council v. U.S. EPA*, 806 F.3d 520, 532–33 (9th Cir. 2015), there is no reason to depart from the presumptive remedy here. Courts use two factors to determine if remand without vacatur is warranted: (1) "the seriousness of the agency's errors" and (2) "the disruptive consequences of an interim change that may itself be changed." *Id.* at 532 (citation omitted). The burden is on NMFS to show anything less than vacatur is warranted, *Coal. to Protect Puget Sound v. Army Corps of Eng'rs*, 466 F. Supp. 3d 1217, 1226 (W.D. Wash. 2020), which it cannot do.

First, the agency's legal violations are serious, going to the core purposes of the MMPA and ESA. Because of the severity of these errors, NMFS's only recourse is to issue new decisions; it cannot justify its decision based on the existing record. *Cf. Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1244 (N.D. Cal. 2015) (courts remand without vacatur only when errors are "mere technical or procedural formalities that the [agencies] can easily cure"). Second, when considering the disruptive consequences, the focus is on the harm to the environment, not economic considerations. *Nat'l Family Farm Coal. v. U.S. EPA*, 960 F.3d 1120, 1144–45 (9th Cir. 2020). There will be no environmental harm from vacatur; instead, vacatur will ensure imperiled humpback whales are protected from entanglements in the pot fishery while the agency undertakes new analyses.

## CONCLUSION

For the foregoing reasons, Plaintiff requests that the Court grant its motion for summary judgment. The Court should declare NMFS in violation of the MMPA, ESA, and APA, and set aside the MMPA Permit and Biological Opinion.

Dated:  July 21, 2022.                        Respectfully submitted,


                                              /s/ Catherine Kilduff
                                              CATHERINE KILDUFF (CA Bar #256331)
                                              KRISTEN MONSELL (CA Bar #304793)
                                              MIYOKO SAKASHITA (CA Bar #239639)
                                              Center for Biological Diversity
                                              1212 Broadway, Suite #800
                                              Oakland, CA 94612
                                              Phone: (510) 844-7100
                                              Fax: (510) 844-7150
                                              ckilduff@biologicaldiversity.org
                                              kmonsell@biologicaldiversity.org
                                              miyoko@biologicaldiversity.org

                                              *Attorneys for Plaintiff Center for
                                              Biological Diversity*