TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Acting Chief
MEREDITH L. FLAX, Assistant Chief
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-1050
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

CENTER FOR BIOLOGICAL DIVERSITY,

       Plaintiff,

   v.

GINA RAIMONDO, in her official capacity as Secretary of Commerce; and NATIONAL MARINE FISHERIES SERVICE,

       Defendants.

Case No. 3:22-cv-00117-JD

**FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Hearing: December 1, 2022
Time: 10:00 AM
Judge: James Donato

## NOTICE OF MOTION

    Please take notice that on December 1, 2022, at 10:00 AM, or as soon thereafter as the parties may be heard, Federal Defendants Gina Raimondo, in her official capacity as Secretary of Commerce, and the National Marine Fisheries Service will bring for hearing their Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment.

    Under Federal Rule of Civil Procedure 56 and Civil Local Rule 7, Federal Defendants cross-move for summary judgment on all of the claims in Plaintiff's Complaint, ECF 1. Federal

Defendants are entitled to summary judgment because Plaintiff's Endangered Species Act claims are time-barred under the Magnuson-Stevens Fishery Conservation and Management Act and, even if the claims were justiciable, the National Marine Fisheries Service complied with the Endangered Species Act's requirements in issuing its biological opinion. The National Marine Fisheries Service also complied with all of its legal requirements when issuing an incidental take permit pursuant to the Marine Mammal Protection Act. Federal Defendants' Cross-Motion is based on the accompanying memorandum, the administrative record, all other matters of which the Court may take judicial notice, and any argument or evidence that may be presented to or considered by the Court prior to its ruling.

1
2

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

LEGAL BACKGROUND ........................................................................................ 1

   I.     The Magnuson-Stevens Fishery Conservation and Management Act ....................... 1

   II.    The Endangered Species Act................................................................................ 2

   III.   The Marine Mammal Protection Act ................................................................... 3

FACTUAL BACKGROUND .................................................................................... 4

STANDARD OF REVIEW ....................................................................................... 6

ARGUMENT ............................................................................................................ 7

   I.     Plaintiff's ESA Claims are Time-Barred............................................................... 7

   II.    NMFS Complied with the ESA. ......................................................................... 9

       A.   NMFS Considered the Threat of Ship Strikes to Humpback Whales ................... 9

       B.   NMFS Examined All Relevant Factors Before Making its No Jeopardy
           Conclusion ...................................................................................................10

       C.   The Reasonable and Prudent Measures in the ITS Comply with
           ESA Regulations .........................................................................................13

       D.   NMFS Considered the Best Available Science Regarding Whale Populations ......15

   III.   NMFS Appropriately Relied on the BiOp ...........................................................16

   IV.   NMFS Complied with the MMPA.......................................................................17

       A.   NMFS Considered Human-Caused M/SI from All Sources when Making its
           Negligible Impact Determination...................................................................18

       B.   NMFS is Not Required to Implement a Take Reduction Plan if there is
           Insufficient Funding Available. .....................................................................22

       C.   NMFS Reasonably Analyzed the CA/OR/WA Stock of Humpback Whales in its
           Negligible Impact Determination...................................................................23

   V.    No Remedy is Necessary....................................................................................25

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**CASES** **PAGE**

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..................................................................................19

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,*
419 U.S. 281 (1974)................................................................................... 6

*Cal. Cmtys. Against Toxics v. EPA,*
699 F.3d 989 (9th Cir. 2012) ...................................................................25

*Center for Biological Diversity v. U.S. Bureau of Land Management,*
422 F. Supp. 2d 1115 (N.D. Cal. 2006) ...........................................14, 15

*City of Tacoma v. FERC,*
460 F.3d 53 (D.C. Cir. 2006).................................................................17

*Ctr. for Biological Diversity v. Haaland,*
998 F.3d 1061 (9th Cir. 2021) .................................................................20

*Hui Kohola I Kohola v. NMFS,*
669 F. Supp. 2d 1182 (D. Haw. 2009)......................................................22

*Idaho Farm Bureau Fed'n v. Babbitt,*
58 F.3d 1392 (9th Cir. 1995) ...................................................................25

*Lands Council v. Powell,*
395 F.3d 1019 (9th Cir. 2005) .................................................................23

*Life Techs. Corp. v. Promega Corp.,*
580 U.S. 140 (2017)..................................................................................20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)..................................................................................... 6

*N. Carolina Fisheries Ass'n, Inc. v. Gutierrez,*
550 F.3d 16 (D.C. Cir. 2008)................................................................... 1

*Nat'l Wildlife Fed'n v. NMFS,*
524 F.3d 917 (9th Cir. 2008) ...................................................................13

*Nat. Res. Def. Council v. Evans*,

    364 F. Supp. 2d 1083 (N.D. Cal. 2003) ................................................................ 6

*Newton v. American Debit Services, Inc.*,

    75 F. Supp. 2d 1083 (N.D. Cal. 2014) .................................................................23

*Norbird Fisheries v. NMFS*,

    112 F.3d 414 (9th Cir. 1997) ................................................................................ 2

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*,

    898 F.2d 1410 (9th Cir. 1990) .....................................................................16, 17

*San Luis & Delta-Mendota Water Auth. v. Jewell*,

    747 F.3d 581 (9th Cir. 2014) ........................................................................6, 10

*Skidmore v. Swift & Co.*,

    323 U.S. 134 (1944) ...........................................................................................20

*Strahan v. Linnon*,

    967 F. Supp. 581 (D. Mass. 1997) .....................................................................22

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,

    438 F.3d 937 (9th Cir. 2006) ................................................................................ 7

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,

    878 F.3d 725 (9th Cir. 2017) ..............................................................................13

## STATUTES

1 U.S.C. § 1 ...............................................................................................................20

5 U.S.C. § 706 ........................................................................................................... 6

16 U.S.C. § 1361(a)(2) .............................................................................................21

16 U.S.C. § 1361(2) .................................................................................................. 3

16 U.S.C. § 1362(11) ...............................................................................................24

16 U.S.C. § 1362(13) ................................................................................................ 3

16 U.S.C. § 1371(a)(5)(E) ........................................................................................18

16 U.S.C. § 1371(a)(5)(E)(i) .............................................................................3, 18, 21, 22, 24

16 U.S.C. § 1371(a)(5)(E)(ii) ...................................................................................20

16 U.S.C. § 1372 .............................................................................................. 3

16 U.S.C. § 1387(d) ................................................................................3, 21, 22

16 U.S.C. § 1387(f)(3) ...............................................................................3, 22

16 U.S.C. § 1531(b) ......................................................................................... 2

16 U.S.C. § 1532(19) ...................................................................................... 2

16 U.S.C. § 1536(a)(2) ..............................................................................2, 16

16 U.S.C. § 1536(b)(4) .................................................................................. 2

16 U.S.C. § 1536(b)(4)(iv) ............................................................................ 3

16 U.S.C. § 1536(b)(4)(C)(i)-(iv) ................................................................. 3

16 U.S.C. § 1801(a)(6) ................................................................................. 1

16 U.S.C. § 1836 ...........................................................................................24

16 U.S.C. § 1853(a)(1) .................................................................................. 2

16 U.S.C. § 1855(f) ..................................................................................2, 6

**RULES**

Fed. R. Civ. P. 8(a)(2)....................................................................................19

