TODD KIM, Assistant Attorney General
S. JAY GOVINDAN, Acting Chief
MEREDITH L. FLAX, Assistant Chief
KAITLYN POIRIER, Trial Attorney (TN Bar # 034394)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-1050
Facsimile: (202) 305-0275
Email: kaitlyn.poirier@usdoj.gov

Attorneys for Federal Defendants

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>GINA RAIMONDO, in her official capacity as Secretary of Commerce; and NATIONAL MARINE FISHERIES SERVICE,<br><br>Defendants. | Case No. 3:22-cv-00117-JD<br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing: December 1, 2022<br>Time: 10:00 AM<br>Judge: James Donato |

**TABLE OF CONTENTS**

INTRODUCTION...........................................................................................................1

ARGUMENT................................................................................................................1

    I.     Plaintiff's ESA Claims are Time-Barred.............................................................1

    II.    NMFS Complied with the ESA. ......................................................................4

         A.    NMFS Examined All Relevant Factors Before Making its No Jeopardy
             Conclusion .........................................................................................4

         B.    The Reasonable and Prudent Measures in the ITS Comply with ESA
             Regulations ........................................................................................6

         C.    NMFS Considered the Best Available Science Regarding Whale
             Populations ........................................................................................7

    III.   NMFS Appropriately Relied on the BiOp ........................................................8

    IV.   NMFS Complied with the MMPA.....................................................................9

         A.    NMFS Considered Human-Caused M/SI from All Sources when Making its
             Negligible Impact Determination.......................................................9

          B.    NMFS is Not Required to Implement a Take Reduction Plan Prior to Issuing
             an MMPA Permit if there is Insufficient Funding Available..............................12

         C.    NMFS Reasonably Analyzed the CA/OR/WA Stock of Humpback Whales in its
             Negligible Impact Determination......................................................14

    V.    No Remedy is Necessary...................................................................................15

CONCLUSION............................................................................................................15

# TABLE OF AUTHORITIES

**CASES**                                         **PAGE**

*Alaska v. Lubchenco,*
    723 F.3d 1043, 1052 (9th Cir. 2013) .............................................................8

*Blue Water Fishermen's Ass'n v. NMFS,*
    158 F. Supp. 2d 118, 119-21 (D. Mass. 2001).............................................4

*Cal. Cmtys. Against Toxics v. EPA,*
    688 F.3d 989 (9th Cir. 2012) .....................................................................15

*Cook Inletkeeper v. Raimondo,*
    533 F. Supp. 3d 739 (D. Alaska 2021) .........................................................5

*Hui Kohola I Kohola v. NMFS,*
    669 F. Supp. 2d 1182 (D. Haw. 2009)..................................................12, 13

*Hui Malama I Kohola v. NMFS,*
    439 Fed. Appx. 618 (9th Cir. 2011).............................................................13

*Idaho Farm Bureau Fed'n v. Babbitt,*
    58 F.3d 1392 (9th Cir. 1995) .....................................................................15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)........................................................................................5

*Newton v. American Debit Services, Inc.,*
    75 F. Supp. 2d 1083 (N.D. Cal. 2014).........................................................10

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy,*
    898 F.2d 1410 (9th Cir. 1990) ..................................................................8, 9

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971, 995 (9th Cir. 2014) .............................................................5, 6

*Strahan v. Linnon,*
    967 F. Supp. 581 (D. Mass. 1997) ........................................................12, 13

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
    438 F.3d 937 (9th Cir. 2006) ................................................................2, 3, 4

## STATUTES

16 U.S.C. § 1371(a)(5)(E)............................................................................passim

16 U.S.C. § 1387.......................................................................... 2, 12, 13, 14

16 U.S.C. § 1536(a)(2)...................................................................................3

16 U.S.C. § 1536(b)(4) ................................................................................ 6

16 U.S.C. § 1836 ....................................................................................... 15

16 U.S.C. § 1855(f) ..............................................................................1, 2, 8

## FEDERAL REGULATIONS

50 C.F.R. § 600.310...................................................................................2

50 C.F.R. § 402.14.....................................................................................6

## OTHER SOURCES

81 Fed. Reg. 62,259  (Sep. 8, 2016)..........................................................7, 14

85 Fed. Reg. 79,880  (Dec. 11, 2020) ..........................................................2

86 Fed. Reg. 58,641  (Oct. 22, 2021).........................................................15

86 Fed. Reg. 69,627  (Dec. 8, 2021) .........................................................14

**TABLE OF ACRONYMS**

| | |
|---|---|
| BiOp | Biological Opinion |
| DPS | Distinct Population Segment |
| ESA | Endangered Species Act |
| FMP | Fishery Management Plan |
| ITS | Incidental Take Statement |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MMPA | Marine Mammal Protection Act |
| M/SI | Mortalities or Serious Injuries |
| NMFS | National Marine Fisheries Service |
| $NIT_T$ | negligible impact threshold from all sources |
| $NIT_S$ | negligible impact threshold for a single fishery |
| RPM | reasonable and prudent measure |

**INTRODUCTION**

In 2020, the National Marine Fisheries Service ("NMFS") authorized the groundfish fishery to continue fishery operations in 2021 and 2022 pursuant to the agency's authority under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"). As demonstrated in Federal Defendants' opening brief, NMFS has complied with both the Endangered Species Act ("ESA") and Marine Mammal Protection Act ("MMPA"), having consulted on the effects of the groundfish fishery on ESA-listed humpback whales and also having determined that the sablefish pot gear fishery, a subset of the groundfish fishery, would have a negligible impact on the CA/OR/WA stock of humpback whales.