**FEDERAL REGULATIONS**

50 C.F.R. § 216.103 ......................................................................................18

50 C.F.R. § 401.14(i)(1) ...............................................................................13

50 C.F.R. § 402.02 .......................................................................................11

50 C.F.R. § 402.13-402.14 ............................................................................ 2

50 C.F.R. § 402.14(a)-(b)(1) ......................................................................... 2

50 C.F.R. § 402.14(g)-(h) ............................................................................. 2

50 C.F.R. § 402.14(i)(2) ...............................................................................14

50 C.F.R. § 660.211 ...................................................................................... 4

**OTHER SOURCES**

35 Fed. Reg. 13,319 ......................................................................................... 4

66 Fed. Reg. 41152 (August 7, 2001) ............................................................. 4

81 Fed. Reg. 62,259 (Sep. 8, 2016) ............................................................. 4, 16

85 Fed. Reg. 79,880 (Dec. 11, 2020) .............................................................. 5

86 Fed. Reg. 3,028 (Jan. 14, 2021) .................................................... 5, 16, 19, 22

86 Fed. Reg. 58,641 (Nov. 5, 2021) .............................................................. 24

86 Fed. Reg. 69,627 (Dec. 8, 2021) .......................................................... 6, 22, 24

1

2

**TABLE OF ACRONYMS**

3

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| FMP | Fishery Management Plan |
| ITS | Incidental Take Statement |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MMPA | Marine Mammal Protection Act |
| M/SI | Mortalities or Serious Injuries |
| NMFS | National Marine Fisheries Service |
| $NIT_T$ | negligible impact threshold from all sources |
| $NIT_S$ | negligible impact threshold for a single fishery |
| RPM | Reasonable and Prudent Measure |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In 2020, the National Marine Fisheries Service ("NMFS") authorized the groundfish fishery to continue fishery operations in 2021 and 2022 off the west coast of the United States pursuant to the agency's authority under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"). But, before doing so, NMFS complied with the Endangered Species Act ("ESA") by consulting on the effects of the groundfish fishery on ESA-listed humpback whales. In the resulting biological opinion ("BiOp"), NMFS concluded that the continued authorization of the fishery was not likely to jeopardize the existence of humpback whales. Then, in 2021, NMFS determined that the sablefish pot gear fishery, a subset of the groundfish fishery, would have a "negligible impact" on humpback whales and issued a Marine Mammal Protection Act ("MMPA") permit to the fishery for the incidental take of those whales.

Plaintiff presents a variety of arguments that NMFS's actions in issuing the BiOp and MMPA permit were unlawful. But, as explained below, Plaintiff's ESA claims are time-barred because Plaintiff filed suit more than 30 days after NMFS authorized the fishery under the MSA. And, even if Plaintiff's ESA claims were justiciable, the BiOp is rational and based on the best scientific information available. Similarly, Plaintiff's claim that the MMPA permit is arbitrary and violates the plain text of the statute is without merit. For these reasons, the Court should grant Federal Defendants' motion for summary judgment.

### LEGAL BACKGROUND

### I.    The Magnuson-Stevens Fishery Conservation and Management Act

The MSA instituted a national program for the management of fishery resources. 16 U.S.C. §§ 1801(a)(6), 1811(a). To assist in fishery management, the MSA established regional fishery management councils to advise NMFS on management of fisheries. Id. § 1852. The Pacific Fishery Management Council ("Council") advises NMFS on fisheries seaward of Washington, Oregon, and California. Id. § 1852(a)(1)(F).

Regulation of fisheries is accomplished through fishery management plans ("FMPs") and implementing regulations promulgated by NMFS. See N. Carolina Fisheries Ass'n, Inc. v.

*Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). All FMPs and each implementing regulation must meet both the requirements of the MSA and "other applicable law," such as the ESA and the MMPA. 16 U.S.C. § 1853(a)(1). The MSA states that "actions that are taken by the Secretary [of Commerce] under regulations which implement" a FMP are subject to judicial review only if petitions are "filed within 30 days after the date on which the regulations are promulgated." *Id.* § 1855(f). The Ninth Circuit has made clear that this provision of the MSA is jurisdictional. *Norbird Fisheries v. NMFS*, 112 F.3d 414, 416 (9th Cir. 1997).

## II.     The Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA defines "species" to include "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

Section 7(a)(2) of the ESA requires Federal agencies (known as an "action agency") to ensure, in consultation with the expert consulting agencies, that any action they fund, authorize, or carry out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. *Id.* § 1536(a)(2). If the action agency determines its proposed action "may affect" listed species or critical habitat, then it must consult with the appropriate expert "consulting agency." *See* 50 C.F.R. § 402.14(a)-(b)(1). In this case, NMFS is both the action agency and the consulting agency. If the consulting agency determines the action is "likely to adversely affect" listed species or critical habitat, the agencies must engage in formal consultation. *See id.* § 402.13-402.14. Formal consultation leads to the issuance of a written biological opinion by the consulting agency that assesses the likelihood of jeopardy to the species and destruction or adverse modification of its critical habitat. *Id.* § 402.14(g)-(h).

If the consulting agency concludes that: (1) the proposed action is not likely to jeopardize

or adversely modify critical habitat of a listed species but is likely to result in incidental take[1] of a listed species; and (2) if the listed species is a marine mammal, the taking is authorized pursuant to the MMPA, it issues an incidental take statement ("ITS"). 16 U.S.C. § 1536(b)(4). An ITS specifies the impact of the incidental taking on the listed species, establishes reasonable and prudent measures ("RPMs") that are necessary or appropriate to minimize the amount or extent of incidental take, and states the terms and conditions that the action agency must comply with to implement the RPMs. *Id.* § 1536(b)(4)(C)(i)-(iv). Any take that occurs in compliance with the terms and conditions of the ITS is exempt from the general take prohibition in Section 9, meaning that the take is lawful. *Id.* § 1536(b)(4)(C)(iv), (o)(2).

### III.     The Marine Mammal Protection Act

Congress enacted the MMPA to ensure that marine mammals are not "permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(2). Under the MMPA, it is unlawful "to take any marine mammal" in "waters or on lands under the jurisdiction of the United States" or "on the high seas." *id.* § 1372; *see also id.* § 1371(a). In the MMPA, "take" means "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13).

The MMPA allows NMFS to issue permits during any period of up to three years to vessels engaged in commercial fishing operations for the incidental taking of a marine mammal that is listed as an endangered or threatened species under the ESA. *Id.* § 1371(a)(5)(E)(i). NMFS must make three determinations before issuing the permit: (1) the incidental mortality and serious injury ("MS/I") from commercial fisheries will have a negligible impact on the species; (2) a recovery plan either has been, or is being developed, for the species pursuant to the ESA; and (3) where required under 16 U.S.C. § 1387(d), a monitoring program is established, vessels engaged in such fisheries are registered, and a take reduction plan has been, or is being, developed for the species. *Id.* Importantly, however, NMFS is not required to implement a take reduction plan if there are insufficient funds available and other species are higher priority for a take reduction team being

---

[1] In the ESA, "take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

developed. *Id*. § 1387(f)(3).

FACTUAL BACKGROUND

Humpback whales are one of the largest mammals on Earth, reaching a maximum length of about 52-57 feet and weighing more than 40 tons. BiOp 000106. Humpback whales are found in all of the world's oceans and are a migratory species, moving between high latitude feeding grounds in the summer to low latitude breeding areas in the winter. BiOp 000108.

NMFS listed humpback whales as an endangered species in 1970. 35 Fed. Reg. 18,319-20 (Dec. 2, 1970). In 2016, NMFS revised the listing status for humpback whales, dividing the previously globally-listed species into 14 distinct population segments ("DPSs"). 81 Fed. Reg. 62,259 (Sep. 8, 2016). The three DPSs of humpback whales that can be found in waters off the United States' west coast are: the Central America DPS, the Mexico DPS and the Hawaii DPS. NMFS has determined that the Central America DPS is endangered, the Mexico DPS is threatened[2], and the Hawaii DPS should not be listed. *See id*. For purposes of the MMPA, NMFS has designated all humpback whales that feed off the west coast of the United States to be the "CA/OR/WA stock." BiOp 000107. In other words, the CA/OR/WA stock of humpback whales consists of whales from the Central America, Mexico, and Hawaii DPSs. *Id*. NMFS has estimated that the minimum number of whales in the CA/OR/WA stock is 4,776 based on data from 2014-2018. BiOp 000108.