Nonetheless, Plaintiff maintains in its opposition that NMFS's biological opinion ("BiOp") and MMPA permit are unlawful, largely restating its previous arguments and failing to acknowledge salient facts. Critically, Plaintiff has not adequately explained how its ESA claims are not time-barred by the MSA when it maintains that the sablefish pot gear fishery will likely need to close as a result of its requested relief—an action that would require modification of regulations implementing the Groundfish Fishery Management Plan ("FMP") and promulgated under the MSA.

For the reasons below, and those stated in Federal Defendants' opening brief, the Court should grant Federal Defendants' motion for summary judgment and deny Plaintiff's motion for summary judgment.[1]

**ARGUMENT**

**I.    Plaintiff's ESA Claims are Time-Barred**

Plaintiff's ESA claims[2] are time-barred because they are intertwined with NMFS's authorization of the fishery and so had to be brought within 30 days after the regulations' promulgation. *See* 16 U.S.C. § 1855(f). Plaintiff does not deny that the 2020 biennial

---

[1] Federal Defendants have not responded to several of Plaintiff's arguments in this reply because the arguments are repetitive and have already been adequately addressed in Federal Defendants' opening brief. Federal Defendants do not waive any of their defenses or arguments.

[2] Federal Defendants do not allege that Plaintiff's MMPA claims are similarly time-barred because NMFS issued the MMPA permit after publication of the 2020 biennial specifications in the Federal Register, unlike the BiOp that NMFS issued before publication of the specifications.

specifications, regulations that implement the Groundfish FMP, were issued on December 11, 2020. *See* 85 Fed. Reg. 79,880 (Dec. 11, 2020). Nor does Plaintiff deny that it waited to file suit until January 9, 2022—more than a year after the biennial specifications were issued and well after expiration of the 30-day statute of limitations period. Unsurprisingly, Plaintiff argues that its claims are not time-barred. But none of Plaintiff's arguments have merit.

First, contrary to Plaintiff's argument (Plaintiff's Reply, ECF 284 at 9), Federal Defendants are not rewriting Plaintiff's requested relief, but rather recognizing what Plaintiff itself has stated on two separate occasions: that Plaintiff believes vacatur of the BiOp "will ensure humpback whales are protected from deadly entanglements in the pot fishery during remand." *Id.* at 15; *see also* Plaintiff's Brief, ECF 282 at 25 (arguing that "vacatur will ensure imperiled humpback whales are protected from entanglements in the pot fishery while the agency undertakes new analyses"). Plaintiff has not explained, and Federal Defendants are not aware of, any steps that could be taken short of closing the sablefish pot gear fishery to ensure that deadly entanglements of humpback whales would not occur.[3] *See* Plaintiff's Reply, ECF 284 at 15. There is no question that closure of the fishery would required modification of the 2020 biennial specifications, which establish annual catch limits for species that are being fished, and allocate the annual catch limit to different sectors of the fishery. *See* BiOp 000093; 50 C.F.R. 600.310(f)(1)(iii) (defining annual catch limit). Thus, it is immaterial that "Plaintiff has not requested an MSA regulation." *See* Plaintiff's Reply, ECF 284 at 9. Plaintiff's requested relief would require a change to an MSA regulation implementing an FMP, directly implicating both the MSA and the MSA's statute of limitations provision. *See Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 944 (9th Cir. 2006) ("[I]nvocation of the magic words, 'the Magnuson Act,' is not a predicate to application

---

[3] Plaintiff's assertion that NMFS could take action to protect humpback whales from deadly entanglements, "which it could do in numerous ways that do not involve the MSA, such as by using its emergency authority under the MMPA," is a red herring. Plaintiff's Reply, ECF 284 at 9. Before NMFS can use its emergency authority under the MMPA, the agency must find that the incidental M/SI from commercial fisheries "is having, or is likely to have, an immediate and significant adverse impact on a stock or species." 16 U.S.C. § 1387(g). But, as NMFS made clear, the sablefish pot gear fishery has a negligible impact on the CA/OR/WA stock of humpback whales. MPA 000019. Tellingly, Plaintiff has failed to identify any of the other "numerous" ways in which NMFS could act.

of § 1855(f) if the substance of the challenge is to the regulations themselves.").