The CA/OR/WA stock can interact with numerous fisheries within and outside of United States' waters, including the groundfish fishery, a year-round fishery that occurs off the coasts of Washington, Oregon, and California. The fishery includes both recreational and commercial fishermen who use a variety of gear types to harvest more than 90 species of fish, including sablefish. BiOp 000093; BiOp 000124. The Council's Groundfish FMP sets the framework for management of the fishery.[3] The Groundfish FMP, and its implementing regulations, authorize and manage sablefish fisheries that use "fixed gear," which includes "trap" or "pot" gear. 50 C.F.R.

---

[2] NMFS has extended the ESA Section 9 prohibition against take to the threatened Mexico DPS. 81 Fed. Reg. at 62,260.

[3] The Groundfish FMP is available at https://www.pcouncil.org/documents/2022/08/pacific-coast-groundfish-fishery-management-plan.pdf/.

§§ 660.211, 600.10. Within the groundfish fishery, there are four distinct sectors that target sablefish either with trawl gear or fixed gear. What is referred to as the "sablefish pot gear fishery" includes vessels fishing with pot/trap gear in all four sectors.

Rules governing pot fisheries have been in regulation for decades, subject to periodic program revisions. *See, e.g.*, 66 Fed. Reg. 41,152 (Aug. 7, 2001). Subsequent rulemakings set the specific amount of fishing allowed (known as "specifications") and the terms under which the fishing may occur (known as "management measures"). Under the framework established by the Groundfish FMP, specifications and management measures are developed and promulgated by NMFS biennially. *See* Groundfish FMP, at 49-50. The most recent biennial specifications implementing the Groundfish FMP were last promulgated on December 11, 2020. 85 Fed. Reg. 79,880 (Dec. 11, 2020).

Humpback whales can become entangled in fishing gear used in the sablefish pot gear fishery. BiOp 000124-25. A whale's entanglement in fishing gear can lead to M/SI. Pacific Coast sablefish pot gear fisheries are listed as Category II fisheries under the MMPA (indicating that they occasionally interact with marine mammals), due to incidental M/SI to the CA/OR/WA stock of humpback whales. *See* 86 Fed. Reg. 3,028 (Jan. 14, 2021). All other Pacific Coast groundfish fisheries are listed as Category III, indicating a remote likelihood of M/SI or no known incidental M/SI of marine mammals. *Id.*

In the BiOp, NMFS determined that the annual maximum number of humpback whales in the CA/OR/WA stock that could become entangled in the sablefish pot gear fishery is 3.87. BiOp 000136. NMFS anticipates that the annual maximum number of whales in the threatened Mexico DPS and endangered Central America DPS that could become entangled is 2.23 and 1.39, respectively.[4] BiOp 000137. Because not all entanglements result in M/SI, NMFS has also estimated the M/SI that could be expected to occur due to the sablefish pot gear fishery. BiOp 000142. NMFS expects that, during any one year, up to three Mexico DPS whales (rounding up from 2.09) and two Central America DPS whales (rounding up from 1.25) may be killed or

[4] NMFS has concluded that more whales may become entangled from the CA/OR/WA stock than from the two ESA-listed DPSs. This is because the CA/OR/WA stock includes both ESA-listed DPSs as well as the non-listed Hawaii DPS.

seriously injured by the sablefish pot gear fishery. *Id.* This represents less than 0.1% of the population of either DPS. *Id.*

In 2012, NMFS completed an ESA consultation on the groundfish fishery's effect on humpback whales and other listed species. BiOp 000091. In 2018, NMFS reinitiated ESA consultation on the authorization and continuing operation of the groundfish fishery due to NMFS's reclassification of humpback whales into 14 different DPSs and the exceedance of the ITS. BiOp 000092. NMFS completed its reinitiated ESA consultation and issued a BiOp on October 26, 2020, concluding that the continued operation of the groundfish fishery is not likely to jeopardize the continued existence of either the Mexico or Central America DPSs of the humpback whale. BiOp 000146; BiOp 000168. NMFS also issued an ITS, which includes RPMs and terms and conditions. BiOp 000146-50. NMFS issued the MMPA permit authorizing incidental take of humpback whales in the sablefish pot gear fishery on December 8, 2021. 86 Fed. Reg. 69,627 (Dec. 8, 2021).

## STANDARD OF REVIEW

Because the ESA and MMPA do not contain their own standard of review, these claims are reviewed pursuant to the Administrative Procedure Act ("APA"). *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (ESA claims); *Nat. Res. Def. Council v. Evans*, 364 F. Supp. 2d 1083, 1093 (N.D. Cal. 2003) (MMPA claims). Section 706 of the APA grants a court a power to hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706. A decision is only "arbitrary and capricious" if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

1

2

**ARGUMENT**

**I.    Plaintiff's ESA Claims are Time-Barred**

Plaintiff's ESA claims are untimely because it filed suit well over 30 days after NMFS issued the 2020 biennial specifications authorizing the sablefish pot gear fishery. Challenges to regulations implementing FMPs must be filed within 30 days of the regulations' promulgation. 16 U.S.C. § 1855(f). By establishing a finite limitations period, Congress indicated its intent that any legal challenge would be quickly resolved, giving fishery participants certainty and allowing them to make financial commitments with confidence. In this suit, Plaintiff seeks to circumvent this directive and undermine Congress' intent by avoiding mention of or alleging claims under the MSA, instead challenging NMFS's authorization and management of the sablefish pot gear fishery via the ESA—which does not require lawsuits to be brought within 30 days.[5]

However, "invocation of the magic words, 'the Magnuson Act,' is not a predicate to application of § 1855(f) if the substance of the challenge is to the regulations themselves." *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 944 (9th Cir. 2006). "To allow parties to avoid this limitation through manipulation of form—avoiding mention of the [MSA] in the complaint—while in substance challenging the regulations, would permit parties through careful pleading to avoid the strict jurisdictional limits imposed by Congress." *Id.* at 945 (alternations and quotation omitted). Instead, "the decisive question is whether the regulations are being attacked, not whether the complaint specifically asserts a violation of the Magnuson Act." *Id.*

While Plaintiff is careful to never mention the MSA in its filings, its artful pleading and deliberate word choices cannot obscure the fact that it is attempting to use the ESA to challenge NMFS's authorization and management of the fishery. The complaint makes repeated references to NMFS's "authorization and management" of the sablefish pot gear fishery, including a statement that the humpback whale "has been, and is being, taken by the Fisheries Service's authorization and management of" the fishery. Complaint, ECF 1 ¶ 59; *see also id.* ¶¶ 8, 135; p.

---

[5] Federal Defendants do not allege that Plaintiff's MMPA claims are similarly time-barred because NMFS issued the MMPA permit after publication of the 2020 biennial specifications in the Federal Register, unlike the BiOp that NMFS issued before publication of the specifications.