Second, Plaintiff argues that its ESA claims do not fall within the class of claims that the Ninth Circuit held to be time-barred in *Turtle Island Restoration Network*, 438 F.3d 937. *See* Plaintiff's Reply, ECF 284 at 7-9. But the similarities between the claims and arguments in both cases are apparent. In *Turtle Island*, the plaintiff alleged that NMFS had violated ESA Section 7, asserting "that this claim [] is directed at an agency action—the issuance of an Incidental Take Statement—separate and apart from the regulations" modifying an FMP that opened a fishery. 438 F.3d at 944-45. However, the Court found that the plaintiff's complaint demonstrated it intended to challenge the regulations. *Id.* Here too, Plaintiff claims that the issuance of the BiOp is separate from the 2020 biennial specifications. Plaintiff's Reply, ECF 284 at 8. But Plaintiff has made repeated references to NMFS's "authorization and management" of the sablefish pot gear fishery in its complaint (Complaint, ECF 1 ¶ 8, 59, 135)[4] and stated in two different briefs that vacatur of the BiOp will ensure that humpback whales are not entangled—something that can happen only if the fishery is closed. *See supra* at 2.

Third, Plaintiff attempts to differentiate *Turtle Island* by arguing that the BiOp does not analyze a new MSA regulation, but rather the continuing implementation of the Groundfish FMP. Plaintiff's Reply, ECF 284 at 8. Plaintiff misses the point. The BiOp evaluates the continuing authorization and implementation of the Groundfish FMP, which is implemented through MSA regulations, including the 2020 biennial specifications.[5] Whether Plaintiff challenges an MSA

---

[4] Plaintiff also claims that NMFS can "authorize and manage" the sablefish pot gear fishery under the MMPA and the ESA. Plaintiff's Reply, ECF 284 at 9. Under the ESA, NMFS determines whether a proposed action (here, the continued authorization of the fishery) is likely to jeopardize listed species or adversely impacts the species' critical habitat. 16 U.S.C. § 1536(a)(2). Both the ESA and MMPA allow NMFS to issue incidental take permits if certain criteria are met. *Id.* § 1539; *id.* § 1371(a)(5)(E)(i). But it is NMFS's actions pursuant to the MSA that authorize a fishery. *See id.* §§ 1854-55.

[5] Plaintiff asserts that it filed its lawsuit within 30 days of two other regulations that implement the Groundfish FMP, but it "does not challenge those regulations either." Plaintiff's Reply, ECF 284 at 8 n.3. While Federal Defendants appreciate that concession, it does not change the facts: (1) Plaintiff seeks to close the fishery; (2) such relief would require modification of the 2020 biennial specifications that were implemented pursuant to the FMP; and (3) this directly implicates the MSA's 30-day statute of limitations provision.

regulation implementing an FMP that opens a fishery, closes a fishery, or continues to authorize a fishery, or whether the BiOp analyzes only a "new MSA regulation" or results from a reinitiated consultation is irrelevant: it is the challenge to an MSA regulation that subjects a lawsuit to the MSA's statute of limitations provision. *See Turtle Island Restoration Network*, 438 F.3d at 945 (challenging re-opening of a fishery); *Blue Water Fishermen's Ass'n v. NMFS*, 158 F. Supp. 2d 118, 119-21 (D. Mass. 2001) (challenging closing of a fishery). Here, by opposing the "authorization and management" of the sablefish pot gear fishery, and seeking relief that would close the fishery, Plaintiff is clearly challenging the underlying fishery action, which is implemented through MSA regulations.

In sum, because Plaintiff's ESA claims relating to the BiOp are untimely under the MSA's judicial review provision, they must be dismissed.

## II.   NMFS Complied with the ESA

Even if the Court finds that Plaintiff's ESA claims are not time-barred under the MSA, the claims still fail on the merits. NMFS considered all relevant factors, individually and cumulatively, before making its decision that the ongoing implementation of the groundfish fishery is not likely to adversely affect ESA-listed humpback whales. NMFS also included the reasonable and prudent measures ("RPMs") that NMFS thought were necessary or appropriate to minimize take. Additionally, NMFS considered the best scientific information available when analyzing the humpback whale population.[6]

### A.   NMFS Examined All Relevant Factors Before Making its No Jeopardy Conclusion

As explained in Federal Defendants' opening brief, and even more thoroughly explained in the BiOp itself, NMFS examined all relevant factors before making its no jeopardy determination. Opening Brief, ECF 293 at 9-13; BiOp 000106-146. Using the best scientific information available, NMFS was able to quantitatively determine the M/SI stemming from the environmental baseline (including entanglements from commercial fisheries and ship strikes) and the effects of the continued operation of the groundfish fishery. BiOp 000143-46. After adding

---

[6] NMFS's incidental take statement is also lawful. *See* Opening Brief, ECF 283 at 13-15.

these together, NMFS applied this information to the status of the species, concluding that the annual maximum impact from all human-caused M/SI for the Mexico and Central America DPS would be 0.23% of the population (rounding up, 16 whales out of 6,724) and 0.53% of the population (10 whales out of 1,876), respectively. BiOp 000144-45. Based on this quantitative information, NMFS made a qualitative determination: that the groundfish fishery is not likely to jeopardize the continued existence of the ESA-listed Central America and Mexico DPSs. BiOp 000144-146.