25. Yet, Plaintiff fails to disclose that the authorization and management takes place through rules promulgated under the MSA. *See generally id*. Plaintiff also fails to identify how and when NMFS authorized the fishery or explain how its lawsuit came within 30 days of that authorization. *See generally id.*

Furthermore, Plaintiff's brief recognizes that the BiOp analyzes the effects of NMFS's continued authorization of the sablefish pot gear fishery on humpback whales. *See* Plaintiff's Brief, ECF 282 at 24 ("As a result of NMFS preparing an unlawful Biological Opinion for authorizing and managing the sablefish pot fishery . . . ."); *see also* Cummings Decl., ECF 282-1 ¶ 15 ("The management actions and inactions of NMFS authorizes fishing in a manner that does not adequately protect against the likelihood of additional entanglements of these imperiled animals."). The brief also makes other references to NMFS's authorization and management of the sablefish pot gear fishery, albeit under the cover of its ESA claims. *See* Plaintiff's Brief, ECF 282 at 1-2, 18. In addition, Plaintiff makes clear that it is aware that "[t]o manage the pot fishery, NMFS implements the [ ] Groundfish Fishery Management Plan." Plaintiff's Brief, ECF 282 at 3. Yet once again, Plaintiff does not disclose that implementation of the Groundfish FMP occurs through MSA regulations. Finally, the Plaintiff asks this Court to declare "that the National Marine Fisheries Service's reliance on the Biological Opinion to authorize and manage the WA/OR/CA sablefish pot fishery, including in issuing the Marine Mammal Protection Act Permit, is unlawful." Proposed Order, ECF 282-4 at 2. Plaintiff implies that if it is successful, the sablefish pot gear fishery will have to be closed, an action that, as explained above, would require a modification of groundfish regulations through further action under the MSA. Plaintiff's Brief, ECF 282 at 25 (arguing that "vacatur will ensure imperiled humpback whales are protected from entanglements in the pot fishery while the agency undertakes new analyses.").

As Plaintiff's filings show, its ESA claims challenge NMFS's authorization and management of the sablefish pot gear fishery and implementation of the Groundfish FMP. That authorization and management came about as a result of several MSA rulemakings, including the biennial rule promulgated on December 11, 2020, yet Plaintiff did not file suit until January 9, 2022—more than a year after the final rule and well after expiration of the 30 day statute of

limitations.  To the extent that Plaintiff argues it is only challenging NMFS's issuance of the BiOp as a consulting agency, the argument is inconsistent with statements made in its complaint, brief, and the relief sought. The "authorization and management" of the fishery is derived not from the BiOp, but from the regulations promulgated under the MSA. Thus, irrespective of how Plaintiff now couches its claim, it is clearly and expressly seeking to invalidate MSA regulations, including components of the biennial rule, which NMFS issued pursuant to the MSA. Because any challenge relating to the BiOp is untimely under the MSA's judicial review provision, Plaintiff's ESA claims must be dismissed.

## II.    NMFS Complied with the ESA

Even if Plaintiff's claims were not time-barred, they lack merit. Plaintiff argues that NMFS's BiOp is arbitrary and capricious because: (1) NMFS did not "consider threats to humpback whales in the environmental baseline and when aggregated with other threats"; (2) the ITS does not minimize take; and (3) NMFS did not use the best available science because it considered the Hawaii DPS when discussing humpback whale populations. Plaintiff's Brief, ECF 282 at 16-20. But NMFS reasonably considered threats to humpback whales, including ship strikes, individually and when aggregated with other threats. NMFS has substantial discretion to determine if, and what kind of, RPMs are "necessary or appropriate" to minimize take and did so here. And, NMFS appropriately used the best scientific information available when analyzing humpback whale populations.

### A.    NMFS Considered the Threat of Ship Strikes to Humpback Whales

Contrary to Plaintiff's assertions, NMFS reasonably considered the threat of ship strikes in the environmental baseline. In the environmental baseline section of the BiOp, NMFS first described the threat of ship strikes to humpback whales generally and to the CA/OR/WA stock of humpback whales in particular. BiOp 000122. NMFS then examined the most recent available stock assessment report for humpback whales[6], which concluded that the annual M/SI of the CA/OR/WA stock of humpback whales for the years 2013-2017 from observed ship strikes is 2.2

---

[6] The CA/OR/WA humpback whale MMPA stock assessment report represents the most current information and best available science for evaluating human impacts on all humpback whales along the west coast, including the two ESA-listed humpback DPSs. *See* BiOp 001763-002147.

per year. *Id.* Lastly, NMFS estimated the threat of ship strikes to each DPS of humpback whales found within the action area. BiOp 000123 (1.34 total annual M/SI from ship strikes for the Mexico DPS); BiOp 000124 (0.86 total annual M/SI from ship strikes for the Central America DPS).

It is apparent from the above information that NMFS considered ship strikes to humpback whales in the environmental baseline, which is what the ESA requires. But Plaintiff claims that NMFS should have considered a model included in the stock assessment report concluding that there could be an estimated 22 ship strike deaths per year. Plaintiff's Brief, ECF 282 at 18. However, it is within NMFS's discretion as the scientific experts to choose to rely on observed data rather than data that has been estimated or extrapolated. *See, e.g.*, *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 610. Furthermore, as discussed below, NMFS considered that it may have underestimated the baseline impacts from human activities, which would include ship strikes. BiOp 000144. And NMFS factored in this underestimation when it made its final conclusions in the BiOp. *See* BiOp 000144. Therefore, Plaintiff's argument should be rejected.

## B. NMFS Examined All Relevant Factors Before Making its No Jeopardy Conclusion

Plaintiff is also mistaken when it contends that "[i]n making its no jeopardy determination, NMFS nowhere analyzed the effects of the pot fishery when combined with baseline conditions, cumulative impacts, and the status of the populations." Plaintiff's Brief, ECF 282 at 17. As demonstrated below, NMFS "add[ed] the effects of the action (Section 2.5) to the environmental baseline (Section 2.4) and the cumulative effects (Section 2.6), taking into account the status of the species (Section 2.2), to formulate the agency's opinion as to whether the proposed action is likely to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing its numbers, reproduction, or distribution." BiOp 000143.

First, NMFS examined the status of the species, finding that, based on the best scientific information available, it is likely that the population of humpback whales off the west coast is increasing 6-7 percent per year and using this information to estimate the abundance of Central America and Mexico DPSs. BiOp 000106-14. This growth rate necessarily would account for all sources of humpback mortality, including ship strikes.

Second, NMFS considered the environmental baseline, which refers to the "condition of

the listed species . . . in the action area, without the consequences" caused by the proposed action. BiOp 000120. NMFS noted that a "comprehensive list of general threats to humpback whales and their habitat is detailed" in NMFS's recovery plan and the most recent status review, and specifically analyzed climate change and other habitat impacts on humpback whales such as pollution and noise. *See* BiOp 000120-21. In addition, NMFS thoroughly discussed human-caused M/SI, including entanglements from commercial fisheries, recreational fisheries, and tribal fisheries, as well as ship strikes. BiOp 000121-24.

Third, NMFS analyzed effects of the specific proposed action: the continued authorization of the groundfish fishery through implementation of the Groundfish FMP and implementing regulations. BiOp 000124. While possible impacts from the fishery include "collisions with fishing vessels, or exposure to pollution or marine debris . . . the available information does not suggest that any of these additional factors are affecting ESA-listed humpback whales as a result of the continued operation" of the fishery. BiOp 000125. Therefore, NMFS focused its analysis on entanglements. BiOp 000125-42.

Fourth, NMFS considered cumulative effects, "those effects of future state or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." BiOp 000143; 50 C.F.R. § 402.02. NMFS determined that "[s]ome continuing non-Federal activities are reasonably certain to contribute to climate effects [i.e., climate change] within the action area," but did not identify any other activities that meet the definition of cumulative effects. *See* BiOp 000143.