Plaintiff turns a blind eye to most of NMFS's detailed and reasonable explanations and calculations, focusing myopically on two points: (1) whether NMFS's estimate that the annual maximum impact from all human-caused M/SI is less than one percent of the population for each DPS is called into question because of NMFS's statement that the environmental baseline could be underestimated; and (2) Plaintiff's belief that NMFS's no jeopardy conclusion was based on a "comparative approach." Plaintiff's Reply, ECF 284 at 11.

To the first point, NMFS recognized in the BiOp that the environmental baseline "may be underestimated to some degree." BiOp 000144-45. For example, an entanglement may go unobserved if the humpback whale swims away with fishing gear or the entanglement occurs far off shore. BiOp 000122. While acknowledging these limitations, NMFS could still reasonably estimate the annual maximum impact from the proposed action coupled with the environmental baseline for the Central America and Mexico DPSs based on the data the agency had. *See* BiOp 000144-46. NMFS clearly did not "entirely fail[] to consider an important aspect of the problem" or "offer[] an explanation for its decision that runs counter to the evidence before the agency." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Instead, it candidly evaluated the admittedly imperfect, but best available, information and used its scientific expertise to draw reasonable conclusions from it. This is all the ESA requires.[7] *See San Luis &*

---

[7] Plaintiff's argument that NMFS underestimated ship strikes (Plaintiff's Reply, ECF 284 at 10), fails for the same reason: NMFS acknowledged that the environmental baseline, including ship strikes, may be underestimated. *See* BiOp 000144-45; BiOp 000122-24. Plaintiff's citation to *Cook Inletkeeper v. Raimondo*, 533 F. Supp. 3d 739 (D. Alaska 2021) is also inapt. Plaintiff's Reply, ECF 284 at 10. In *Cook Inletkeeper*, the BiOp "did not address the effects on beluga whales that are closer to the tugboats, nor explain why beluga whales are not expected to be encountered at

*Delta-Mendota Water Authority v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (discussing the best available science requirement).

As for the second point, NMFS's jeopardy analysis was not dependent on a comparative approach. NMFS did compare the M/SI from the groundfish fishery relative to other sources of human-caused M/SI to understand the impacts of the fishery on ESA-listed humpback whales. BiOp 000144-146. But its final no jeopardy conclusion reaches a qualitative determination based on the impacts from the fishery **and** the environmental baseline together on the status of the species. BiOp 000144 ("Given the current trajectory of Mexico DPS humpback whales, it does not appear that current levels of impact from the PCGF fishery, in addition to the current levels of other impacts that are anticipated to continue to occur, is likely to prohibit continued population growth toward recovery by the Mexico DPS of humpback whales."); BiOp 000145-46 (reaching same conclusion for Central America DPS). This is squarely in-line with NMFS's ESA obligations. *See* 50 C.F.R. § 402.14(g)(4).

**B.    The Reasonable and Prudent Measures in the Incidental Take Statement Comply with the ESA**

As required by the ESA, NMFS included an RPM in the ITS that the agency felt was "necessary or appropriate" to minimize take. *See* 16 U.S.C. § 1536(b)(4)(C); BiOp 000148-49. Plaintiff asserts "that NMFS cannot claim that its RPM is sufficient by pointing to a measure that no longer exists": the Groundfish Endangered Species Workgroup. ECF 284 at 12. To clarify, the RPM included in the BiOp is what NMFS determined was necessary or appropriate to minimize take. But as a practical matter, the Group remains in effect (it is both required by RPMs in biological opinions for other ESA-listed species and is now an established and active advisory group to the Pacific Fishery Management Council) and continues to make recommendations regarding humpback whales. ER 00108-112. Because NMFS was aware of the ongoing work of the Group, including for humpback whales, NMFS did include Term and Condition 2 in the ITS, requiring NMFS to review the Terms of Reference for the Group. BiOp 000149.

---

closer distances." 533 F. Supp. 3d at 763. Here, the BiOp did, in fact, consider ship strikes. BiOp 000122-24.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**C.** **NMFS Considered the Best Available Science Regarding Whale Populations**

NMFS used the best scientific information available, including the MMPA stock assessment and the most recent estimate of the abundance of humpback whales along the U.S. West Coast available at the time (Calambokidis and Barlow 2020, BiOp 001152-65), to estimate that there are approximately 1,876 whales in the Central America DPS and 6,724 in the Mexico DPS. BiOp 000107-08; 000111-13. Plaintiff takes issue with NMFS's conclusion that the 2017 Wade study by itself did not represent the best scientific information available, as well as the agency's use of the MMPA stock assessment and other more recent scientific information regarding humpback whale populations. Plaintiff's Reply, ECF 284 at 13-14. But the agency's use of data, and the conclusions it drew from that data, is reasonable.

As explained in the BiOp, NMFS did not take the 2017 Wade study at face value. "Because these estimates are >8 years old, and humpback whales in the Pacific have recently experienced positive growth, they are not considered a reliable estimate of current abundance." BiOp 000111 (citing NOAA 2016; Carretta et al. 2020). NMFS instead used the population and distribution estimates from the Wade study, information from the more recent MMPA stock assessment report showing that the CA/OR/WA stock of humpback whales has been increasing about 6-7 percent annually since 2006, and the 2020 Calambokidis and Barlow stock-specific study suggesting that there are 4,973 humpback whales off the U.S. West Coast, to arrive at its population estimate. BiOp 000107-08; BiOp 000111-13. Given the lack of updated current DPS specific abundance information, NMFS used its scientific expertise to develop a conservative population abundance estimate for each DPS. BiOp 000113-000114.