Having competed this analysis, NMFS moved on to the penultimate step in determining whether a proposed action is likely to jeopardize listed species: adding the environmental baseline to the effects of the action and cumulative effects. BiOp 000143-46. Because NMFS could not identify any activities that meet the definition of cumulative effects beyond those activities described in the environmental baseline, the agency only added the environmental baseline to the effects of the action. *See id.* As demonstrated by the following tables from the BiOp, NMFS added the M/SI from the environmental baseline to the effects of the groundfish fishery for both the Central America and Mexico DPSs:

Analysis for Mexico DPS (BiOp 000145)

| Source of take | M/SI |
|---|---|
| Environmental Baseline average annual impact (Section 2.4.1) | 13.63 |
| PCGF – One-year maximum (Section 2.5.5) | 2.05 |
| PCGF – Maximum five-year running average (Section 2.5.5) | 1.44 |
| **Total Annual Impact to DPS (one-year maximum plus the baseline)** | **15.68** |

Analysis for Central America DPS (BiOp 000146)

| Source of take | Total Annual M/SI |
|---|---|
| Environmental Baseline average annual impact (Section 2.4.2) | 8.72 |
| PCGF – One-year maximum (Section 2.5.5) | 1.28 |
| PCGF – Maximum five-year running average (Section 2.5.5) | 0.90 |
| **Total Annual Impact to DPS (one-year maximum plus the baseline)** | **10.00** |

Finally, NMFS applied this information to the status of the species, concluding that the annual **maximum impact** for the Mexico DPS would be 0.23% of the population (rounding up, 16 whales out of 6,724). BiOp 000144. The annual **maximum impact** for the Central America DPS would be 0.53% of the population (10 whales out of 1,876). BiOp 000145. NMFS recognized that the environmental baseline impacts, including ship strikes, from human activities "may be underestimated to some degree." BiOp 000144. However, because the proposed action is likely to impact significantly less than 1% of each DPS, the effects of the proposed action represent only an estimated 10% (or less) of the total M/SI for each DPS, and the population is likely increasing, "it does not appear that current levels of impact from the PCGF fishery, in addition to the current levels of other impacts that are anticipated to continue to occur, is likely to prohibit continued population growth toward recovery" of the Mexico and Central America DPSs. BiOp 000145-46. Based on all of this data, NMFS reasonably concluded that the continued authorization of the groundfish fishery is not likely to jeopardize the continued existence of either the Mexico or Central America DPS. BiOp 000146.

Despite Plaintiff's assertions to the contrary, the BiOp shows that NMFS did indeed analyze the effects of the groundfish fishery combined with the baseline conditions in the context

of the status of the species. Plaintiff attempts to muddy the water by citing to several cases that are inapposite. In *Turtle Island Restoration Network*, the agency premised its no jeopardy conclusion on the fact that the effects on the species would be minimal when compared to other threats, even though "any level of take and mortality can have an adverse effect on the overlying population." *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878 F.3d 725, 738 (9th Cir. 2017); *see also Nat'l Wildlife Fed'n v. NMFS*, 524 F.3d 917, 930 (9th Cir. 2008) (holding that an agency may not take an action that causes additional harm if baseline conditions already jeopardize a species). But here, while NMFS did compare the M/SI from the groundfish fishery relative to other sources of human-caused M/SI to understand the impacts of the fishery on ESA-listed humpback whales, its final conclusion rests on the impact of the fishery in addition to the environmental baseline. *See* BiOp 000144-46. NMFS reasonably considered that, even if the agency had underestimated the environmental baseline impacts from human-caused M/SI, the groundfish fishery will account for a small fraction of the total amount of human-caused M/SI. BiOp 000144. However, in making its no-jeopardy determination NMFS evaluated the status of the species and the level of impact from the groundfish fishery in addition to other impacts. BiOp 000144-45. This is squarely in-line with NMFS's ESA obligations. For these reasons, NMFS's qualitative and quantitative decision that the groundfish fishery is not likely to cause jeopardy is reasonable and should be upheld.

### C.   The Reasonable and Prudent Measures in the ITS Comply with the ESA

Plaintiff claims that NMFS "must" minimize the impact of incidental take under the ESA regulations and that the ITS "fails to include measures to minimize the impact of humpback whale entanglements from the [sablefish] pot [gear] fishery" and Plaintiff's Brief, ECF 282 at 18-19. Plaintiff is wrong on both the law and the facts.

As for the law, the ESA regulations state that an ITS needs to, among other things: (1) specify those RPMs that NMFS "considers necessary or appropriate to minimize" the impact of incidental take; (2) in the case of marine mammals, specify those measures that are necessary to comply with the MMPA; and (3) sets forth the terms and conditions that must be complied with to implement those measures. 16 U.S.C. § 1536(b)(4)(C). Pursuant this statutory language, the

agency has substantial discretion to determine what RPMs to specify. If NMFS does not believe RPMs are "necessary or appropriate to minimize" the impact of incidental take, NMFS does not have to include them in an ITS at all. *See id.*

Plaintiff is also wrong on the facts. NMFS did in fact include RPMs that the agency felt were "necessary or appropriate" to minimize take. BiOp 000148-49. NMFS specified that monitoring should occur to "ensure compliance with the regulatory and conservation measures included in the proposed action and the identified amount or extent of incidental take, including collection and evaluation of data on the capture, injury and mortality of humpback whales." *Id.* Plaintiff tries to fault NMFS because the 2012 BiOp had additional RPMs that were not included in the 2020 BiOp. Plaintiff's Brief, ECF 282 at 19. What Plaintiff has knowledge of, but does not mention, is that an RPM from the 2012 BiOp—the formation of a the Groundfish Endangered Species Work Group—is still in effect. *See* Complaint, ECF 1 ¶ 117; ER 00108-112. In fact, the Group met in June 2021 and discussed potential conservation measures for humpback whales— after the most recent BiOp was issued.[7] *Id.* Term and Condition 2 from the ITS in the 2020 BiOp specifically requires that NMFS review the Terms of Reference for the Group, clearing indicating that NMFS is aware the Group is still in effect. BiOp 000149.

While Plaintiff scoffs at the substance of the current RPM, and ignores the previous RPM that is still in effect, it does not offer up any alternative measures that are implementable. Nor could it. The regulations explain that RPMs, along with the terms and conditions that implement them, "cannot alter the basic design, location, scope, duration, or timing of the action and may involve only minor changes." 50 C.F.R. § 402.14(i)(2). In NMFS's judgment as the expert agency, the monitoring in the present ITS, along with the continued operation of the Group, are those RPMs "necessary or appropriate" to minimize take and do not run afoul of the minor change rule. Plaintiff's argument fails to undermine the substantial discretion and deference owed the agency for such determinations.

---

[7] The Groundfish Endangered Species Workgroup is an active advisory body to the Pacific Fishery Management Council. *See* https://www.pcouncil.org/navigating-the-council/membership-groups-and-staff/advisory-groups/groundfish-endangered-species-workgroup/ (last visited August 25, 2022).

The present case is decidedly different from the case Plaintiff cited in its brief, *Center for Biological Diversity v. U.S. Bureau of Land Management*, 422 F. Supp. 2d 1115, 1141 (N.D. Cal. 2006). In that case, the consulting agency included RPMs in the ITS but did not include terms and conditions to implement them. *Id.* at 1141 ("The ESA provides that **if** an ITS contains reasonable and prudent measures, it 'shall' also include terms and conditions that the agency must comply with in order to implement the RPMs.") (emphasis added).

In short, the RPM is reasonable and complies with the ESA.