Plaintiff claims that NMFS's "line of reasoning [that the species-specific abundance estimates are not current] was debunked by the agency itself in its humpback whale DPS listing decision." Plaintiff's Reply, ECF 284 at 13 (citing 81 Fed. Reg. 62,260, 62,278 (Sep. 8, 2016)). However, Plaintiff's argument is unclear as the Federal Register notice Plaintiff cites discusses the West Indies DPS in the Atlantic Ocean, which is not at issue in this case, refers to data that does not pertain to either the Central America or Mexico DPSs, and confirms that in ESA listing decisions NMFS used the best scientific and commercial information available—just as NMFS

did here. 81 Fed. Reg. at 62,278.

NMFS decision to use the MMPA stock assessment (in addition to other scientific information) for its population abundance estimate was also reasonable. *See supra* at 6. While the MMPA stock assessment pertains to the CA/OR/WA stock, including both the ESA-listed and non-ESA listed DPSs, the BiOp reconciled what was known about each DPS, including prior DPS population estimates, geographic distribution and foraging habits, with the MMPA stock assessment information to develop conservative estimates for each ESA-listed DPS. BiOp 000107-114.

Plaintiff relies on *Alaska v. Lubchenco*, 723 F.3d 1043, 1052 (9th Cir. 2013), to attack NMFS's use of the MMPA stock assessment, but Plaintiff's reliance is misplaced. Nowhere in the BiOp, or briefing, does NMFS assert "that the increase in unlisted humpbacks in the North Pacific Ocean can indicate whether smaller endangered and threatened DPSs are in jeopardy of extinction." Plaintiff's Reply, ECF 284 at 14 (providing no citation to support its argument). NMFS did use information from the most recent MMPA stock assessment, the 2020 Calambokidis and Barlow study, along with information from 2017 Wade study and other studies, to estimate the abundance of each ESA-listed humpback whale DPS. BiOp 000107-08; BiOp 000111-13.

### III. NMFS Appropriately Relied on the BiOp

Plaintiff contends that NMFS, as the action agency, erred in relying on the BiOp to authorize the fishery. *See* Plaintiff's Reply, ECF 284 at 13. Just by bringing this claim, Plaintiff has shown its intention to challenge NMFS's authorization of the sablefish pot gear fishery. Plaintiff's ESA claims, including this one, must fail because they are time-barred by the MSA. 16 U.S.C. § 1855(f). But to the extent the Court reaches the ESA claims, this claim also fails on the merits.

Plaintiff asserts that NMFS (as the action agency) violated ESA Section 7 by relying on the BiOp (Plaintiff's Reply, ECF 284 at 14), but this argument is premised on the mistaken conclusions about the BiOp. NMFS's BiOp represented a thorough and reasoned analysis of the effects on the impacts from the fishery and the environmental baseline together on the status of the species. *See supra* at 4-7; *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898

F.2d 1410, 1415-16 (9th Cir. 1990) (holding that the action agency did not act arbitrarily and capriciously in its reliance on a valid BiOp). Moreover, "even when [a BiOp] is based on 'admittedly weak' information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no 'new' information--i.e., information the [consulting agency] did not take into account--which challenges the opinion's conclusions." *Pyramid Lake*, 898 F.2d at 1415. Plaintiff has not put forth any new information NMFS did not take into account. Thus, NMFS satisfied its substantive duty under the ESA. *See id.* at 1416.

For these reasons, the Court should grant summary judgment in Federal Defendants' favor on the ESA claims.

## IV.    NMFS Complied with the MMPA

### A.    NMFS Considered Human-Caused M/SI from All Sources when Making its Negligible Impact Determination

Plaintiff doubles down on its argument that NMFS only considered the level of humpback whale mortality from the sablefish pot gear fishery, rather than from all commercial fisheries, when making its negligible impact determination. Plaintiff's Brief, ECF 282 at 8; Plaintiff's Reply, ECF 284 at 1-2. But Plaintiff continues to ignore the facts: NMFS considered the maximum total amount of human-caused M/SI from all sources, including state fisheries and commercial fisheries, when making its determination. MMPA 000017-23. Following the two-tiered approach outlined in the agency's directive for determining negligible impact (MMPA 001219-39), NMFS assumed for the first tier of its analysis that the total amount of human-caused M/SI from all sources for the CA/OR/WA stock of humpback whales exceeds the total negligible impact threshold ("$NIT_T$") and is thus not negligible. MMPA 000017-23. This is the most protective approach that NMFS can take because there are only two possible conclusions the agency can reach at the end of its first-tier analysis: the total amount of human-caused M/SI for the stock either exceeds the $NIT_T$ (meaning it is not negligible and a second-tier analysis examining the fishery at issue is required) or it does not (meaning it is negligible and the agency can issue a negligible impact determination to any fishery immediately). MMPA 001219-39.