### D.      NMFS Considered the Best Available Science Regarding Whale Populations

Plaintiff mischaracterizes the BiOp when it claims that NMFS "underestimated the pot [gear] fishery's harm to humpback whales in its Biological Opinion by erroneously assuming that information about the CA/OR/WA stock applies to the Central America and Mexico populations." Plaintiff's Brief, ECF 282 at 22. NMFS stated in its BiOp that the 2017 Wade study, which Plaintiff relies on for its favored population estimate, estimated the abundance of the Central America and Mexico DPSs to be 783 and 2,806 animals, respectively. BiOp 000111-12. However, the Wade study is based on data collected from 2004-2006. BiOp 000111. NMFS noted in the BiOp that "[b]ecause these estimates are >8 years old, and humpback whales in the Pacific have recently experienced positive growth, they are not considered a reliable estimate of current abundance." *Id.* (citing NOAA 2016; Carretta et al. 2020). In addition, NMFS stated that "it is difficult to determine the abundance" of the Central America and Mexico DPSs from the data in the agency's own stock assessment report, given that there are three different DPSs in the CA/OR/WA stock. *Id.*

After considering this information, NMFS recognized that it did "not have an analysis that provides a specific estimate of the current DPS abundances and distributions." BiOp 000113. However, the agency "used the available information to consider several scenarios and generated the most plausible estimate of the current abundance and distribution of the two listed DPSs." *Id.* Using the population and distribution estimates from the Wade study, and information from the stock assessment report showing that the CA/OR/WA stock of humpback whales has been increasing about 6-7 percent annually since 2006 when the Wade study was completed, NMFS estimated that there are approximately 1,876 whales in the Central America DPS and 6,724 in the

Mexico DPS. BiOp 000111-13. This estimate is based on the best scientific information available and reflects the agency's scientific expertise, which is owed substantial deference.

The ESA listing decision, as well as the critical habitat designation proposed and final rules that Plaintiff cites as proof that the abundance estimate in the BiOp is inconsistent with other NMFS decisions, in fact shows the opposite. *See* Plaintiff's Brief, ECF 282 at 22-23. The proposed critical habitat rule, issued a full year before the BiOp, stated only that the Central America DPS "has been most recently estimated to include 783 whales (CV = 0.170, Wade 2017)." 84 Fed. Reg. at 54,356 (Oct. 9, 2019). The final critical habitat rule, issued approximately six months after the BiOp and following the 2019 stock assessment report, stated only that the Central America DPS had "previously been estimated to include about 783 whales (CV = 0.170, Wade 2017)." 86 Fed. Reg. at 21,123 (Apr. 21, 2021). Both of these statements are true and neither contradict NMFS's conclusion made in the BiOp regarding estimates of the current population abundance. Similarly, in the ESA listing decision, NMFS stated in 2016 that it does not have "specific evidence" that the Mexico DPS is increasing. 81 Fed. Reg. at 62,306. But that statement, and ESA listing decision, was made before the stock assessment was completed, estimating that the CA/OR/WA stock is increasing 6-7 percent annually.

While Plaintiff would certainly prefer that NMFS use population estimates from more than 15 years ago and ignore studies showing that the CA/OR/WA stock of humpback whales is increasing, that is not what the ESA requires. The ESA actually requires NMFS to consider the best scientific information available when making its jeopardy determination, and that is what the agency did here. *See* 16 U.S.C. § 1536(a)(2).

### III.   NMFS Appropriately Relied on the BiOp

Plaintiff contends that NMFS, as the action agency, erred in relying on the BiOp to authorize the fishery. *See* Plaintiff's Brief, ECF 282 at 24. As a preliminary matter, this drives home the point that Plaintiff is improperly challenging the MSA regulations outside the 30 day window required by the MSA. *See supra* at 7-9. But, in any event, where a BiOp concludes that the proposed action is not likely to jeopardize a listed species or destroy or adversely modify its critical habitat, the action agency may reasonably rely on the BiOp and proceed with the action in

compliance with the ESA. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415-16 (9th Cir. 1990). As the Ninth Circuit has explained, in judging an action agency's reliance on a BiOp, the consulting agency's "actions, or lack thereof, in preparing its opinions are relevant [] only to the extent that they demonstrate whether the [action agency's] reliance on the reports is 'arbitrary and capricious.'" *Id.* (citation omitted); *accord City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006) ("when we are reviewing the decision of an action agency to rely on a BiOp, the focus of our review is quite different than when we are reviewing a BiOp directly. In the former case, the critical question is whether the action agency's reliance was arbitrary and capricious, not whether the BiOp itself is somehow flawed"). Here, Plaintiff fails to show that the BiOp is arbitrary and capricious as an initial matter. And Plaintiff has presented no evidence that NMFS (as an action agency) acted irrationally as an independent matter in accepting it. *See* Plaintiff's Brief, ECF 282 at 24. Thus, to the extent the Court reaches the ESA claims, it should grant summary judgment in Federal Defendants' favor.

## IV.    NMFS Complied with the MMPA

Changing tack, Plaintiff alleges that NMFS's MMPA permit allowing commercial fisheries to incidentally take the CA/OR/WA humpback whale is unlawful for three reasons: (1) NMFS should have considered entanglements from all commercial fisheries, not just the sablefish pot gear fishery, when issuing its negligible impact determination; (2) NMFS violated the plain text of the MMPA when it issued the permit without having developed, or being in the process of developing, a take reduction plan for the humpback whale; and (3) in a familiar refrain, the negligible impact determination is not based on the best scientific information available because it analyzed the CA/OR/WA stock of humpback whales rather than just the Mexico and Central America DPSs.

As explained below, Plaintiff is wrong on all counts. NMFS took the most conservative (i.e., protective) approach possible and assumed that the total human-caused M/SI from all sources, including all commercial fisheries, was not negligible. Moreover, the MMPA does not require NMFS to implement a take reduction plan under development if there are insufficient funds available and other species are higher priority. And finally, NMFS acted reasonably when it

analyzed a stock, a concept that is used in the MMPA, rather than distinction population segments, which is an ESA concept.

### A.  NMFS Considered Human-Caused M/SI from All Sources when Making its Negligible Impact Determination

Plaintiff's assertion that the "negligible impact determination is unlawful for considering only the level of humpback whale mortality from the [sablefish] pot [gear] fishery and not also considering the extent of mortality from other commercial fisheries," ECF 282 at 8, rests on either a misunderstanding, or disapproval of, a NMFS directive.

Before issuing a MMPA permit for commercial fisheries to incidentally take ESA-listed species, NMFS must determine that the incidental M/SI from commercial fisheries will have a negligible impact[8] on the species. 16 U.S.C. § 1371(a)(5)(E)(i). NMFS has developed a directive for how to make this determination, which outlines a two-tiered approach. *See* MMPA 001219-39. In the first-tier of the analysis, NMFS determines the total negligible impact threshold ("$NIT_T$"), which represents the maximum total amount of human-caused M/SI **from all sources** that NMFS considers negligible for a certain stock. MMPA 001222. NMFS then compares the maximum total human-caused M/SI to $NIT_T$. *Id.* If the total human-caused M/SI is less than or equal to $NIT_T$, then commercial fisheries (which are a subset of the total amount of human-caused M/SI from all sources) have a negligible impact on the species. *Id.* In this situation, NMFS can end its analysis and issue a negligible impact determination. *Id.* However, if the total human-caused M/SI exceeds $NIT_T$, then NMFS moves to the second-tier analysis and determines the single-fishery negligible impact threshold ("$NIT_S$"). *Id.* $NIT_S$ represents the amount of M/SI stemming **from a single fishery** that NMFS would consider negligible. *Id.* If the M/SI from a single fishery is less than $NIT_S$ then that fishery has a negligible impact and NMFS can issue a negligible impact determination. *See id.* NMFS utilizes the two-tiered approach because the

---

[8] The MMPA does not define "negligible impact". NMFS has adopted a regulatory definition of negligible impact as the term is used in other provisions of the MMPA, but not for how it is used in 16 U.S.C. § 1371(a)(5)(E)(i)(I). MMPA 001220; *see* 50 C.F.R. § 216.103 (defining negligible impact as "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival"). Nonetheless, NMFS looked at this definition when developing its directive. MMPA 001219-20.

agency "recognizes that some stocks may experience non-negligible levels of human-caused M/SI, but one or more commercial fisheries may contribute a very small portion of that M/SI such that its individual effect is negligible and virtually undetectable." *Id.*

For transboundary stocks,[9] NMFS "cannot know for certain the M/SI that occurs outside of U.S. waters." MMPA 001227. Therefore, NMFS takes the most conservative approach possible: the agency automatically assumes that the total amount of human-caused M/SI from all sources exceeds $NIT_T$ and is therefore not negligible. *Id.* In these situations, NMFS proceeds to the second-tier analysis and analyzes NITs. *Id.* Because the CA/OR/WA humpback whale is a transboundary stock, NMFS followed its directive and assumed that human-caused MS/I from all sources was not negligible. MMPA 000017-23. NMFS then proceeded to the second-tier analysis, ultimately concluding that the amount of M/SI from the sablefish pot gear fishery alone (1.9) did not exceed the NITs (2.48), and was negligible. MPA 000019. NMFS issued a negligible impact determination and a incidental take permit to the sablefish pot gear fishery in 2021. MMPA 000017-23; *see also* MMPA 000011-14.