Plaintiff's theory that NMFS's two-tiered analysis "could authorize fisheries to kill the

remaining members of an endangered species, provided the level of mortality in each fishery on its own would have a negligible impact" is incorrect. Plaintiff's Reply, ECF 284 at 3. During the second-tier analysis, NMFS determines the negligible impact threshold for a single fishery ("NIT$_s$") using a formula that factors in the minimum abundance estimate for the species or stock, the maximum productivity rate, and, importantly, no more than a 1% delay in the time it will take for a species to recover. MMPA 001222-23. NMFS specifically chose a 1% delay in recovery time rather than a higher percentage "to provide reasonable assurance that the contribution of M/SI from any individual commercial fishery to the Total M/SI would not have a significant effect on the population dynamics of any marine mammal stock." MMPA 001237; *see also id.* (stating that it is "virtually impossible to detect the difference between a population recovering with no human-caused mortality and one recovering with human-caused mortality at a level expected to cause a 1% delay or less in the time to recovery"). This formula ensures that the NIT$_s$ equals a "level[] of removal that result[s] in a small or undetectable difference[] to the population dynamics of the stock." *See* MMPA 001220. Thus, if the human-caused M/SI from a single fishery is below this amount, the fishery will have a virtually undetectable change in the population of the stock. NMFS has and will continued to conduct second-tier analyses as was done here for other fisheries, as it employs a sound and robust approach to utilize the best scientific information available to conduct negligible impact analyses that account for any changes to the stock resulting from previous incidental take permits. NMFS's directive comports with the MMPA and will not result in the piecemeal extinction scenario that Plaintiff has envisioned.[8]

      Plaintiff's two remaining arguments rely on this same faulty premise: that NMFS did not

---

[8] As a preliminary matter, Plaintiff did not challenge the directive in its complaint, and cannot do so now. *See* Complaint, ECF 1; *Newton v. American Debit Services, Inc.*, 75 F. Supp. 3d 1048, 1063 (N.D. Cal. 2014) ("As the Ninth Circuit has repeatedly held, 'summary judgment is not a procedural second chance to flesh out inadequate pleadings.'") (citations omitted). Furthermore, it is misleading to suggest that NMFS allows the intentional killing of CA/OR/WA humpback whales. *See* Plaintiff's Reply, ECF 284 at 3 (stating that NMFS "authorize[s] fisheries to kill" CA/OR/WA humpback whales). NMFS provides commercial fisheries with an MMPA permit that allows the **incidental take** (i.e., M/SI) of CA/OR/WA humpback whales for three years provided certain conditions are met, including that the incidental take have a negligible impact on the species. 16 U.S.C. § 1371(a)(5)(E)(i).

consider human-caused M/SI from all sources when making its negligible impact determinations. First, Plaintiff incorrectly asserts that NMFS's directive "conflicts" with the agency's previous approach to making negligible impact determinations because NMFS previously "looked at the mortality level from U.S. commercial fisheries in the aggregate." Plaintiff's Reply, ECF 284 at 2. But NMFS considered the total human caused M/SI from all commercial fisheries under both approaches. It is **how** NMFS considers these data that has changed. Previously, NMFS attempted to precisely calculate the amount of human caused M/SI to transboundary stocks and determine whether the M/SI was negligible. *See* MMPA 001235. Now, NMFS assumes that the amount of human caused M/SI for transboundary stocks is not negligible because NMFS "cannot know for certain the M/SI that occurs outside of U.S. waters." MMPA 001227. Contrary to Plaintiff's argument, NMFS has fully explained why it decided to change its former approach. *See id.*; MMPA 001235-38 (listing the issues that "proved problematic" when conducting negligible impact analysis with the previous approach, explaining why a new approach was necessary, and discussing the development of the two-tiered approach).[9] NMFS did not need to detail the rationale for the new approach in the negligible impact determination analysis for sablefish pot gear fishery itself, as NMFS was following the approach that the agency adopted, after taking public comment, and had made publicly available.

    Second, Plaintiff argues that NMFS did not consider state-managed commercial fisheries when making its determination. Plaintiff's Reply, ECF 284 at 2. However, as explained above, NMFS assumed that the human-caused M/SI from all sources—which would include state managed fisheries—was not negligible. MMPA 000017-23; *see also* MMPA 001224 (directive stating that the analyst "should . . . identify all U.S. commercial fisheries (including state- and federally-managed fisheries) that have incidental M/SI of ESA-listed marine mammal stocks in

---

[9] Plaintiff claims that its interpretation of "fisheries" in 16 U.S.C. § 1371(a)(5)(E)(i)(I) "makes more sense—and is more consistent with the conservation purposes of the MMPA." Plaintiff's Reply, ECF 284 at 2. Federal Defendants disagree (*see* Opening Brief, ECF 283 at 20-21), and note that Plaintiff concedes with its language that NMFS's interpretation does make "sense" and is "consistent with the conservation purposes of the MMPA." *See id.* Plaintiff simply prefers its interpretation.

the appropriate region(s)" when making a negligible impact determination).