Plaintiff does not argue that NMFS failed to follow its directive or even challenge NMFS's conclusion that the sablefish pot gear fishery itself has a negligible impact on humpback whales. *See* Plaintiff's Brief, ECF 282 at 8. Rather, Plaintiff claims that NMFS must "consider[] the deaths from all commercial fisheries before allowing any individual fishery to kill an endangered marine mammal." *Id.* at 9. But Plaintiff fails to recognize that NMFS did so. As discussed above, because the CA/OR/WA humpback whale stock is transboundary, NMFS assumed that the M/SI from all sources, including all commercial fisheries, was non-negligible. That is the most conservative and protective approach that NMFS can take given that the agency cannot know for certain what M/SI is occurring outside U.S. waters. Notably, Plaintiff has identified no alternative method NMFS should have used to make a negligible impact determination given the transboundary nature of humpback whales and the unreliability of data outside United States' waters.[10] *See generally*

---

[9] Transboundary stocks are those stocks that migrate into and out of the United States' waters.

[10] To the extent Plaintiff is attempting to argue that the directive itself is unlawful, it did not challenge the directive in its complaint and cannot do so now. *See* Complaint, ECF 1; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a plaintiff is "require[d]" to plead a "short and plain

Plaintiff's Brief, ECF 282.

Similarly, Plaintiff argues that because NMFS considered M/SI from all fisheries in previous negligible impact determinations, including a past determination for the sablefish pot gear fishery, NMFS should have done the same here. Plaintiff's Brief, ECF 282 at 10-11. But, once again, Plaintiff's argument is a moot point: NMFS considered M/SI from all sources in this determination, just like it did in previous determinations. It is how, not whether, NMFS considered the M/SI from all sources that has changed. Rather than attempting to precisely calculate all sources of M/SI as it did previously, NMFS now assumes for transboundary stocks that the M/SI from all sources was not negligible. MMPA 001227. And, even where NMFS's directive is different from its previous practice, the directive acknowledges that NMFS had previously used different criteria to evaluate negligible impact, described why these criteria "proved problematic", established a new policy for evaluating negligible impact, and explained why this directive provides a more rational approach—all of the necessary requirements for a change in agency position. *See Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021).

In a variation on the same theme, Plaintiff contends that the MMPA requires NMFS to determine that "the incidental mortality and serious injury from commercial fisheries", rather than a single fishery, will have a negligible impact on the stock. Plaintiff's Brief, ECF 282 at 9. Plaintiff suggests that all commercial fisheries in total must have a negligible impact on a stock, before a negligible impact determination can be issued. *See id.* But this is a non-sequitur. NMFS did consider M/SI from all fisheries. But putting that aside, as Plaintiff admits, Congress' use of a plural ("fisheries") can include the singular ("fishery"). *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise—. . . words importing the plural include the singular"); *Life Techs. Corp. v. Promega Corp.*, 580 U.S. 140, 151 (2017); Plaintiff's Brief, ECF 282 at 9. Moreover, when looking at the statute, it is apparent that "fisheries"

statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests"); Fed. R. Civ. P. 8(a)(2). Moreover, any challenge to the directive would not succeed, particularly given the deference it is due under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

could include a single "fishery". For example, 16 U.S.C. § 1371(a)(5)(E)(ii), states that "[u]pon a determination by the Secretary that the requirements of clause (i) have been met, the Secretary shall publish in the Federal Register a list of those fisheries for which such determination was made." It would be unnecessary for the Secretary to make a "list of those fisheries" for which a negligible impact determination is made if the Secretary had to make a determination that every commercial fishery, in total, will have a negligible impact on a stock. Furthermore, Plaintiff's reading of the statute would mean that NMFS would need to analyze the exact M/SI from all commercial fisheries, which is not feasible for transboundary stocks. MMPA 001228.

Plaintiff's reliance on the statutory purpose of the MMPA and legislative history does not support its reading either. The MMPA recognizes that marine mammals "may be taken incidentally in the course of commercial fishing operations" and establishes a process for obtaining an incidental take permit. *See* 16 U.S.C. § 1361(a)(2); *id*. § 1387. Therefore, while the "immediate goal" of the MMPA is that incidental take of marine mammals "be reduced to insignificant levels approaching a zero mortality and serious injury rate", it still permits incidental take to occur provided there will be a negligible impact on the stock and other requirements are met. *See id*. § 1361(a)(2); *id*. § 1387(a)(1). By concluding that the sablefish pot gear fishery has a negligible impact, and analyzing in the future whether other commercial fisheries have a negligible impact on humpback whales, NMFS is meeting the "immediate goal" of the MMPA.

Moreover, the congressional committee report stating that the Committee believes the "negligible impact" standard in the MMPA is more stringent than the ESA "no jeopardy" standard, shows only that. *See* Plaintiff's Brief, ECF 282 at 10 (citing H.R. Rep. No. 103-439 at 30). As noted previously, Congress did not define "negligible impact" in the MMPA and neither has NMFS defined the term as used in 16 U.S.C. § 1371(a)(5)(E)(i). *See supra* n.8. But even assuming that the negligible impact is a more stringent standard than the ESA jeopardy standard and ESA case law applies here, NMFS did indeed consider the totality of impacts from commercial fisheries in conducting a negligible impact determination. *See supra* at 19.

In sum, Plaintiff's argument that NMFS did not consider all sources of M/SI when making its negligible impact determination for humpback whales lacks merit. Plaintiff's argument is not

supported by the MMPA, legislative history, or previous agency determinations. NMFS's determination was reasonable and should be upheld.

### B.    NMFS is Not Required to Implement a Take Reduction Plan if there is Insufficient Funding Available

Relying on 16 U.S.C. § 1371(a)(5)(E)(i), Plaintiff next contends that NMFS was legally required to develop, or be developing, a take reduction plan for humpback whales prior to issuing its MMPA permit to the sablefish pot gear fishery. Plaintiff's Brief, ECF 282 at 12-14. Plaintiff argues at length that the agency's failure to do so "violates the plain language of the MMPA" and renders the MMPA permit invalid. *Id.* But it is Plaintiff that did not consider the plain language of the MMPA, which expressly contemplates that NMFS may not be able to implement a take reduction plan under development prior to issuing a permit if there is insufficient funding available. 16 U.S.C. § 1387(f)(3). "If there is insufficient funding available to develop and implement a take reduction plan for all such stocks that interact with commercial fisheries listed under subsection (c)(1)(A) (i) or (ii), the Secretary shall give highest priority to the development and implementation of take reduction plans for species or stocks": (1) whose level of incidental mortality and serious injury exceeds the PBR; (2) has a small population size; and (3) that is declining most rapidly. *Id.*[11] This provision allows NMFS to set priorities for developing take reduction plans and "not develop a reduction plan at all if there is insufficient funds." *Hui Kohola I Kohola v. NMFS*, 669 F. Supp. 2d 1182, 1191 (D. Haw. 2009); *see also Strahan v. Linnon*, 967 F. Supp. 581, 590 n.9 (D. Mass. 1997) (noting that Plaintiff's claim that NMFS did not implement a take reduction plan under development would fail because of the "great degree of flexibility afforded to" NMFS to set priorities).