**B.    NMFS is Not Required to Implement a Take Reduction Plan Prior to Issuing an MMPA Permit if there is Insufficient Funding Available**

Before NMFS can issue an MMPA permit for the incidental take of a marine mammal listed pursuant to the ESA, the agency must determine that "where required under Section 1387 of this title . . . a take reduction plan has been developed or is being developed." 16 U.S.C. § 1371(a)(5)(E)(i). In turn, 16 U.S.C. § 1387(f)(1) states that NMFS "shall develop and implement a take reduction plan designed to assist in the recovery or depletion of each strategic stock which interacts with a commercial fishery listed under subsection (c)(1)(A)(i) or (ii) [fisheries that have incidental or occasional incidental M/SI of marine mammals, respectively]." *Id.* § 1387(f)(1). However, just two subsections later, the MMPA provides that: "If there is insufficient funding available to develop and implement a take reduction plan for all such stocks that interact with commercial fisheries listed under subsection (c)(1)(A) (i) or (ii), the Secretary shall give highest priority to the development and implementation of take reduction plans for species or stocks" that meet certain criteria. *Id.* § 1387(f)(3). These provisions allow NMFS the flexibility to set priorities for developing take reduction plans, or even "not develop a reduction plan at all if there is insufficient funds." *Hui Kohola I Kohola v. NMFS*, 669 F. Supp. 2d 1182, 1191 (D. Haw. 2009); *see also Strahan v. Linnon*, 967 F. Supp. 581, 590 n.9 (D. Mass. 1997).

Plaintiff argues that Congress was silent in 16 U.S.C. § 1371(a)(5)(E)(i) on the issue of whether NMFS may not develop or may defer development of a take reduction plan if there are insufficient funds. Plaintiff's Reply, ECF 284 at 4-5. Thus, according to Plaintiff, NMFS cannot issue an MMPA permit without a take reduction plan being developed or in development—even if the agency lacks the funds to do so. *See id.* However, the statute does not support Plaintiff's reading. 16 U.S.C. § 1371(a)(5)(E)(i) specifically refers to 16 U.S.C. § 1387, which outlines the entire take reduction plan process, including under what circumstances NMFS shall develop and implement a take reduction plan, who develops a take reduction plan, what a take reduction plan should include, **and** what to do if NMFS has insufficient funds available to develop such a plan. *See* 16 U.S.C. § 1371(a)(5)(E)(i); *id.* § 1387. Congress did not exclude any of those provisions

when drafting 16 U.S.C. § 1371(a)(5)(E)(i). Indeed, if Plaintiff's reading of 16 U.S.C. § 1371(a)(5)(E)(i) is correct, Congress was silent on all of the specific provisions in 16 U.S.C. § 1387, and NMFS would not have to comply with any of them when completing a take reduction plan for ESA-listed species. That cannot be what Congress, who carefully crafted the take reduction plan process, intended.

Plaintiff also asserts that its reading of 16 U.S.C. § 1371(a)(5)(E)(i) is correct because otherwise, "NMFS could forever escape the narrowly crafted limits on when it can authorize fisheries to kill endangered whales by saying the agency intends to develop a take reduction team at some unspecified point in the future." Plaintiff's Reply, ECF 284 at 6. Plaintiff's concern is unwarranted. 16 U.S.C. § 1387 provides a narrow circumstance in which NMFS can postpone developing a take reduction plan: when there is insufficient funding. And a plaintiff may file a lawsuit against NMFS alleging that the agency has sufficient funding to complete a take reduction plan. *See Hui Kahola I Kahola*, 669 F. Supp. 2d at 1189-90. However, under the MMPA, a plaintiff cannot successfully argue that NMFS lacks the discretion to defer developing a take reduction plan if the agency lacks sufficient funds to create one.

Plaintiff next argues that the only two opinions discussing the insufficient funds provision in the MMPA are "inapt." Plaintiff's Reply, ECF 284 at 4. However, both opinions are instructive. In *Strahan*, the plaintiff alleged that NMFS had not complied with the time limits set in the MMPA for creating a take reduction plan and that NMFS did, in fact, have sufficient funding to develop the plan. 967 F. Supp. at 590, n.9. The court found that plaintiff's claim was moot because a take reduction team had been formed, but noted that the claim would fail in any event "because of the great degree of flexibility afforded to defendants by" 16 U.S.C. § 1387(f)(3) to set priorities for completing take reduction plans. *Id.* at n.9. The plaintiffs in *Hui Kohola I Kohola* argued that NMFS had not formed a take reduction team to develop a take reduction plan for Hawaii's false killer whales and that it had the funds to do so. 669 F. Supp. 2d at 1187-1190. The court found that "Congress expressly alleviated NMFS's obligation to create take reduction plans in the absence of

funding." *Id* at 1190.[10] These cases support Federal Defendants' argument that NMFS is not required to develop a take reduction plan if it lacks the funding to do so, as is the case for the CA/OR/WA stock of humpback whales. 86 Fed. Reg. at 69,629-31 (Dec. 8, 2021); MMPA 000012. Plaintiff attempts to distinguish these cases because neither court mentions 16 U.S.C. § 1371(a)(5)(E)(i). Plaintiff is creating two regimes within the MMPA: one for ESA-listed species where (presumably) all of the provisions of 16 U.S.C. § 1387 apply except for the provision regarding insufficient funds, and a second regime for other marine mammals where all of the provisions of 16 U.S.C. § 1387 apply. Plaintiff's dichotomy is not supported by the plain language of the MMPA. *See* 16 U.S.C. § 1371(a)(5)(E)(i) (explicitly referencing 16 U.S.C. § 1387).