Here, NMFS deferred implementation of a take reduction plan for the CA/OR/WA stock

---

[11] It is not clear why Plaintiff did not address this provision of the MMPA when submitting its opening brief to the Court. Plaintiff submitted comments on NMFS's proposed rule to issue the MMPA permit on this very issue, asserting that the agency had not developed, and was not in the process of developing, the take reduction plan. *See* 86 Fed. Reg. at 69,631. NMFS responded to Plaintiff's comment by identifying this provision and explaining that it applied in this instance. *See id.* Moreover, Plaintiff cited to NMFS's priority list for establishing take reduction teams that develop take reduction plans. Plaintiff's Brief, ECF 282 at 13. This demonstrates that Plaintiff presumably had knowledge of the statutory provision that allows NMFS to create such a list.

of humpback whales for the reasons identified in the statute: there is insufficient funding available to implement a take reduction plan for all applicable stocks and there are higher priority stocks. 86 Fed. Reg. at 69,629, 69,631; MMPA 000012. In the priority list of take reduction teams under development, NMFS concluded that there are higher priority stocks because of the "low levels of M/SI incidental to commercial fishing compared to other marine mammal stocks and commercial fisheries." 86 Fed. Reg. at 69,631; *see* ER 000668 (NMFS's priority list for establishing take reduction teams that develop take reduction plans). NMFS's conclusion is bolstered by the best scientific information available, which shows that a conservative estimate of the number of CA/OR/WA humpback whales is 4,776 and the population is increasing 6-7 percent annually. BiOp 000107-08.

Plaintiff did not allege in its complaint that NMFS had sufficient funding to develop a take reduction plan for the humpback whale prior to issuing the MMPA permit. *See* Complaint, ECF 1. Nor did Plaintiff allege that the agency's priority list is inaccurate or unlawful. *See id.* Therefore, Plaintiff cannot now argue these points. *See id.*; *Newton v. American Debit Services, Inc.*, 75 F. Supp. 3d 1048, 1063 (N.D. Cal. 2014) ("As the Ninth Circuit has repeatedly held, 'summary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (citations omitted). However, should the Court allow Plaintiff to raise these arguments, NMFS is prepared to provide further evidence to the Court regarding its insufficient funding for implementing take reduction plans under development and its competing priorities. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (allowing extra-record documents if necessary to show if the agency has considered all relevant factors and adequately explained its decision).

### C.   NMFS Reasonably Analyzed the CA/OR/WA Stock of Humpback Whales in its Negligible Impact Determination

Finally, Plaintiff contends that NMFS did not use the best available science when making its negligible impact determination because NMFS analyzed the CA/OR/WA stock, rather than the two ESA-listed DPSs of humpback whales. Plaintiff's Brief, ECF 28 at 20-21. But Plaintiff is improperly conflating the MMPA and ESA.

Pursuant to the ESA, NMFS can list, manage, and conserve species, subspecies, or DPSs of a species. However, under the MMPA, NMFS manages stocks: "a group of marine mammals

of the same species or smaller taxa in a common spatial arrangement, that interbreed when mature." 16 U.S.C. § 1362(11). "A marine mammal 'population stock' or 'stock' is the fundamental unit of conservation under the" MMPA. MMPA 001240. While the animals in a particular MMPA stock are frequently the same as those animals listed as a species, subspecies, or DPS under the ESA, that is not always the case. The CA/OR/WA humpback whale stock comprises whales from the ESA-listed endangered Central America and threatened Mexico DPSs. 86 Fed. Reg. at 69,630-31. But it also includes the unlisted Hawaii DPS. *Id.* at 69,631.

The current misalignment stems from the 2016 decision to revise the ESA listing of the humpback whale species into 14 DPSs. *Id.* NMFS is in the process of revising humpback whale stock structure under the MMPA pursuant to its Procedural Directive 02-204-03: Reviewing and Designating Stocks and Issuing Stock Assessment Reports (MMPA 001240-48). *Id.* But in the interim, nothing requires NMFS to segment out the ESA-listed humpback whales in the stock from the non-ESA listed whales. In fact, doing so would be at odds with the plain language of the MMPA which requires NMFS to manage "stocks." *See, e.g.*, 16 U.S.C. § 1836(a) (requiring NMFS to prepare a stock assessment report "for each marine mammal stock which occurs in waters under the jurisdiction of the United States").[12] NMFS cannot simply decide to only consider some humpback whales in the currently designated stock when making determinations, including a negligible impact determination. NMFS designated the CA/OR/WA stock as a stock in 1995 and is required to use this MMPA identified stock until NMFS revises it pursuant to its directive. Therefore, it was reasonable for NMFS to conclude that it would continue managing humpback whales on the west coast as the CA/OR/WA stock because it "cannot manage one portion of an MMPA stock as ESA-listed and another portion of a stock as not ESA-listed." 86 Fed. Reg. 58,641 (Oct. 22, 2021). And, contrary to Plaintiff's argument (ECF 282 at 21), NMFS's decision to examine the CA/OR/WA stock as a whole rather than using the ESA DPSs is **more** protective for humpback whales. Right now, the Hawaii DPS is receiving MMPA protections that it would not otherwise be entitled to if the stock structure was changed to align with the DPSs.

---

[12] NMFS relies on stock assessment reports when making decisions, including the negligible impact determination at issue here. *See* MMPA 000012.

In sum, NMFS's decision to issue the permit is reasonable and based on the plain language of the MMPA.

## V.     No Remedy is Necessary

Plaintiff has not shown that its request for relief can be, or should be, granted. However, if the Court rules for Plaintiff, Federal Defendants request the opportunity to provide separate briefing on remedy. Plaintiff requests vacatur of the BiOp and MMPA permit. Proposed Order, ECF 282-4. But even if the Court rules for Plaintiff on any of its claims, vacatur would not automatically follow because the Court is not required to set aside every unlawful agency action. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (stating that "when equity demands" a court can leave an unlawful regulation in place while the agency follows the necessary procedures). The Ninth Circuit has provided two factors courts weigh when deciding whether to remand to an agency without vacatur: (1) how serious the agency's errors are; and (2) the disruptive consequences of an interim change that may itself be changed. *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). Because the arguments on these two factors will depend on the Court's ruling and activity on the ground at the time of any such ruling, Federal Defendants cannot adequately address the factors at this time. If the Court rules in Plaintiff's favor on any of its claims, Federal Defendants request an opportunity to brief these two factors in light of any errors identified by the Court.

## CONCLUSION

For these reasons, Federal Defendants' motion for summary judgment should be granted and Plaintiff's motion should be denied.


Dated: August 25, 2022                    Respectfully submitted,



                                          TODD KIM, Assistant Attorney General
                                          S. JAY GOVINDAN, Acting Chief
                                          MEREDITH L. FLAX, Assistant Chief

                                          */s/ Kaitlyn Poirier*
                                          KAITLYN POIRIER, Trial Attorney

U.S. Department of Justice
Environment  and Natural Resources Division
Wildlife  and Marine Resources Section
Ben Franklin  Station, P.O. Box 7611
Washington,  D.C. 20044-7611
(202) 307-6623  (tel)
(202) 305-0275  (fax)
kaitlyn.poirier@usdoj.gov

Attorneys for Federal Defendants