### C. NMFS Reasonably Analyzed the CA/OR/WA Stock of Humpback Whales in its Negligible Impact Determination

Finally, Plaintiff argues that NMFS did not use the best available science when making its negligible impact determination because NMFS analyzed the CA/OR/WA stock as a whole, rather than only the two ESA-listed DPSs of humpback whales. Plaintiff's Reply, ECF 284 at 6-7. Even though Plaintiff may wish it so for purposes of this case, the ESA and MMPA are not the same and cannot be treated as such. Under the ESA, NMFS manages species, subspecies, or DPSs. But under the MMPA, NMFS manages stocks. *See* MMPA 001240. Therefore, when making determinations pursuant to the MMPA, NMFS must make determinations for the MMPA stock and not the ESA DPS.

Following the 1994 amendments to the MMPA, NMFS designated the CA/OR/WA stock of humpback whales in 1995 in its first stock assessment reports. NMFS has maintained and updated the stock assessment since that time. *See, e.g.*, BiOp 001763-002147. In 2016, NMFS revised the ESA listing of the entire humpback whale species into 14 DPSs. 81 Fed. Reg. 62,259. Given the new information that informed the ESA listing decision, as well as information that has become available since (e.g., Calambokidis and Barlow 2020), NMFS is currently revising humpback whale stock structure under the MMPA. 86 Fed. Reg. at 69,631. However, until such

---

[10] On appeal, the Ninth Circuit vacated the district court's judgment after deciding that the case was moot. *Hui Malama I Kohola v. NMFS*, 439 Fed. Appx. 618 (9th Cir. 2011). The Ninth Circuit did not discuss the substance of the district court's opinion.

time as NMFS revises the stock designation pursuant to its Procedural Directive 02-204-03 (MMPA 001240-48), the MMPA requires NMFS to make determinations based on the current stock structure and the best scientific information available that pertains to that stock. *See, e.g.*, 16 U.S.C. § 1836(a) (requiring NMFS to prepare a stock assessment report "for each marine mammal stock which occurs in waters under the jurisdiction of the United States"). For these reasons, it was rational for NMFS to conclude that it "cannot manage one portion of an MMPA stock as ESA-listed and another portion of a stock as not ESA-listed," as Plaintiff's demand, and analyze the CA/OR/WA stock in the negligible impact determination. *See* 86 Fed. Reg. 58,641 (Oct. 22, 2021).

Importantly, although Plaintiff complains that the Hawaii DPS no longer fits the definition of "stock" under the MMPA, Plaintiff has not brought a claim challenging NMFS's designation of the CA/OR/WA stock. *See* Plaintiff's Reply, ECF 284 at 6-7; Complaint, ECF 1. Nor could it, given that such a challenge would be decades past the statute of limitations. 28 U.S.C. § 2401.

## V.      No Remedy is Necessary

In the event the Court rules for Plaintiff on any claim, Federal Defendants reiterate their request that the parties be allowed to provide separate briefing on remedy. Although Plaintiff requests vacatur of the BiOp and MMPA permit, not every unlawful agency action requires vacatur. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (outlining two factors courts weigh when deciding whether to remand to an agency without vacatur). Federal Defendants would like the opportunity to brief those two factors in light of any errors identified by the Court. Furthermore, in seeking relief, Plaintiff alleges that "vacatur will ensure humpback whales are protected from deadly entanglements in the pot fishery during remand." As outlined above, NMFS is not aware of any likely action, short of shutting down the fishery, that would achieve this form of relief. In the event the Court finds Plaintiff's ESA claims are not time-barred, NMFS would like the opportunity to brief on the harm that would flow from the implied relief Plaintiff is seeking.

## CONCLUSION

For these reasons, Federal Defendants' motion for summary judgment should be granted and Plaintiff's motion should be denied.

Dated: October 13, 2022                Respectfully submitted,


                                       TODD KIM, Assistant Attorney General
                                       S. JAY GOVINDAN, Acting Chief
                                       MEREDITH L. FLAX, Assistant Chief

                                       */s/ Kaitlyn Poirier*
                                       KAITLYN POIRIER, Trial Attorney
                                       U.S. Department of Justice
                                       Environment and Natural Resources Division
                                       Wildlife and Marine Resources Section
                                       Ben Franklin Station, P.O. Box 7611
                                       Washington, D.C. 20044-7611
                                       (202) 307-6623 (tel)
                                       (202) 305-0275 (fax)
                                       kaitlyn.poirier@usdoj.gov

                                       Attorneys for Federal Defendants